**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

FOOD MARKETPLACE, INC., et al.,

*Petitioners*,

*v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY, MICHAEL S. REGAN

*Respondents.*

On Petition for Review of Final Agency Action
of the United States Environmental Protection Agency

**PETITIONERS' OPENING BRIEF**

Matthew W. Morrison
Sidney L. Fowler
Shelby L. Dyl
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
(202) 663-8036

Elbert Lin
Kevin S. Elliker
David N. Goldman
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200

Emily Huang
PILLSBURY WINTHROP SHAW
PITTMAN LLP
725 South Figueroa St., 36th Fl.
Los Angeles, CA 92037
(213) 488-7100

April 1, 2024

# <u>CERTIFICATE OF CORPORATE DISCLOSURE</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

1. **Food Marketplace, Inc. (FMI—The Food Industry Association)** consists of members throughout the food industry, including retailers who sell to customers, producers who supply food, and companies providing support services. FMI does not have a parent corporation and no publicly held corporation has a 10% or greater ownership in it.

2. **The American Frozen Food Institute** consists of members of the frozen food and beverage industry, including processors, retailers, and companies providing support services. The American Frozen Food Institute does not have a parent corporation and no publicly held corporation has a 10% or greater ownership in it.

3. **The National Grocers Association** consists of independent privately owned grocers and the wholesale-distributors that service them. The National Grocers Association does not have a parent corporation and no publicly held corporation has a 10% or greater ownership in it.

Date: April 1, 2024                              /s/ Elbert Lin

Elbert Lin
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, Petitioners Food Marketplace, Inc. (FMI, The Food Industry Association), National Grocers Association, and American Frozen Food Institute, through undersigned counsel, hereby certify the following as to parties, rulings, and related proceedings in this case.

## Parties, Intervenors, and Amici

### A. Petitioners

FMI, The Food Industry Association; National Grocers Association; and American Frozen Food Institute.

### B. Respondent

United States Environmental Protection Agency ("EPA").

### C. Intervenors for Respondent

None.

### D. Amici

None.

## Rulings Under Review

The ruling under review is EPA's final rule entitled *Restrictions on the Use of Certain Hydrofluorocarbons Under the American Innovation and Manufacturing Act of 2020*, published on October 24, 2023, at 88 Fed. Reg. 73098.

**Related Cases**

*Semiconductor Equipment and Materials International v. EPA*, Case No. 23-1344.

*Chemours Company FC, LLC v. EPA*, Case No. 23-1345.

Date: April 1, 2024                                    Respectfully submitted,


/s/ Elbert Lin
Elbert Lin
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200

# TABLE OF CONTENTS

CERTIFICATE OF CORPORATE DISCLOSURE ................................................. ii

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... iv

TABLE OF CONTENTS........................................................................... vi

TABLE OF AUTHORITIES ................................................................. viii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS................................ xiii

INTRODUCTION ..................................................................................1

JURISDICTION.....................................................................................4

STATEMENT OF ISSUES .......................................................................4

STATUTES AND REGULATIONS.............................................................5

STATEMENT OF THE CASE....................................................................5

   I.   The retail food refrigeration industry depends on constant, reliable refrigeration and temperature control........................................................5

   II.   The American Innovation and Manufacturing ("AIM") Act of 2020.............9

   III.   The Technology Transition Rule ...........................................................11

SUMMARY OF THE ARGUMENT .......................................................14

STANDARD OF REVIEW ...................................................................19

STANDING ......................................................................................21

ARGUMENT ....................................................................................24

   I.   EPA interpreted "availability" contrary to the word's plain meaning, which is confirmed by statutory context. .......................................................24

   II.   EPA's conclusion that sufficient substitutes would be "available" by the compliance deadlines is arbitrary and capricious.................................27

      A.  A2Ls .........................................................................................30

      B.  A3s.............................................................................................43

      C.  Ammonia (R-717) .....................................................................46

      D.  A1s (R-471A and transcritical CO2) .......................................48

   III.   Even if transcritical $CO_2$ is available, EPA failed to adequately consider the "overall economic costs and environmental impacts" of a nationwide transition to transcritical $CO_2$ in two equipment systems. ...................54

A. EPA ignored the significant environmental impacts of a nationwide transition to transcritical $CO_2$ for two equipment systems. .............................54

B. EPA failed to accurately assess the economic consequences of a nationwide transition to transcritical $CO_2$ systems for two equipment systems... ....................................................................................................57

IV. EPA failed to adequately consider "the remaining phase-down period." ..... ....................................................................................................60

V. This Court should vacate the portions of the Final Rule setting the challenged compliance deadlines. ......................................................62

CONCLUSION .......................................................................................64

CERTIFICATE OF COMPLIANCE ........................................................65

CERTIFICATE OF SERVICE ................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) .................................................................61, 62

*Am. Great Lakes Ports Ass'n v. Schultz,*
    962 F.3d 510 (D.C. Cir. 2020) ...................................................................61

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy,*
    22 F.4th 1018 (D.C. Cir. 2022) .................................................................53

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.,*
    724 F.3d 243 (D.C. Cir. 2013) .............................................................22, 23

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ............................................................................25, 26

*Diné Citizens Against Ruining Our Env't v. Haaland,*
    59 F.4th 1016 (10th Cir. 2023) ..................................................................52

*Heating, Air Conditioning & Refrigeration Distributors Int'l v. EPA,*
    71 F.4th 59 (D.C. Cir. 2023) ..............................................9, 10, 20, 56

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ............................................................................22, 23

*In re Murray Energy Corp.,*
    788 F.3d 330 (D.C. Cir. 2015) .............................................................38, 41

*Int'l Ladies' Garment Workers' Union v. Donovan,*
    722 F.2d 795 (D.C. Cir. 1983) ...............................36, 37, 39, 42, 59

*K Mart Corp. v. Cartier, Inc.,*
    486 U.S. 281 (1988) ...................................................................................25

*Loper Bright Enterps. v. Raimondo,*
    No. 22-451 (U.S.) .......................................................................................26

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
　　70 F.4th 582 (D.C. Cir. 2023)........................................................23, 24

*Massachusetts v. EPA*,
　　549 U.S. 497 (2007)..........................................................................22

*MD/DC/DE Broads. Ass'n v. FCC*,
　　236 F.3d 13 (D.C. Cir.), *pet. for reh'g denied*, 253 F.3d 732 (D.C.
　　Cir. 2001) ...............................................................................29, 52, 53

*MD/DC/DE Broads. Ass'n v. FCC*,
　　, 253 F.3d 732 (D.C. Cir. 2001)................................................29, 53

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*,
　　463 U.S. 29 (1983)............................ 20, 21, 37, 49, 54, 56, 59

*Nat'l Lifeline Ass'n v. FCC*,
　　921 F.3d 1102 (D.C. Cir. 2019)....................................................20, 37

*New York v. EPA*,
　　964 F.3d 1214 (D.C. Cir. 2020)............................................................61

*Organized Vill. of Kake v. USDA*,
　　795 F.3d 956 (9th Cir. 2015) (en banc) ..............................................41

*Pharm. Research & Mfrs. of Am. v. FTC*,
　　790 F.3d 198 (D.C. Cir. 2015)..............................................................20

*Relentless, Inc. v. Dep't of Com.*,
　　No. 22-1219 (U.S.) ..............................................................................26

*Richardson v. Perales*,
　　402 U.S. 389 (1971)..............................................................................21

*Ross v. Blake*,
　　578 U.S. 632 (2016)................................................................24, 25, 36

*SEC v. Chenery Corp.*,
　　318 U.S. 80 (1943)................................................................21, 27, 53

*Spokeo, Inc. v. Robins*,
　　578 U.S. 330 (2016)..............................................................................22

*Tourus Records, Inc. v. DEA*,
   259 F.3d 731 (D.C. Cir. 2001)...........................................................45

**Statutes**

American Innovation and Manufacturing Act of 2020,
   Pub. L. No. 116-260, Div. S, §103, 134 Stat. 2255 (codified at 42
   U.S.C. §7675) .......... 1, 2, 3, 4, 5, 9, 15, 18, 19, 24, 25, 43, 53, 56, 59, 60, 61, 62

Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* .......................................................19, 61

42 U.S.C. §§

   1997e(a) ..................................................................................24

   7607(b)(1) .............................................................................4, 14

   7607(d)(9)(A) ..............................................................................20

   7607(d)(9)(C) ..............................................................................20

   7671a .......................................................................................9

   7671c .......................................................................................9

   7675(e)(1)(C) ..............................................................................10

   7675(e)(2)(B) ..............................................................................10

   7675(e)(2)(C) ..............................................................................10

   7675(e)(3)(A) ...............................................................................9

   7675(i) ....................................................................................11

   7675(i)(1) .................................................................................10

   7675(i)(4) ................................................................10, 15, 24, 53, 62

   7675(i)(4)(B)............................... 4, 11, 24, 25, 27, 32, 43, 44, 49, 50, 51, 52, 53

   7675(i)(4)(C)...........................................................5, 17, 53, 56, 59

   7675(i)(4)(D)................................................................5, 19, 60

7675(k)(1)(C).................................................................4, 14, 20

**Regulations**

40 C.F.R. §82.170(a)...............................................................12

40 C.F.R. §84.7(a)..............................................................10, 60

**Federal Register**

80 Fed. Reg. 19454, 19467 (Apr. 10, 2015) .........................................41

86 Fed. Reg. 55116 (Oct. 5, 2021) (codified at 40 C.F.R. §84.7) ...10, 13, 19, 60, 62

86 Fed. Reg. 55116 (Oct. 5, 2021).............................................9

87 Fed. Reg. 76738 (Dec. 15, 2022) ..............................................11

88 Fed. Reg. 1822 (Jan. 11, 2024) ...............................................33

88 Fed. Reg. 33722 (May 24, 2023) ..............................................37

88 Fed. Reg. 73098 (Oct. 24, 2023)..... 2, 3, 4, 13, 14, 15, 16, 17, 19, 22, 23, 25, 26, 27, 29, 30, 31, 32, 34, 35, 36, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62

**Miscellaneous**

Am. City & Cnty. Exch., *Balancing State & Local Government* 6 (Nov. 2023), https://alec.org/wp-content/uploads/2023/11/2023-ACCE-The-Balancing-Act_Web.pdf................................................31

*American Heritage Dictionary* (5th ed. 2012).........................................24

Climate-Friendly Supermarkets, *What's in your supermarket?* https://www.climatefriendlysupermarkets.org/map ...........................................52

EPA, *GreenChill Certified Store Achievements*, https://www.epa.gov/greenchill/greenchill-certified-store-achievements...................................................................52

EPA, *GreenChill Program*, https://www.epa.gov/greenchill................................51

EPA, *Our Current Understanding of the Human Health & Environmental Risks of PFAS*, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas ................33

EPA, *Phaseout of Class II Ozone-Depleting Substances*, https://www.epa.gov/ods-phaseout/phaseout-class-ii-ozone-depleting-substances ...................................................................43

ICC, *2024 International Building Code*, https://codes.iccsafe.org/content/IBC2024P1/preface#IBC2024P1_FmPREFACE_FMSecChapter1ScopeandAdministration ................................30

ICC, *Adoption Process by State: Revised June 2019*, https://www.iccsafe.org/wp-content/uploads/Code-Adoption-Process-by-State-June-2019.pdf .........................................39

*International Codes - Adoption by State (January 2024)*, https://www.iccsafe.org/wp-content/uploads/Master-I-Code-Adoption-Chart-Jan-2023.pdf (*IBC Adoption Chart*) ........................30

McQuillin, *The Law of Municipal Corporations* §§10:16, 10:18 (3d ed. Westlaw June 2023) ...................................................31

Mem. from David Uhlmann, EPA, to Reg'l Admin'rs, *FY 2024-2027 National Enforcement and Compliance Initiatives* (Aug. 17, 2023), https://www.epa.gov/system/files/documents/2023-08/fy2024-27necis.pdf ........................................................................33

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2020) ....................24

Samantha Slater, Air-Conditioning, Heating, and Refrigeration Institute, *HVACR and Watering Heating Industry Developments: Decarbonization, Heat Pumps & the Low Global Warming Potential Refrigerant* Transition, https://www.etcc-ca.com/sites/default/files/Decarb_Market-Samantha_Slater-Final.pdf ........................................................................37

So. Nev. Water Auth., *Understand laws and ordinances*, https://www.snwa.com/conservation/understand-laws-ordinances/index.html .........................................................55

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

AIM         The American Innovation and Manufacturing Act

AFFI        American Frozen Food Institute

CAA         Clean Air Act

CFC         Chlorofluorocarbon

EPA         United States Environmental Protection Agency

FMI         Food Marketplace, Inc. (FMI, The Food Industry Association)

GWP         Global warming potential

HCFC        Hydrochlorofluorocarbon

HFC         Hydrofluorocarbon

HVAC        Heating, ventilation, and air conditioning

ODS         Ozone-Depleting Substances

NGA         National Grocers Association

## **INTRODUCTION**

Reliable, constant temperature control is the cornerstone of America's retail food industry. A store's operational success hinges on its ability to maintain thousands of products at the required temperature, relying on refrigeration, as well as heating and air-conditioning equipment (commonly known as "HVAC"), that can be extraordinarily complex. That is why grocery stores and other food retailers typically need multiple years to design, procure, and install such equipment when building or remodeling stores.

But the refrigerants used in retail food refrigeration and HVAC equipment (and many other sectors) currently contain hydrofluorocarbons ("HFCs"), which have been found to contribute to global warming. So Congress passed the American Innovation and Manufacturing Act of 2020 (the "AIM Act") to curb the use of HFCs in an orderly, safe, and affordable transition. The AIM Act tasks EPA with issuing rules to slowly phase out HFCs in various sectors so that by 2036 HFC production and consumption are reduced by 85%.

EPA did not move slowly. In 2022, EPA issued a proposed rule that sought to restrict by January 1, 2025, a wide-range of HFC-based equipment, including various retail food refrigeration systems and commercial air conditioning and heat equipment. Petitioners—national trade associations with members in the food, beverage, and grocery industries—spoke up. Though they support EPA's efforts to

reduce HFCs, they explained that the 2025 deadline was not feasible. The industry needed substantially more time to ensure that the proposed substitute systems and equipment could be installed, as a legal and practical matter, and used safely and reliably.

EPA barged forward with the Final Rule at issue in this case. It kept the 2025 compliance deadline in place for some equipment. And though EPA extended the deadline for certain other relevant technologies, it did so only until 2026 and 2027—far short of the 2032 date that Petitioners had explained represented the earliest feasible deadline.

The Final Rule is both contrary to the AIM Act and arbitrary and capricious. First, EPA misinterpreted the AIM Act. The statute requires EPA to assess the "availability" of substitute technology—measured by several enumerated factors—before restricting the use of an HFC in a particular sector or subsector. In interpreting that statutory term, EPA took the position that so long as "many" of those factors "could feasibly be met," a substitute was "available." But that reading cannot be squared with the ordinary meaning of the word "available," nor with the surrounding statutory text.

Second, even accepting the Agency's reading of that term, EPA acted arbitrarily and capriciously by concluding that its proposed substitutes for retail food refrigeration and HVAC were "available." In some cases, the substitutes are not

even legal under local building codes. In others, there are not enough technicians who know how to safely install and repair this new and complex technology, and they do not have time to learn by the compliance deadlines. The Agency's responses failed to provide a reasoned explanation for rejecting these concerns. At best, only a fraction of the substitutes identified by EPA can reasonably be considered available. Yet the Agency premised its series of aggressive compliance deadlines on the availability of *all* the identified substitutes.

Third, EPA undertook a flawed analysis of the Final Rule's overall economic costs and environmental impacts—also a requirement of the AIM Act. The Agency failed to recognize that it was effectively requiring a nationwide transition to transcritical $CO_2$ in several subsectors in a very compressed timeframe. Consequently, EPA overlooked a variety of negative environmental impacts associated with transcritical $CO_2$, which may negate the potential environmental benefit from the reduction of HFCs. And the Agency's conclusion that the transition to substitute technologies would lower costs for grocery stores and consumers is incorrect when transcritical $CO_2$, which is significantly more expensive than HFC systems, is the only arguably viable option.

Finally, and at minimum, EPA acted arbitrarily and capriciously in failing to justify the difference between the aggressive timeline and the remaining phase-down period—another statutorily required consideration. The phase-down period

provides that HFCs must be reduced by 85% by 2036. The Final Rule effectively moved that timeline up by *nine years* for food refrigeration and HVAC. To the extent EPA gave some reasoned basis for its actions, it certainly did not offer enough to justify the nine-year acceleration.

This Court should grant the petition for review and vacate the Final Rule's challenged compliance deadlines.

## JURISDICTION

This Court has jurisdiction pursuant to 42 U.S.C. §§7607(b)(1) and 7675(k)(1)(C). Venue is appropriate because the Final Rule is nationally applicable. §7607(b)(1). Petitioners timely filed the Petition for Review on December 26, 2023. ECF #2033337.

## STATEMENT OF ISSUES

1. Did EPA misinterpret the AIM Act when it decided that, in carrying out its obligation to consider "the availability" of substitutes based on the statutory factors in 42 U.S.C. §7675(i)(4)(B), a substitute was available so long as "many" of those factors "could feasibly be met"?

2. Did EPA act arbitrarily and capriciously by setting compliance deadlines between January 1, 2025, and January 1, 2027, for the retail food refrigeration, cold storage warehouse, and residential and light commercial air conditioning and heat

pump sectors, notwithstanding evidence that numerous statutory factors in the AIM Act counsel against such aggressive deadlines?

3. Did EPA act arbitrarily and capriciously when it effectively mandated a nationwide transition to transcritical $CO_2$ systems for two equipment systems and did not factor in the "overall economic costs and environmental impacts" of such a transition under §7675(i)(4)(C)?

4. Did EPA act arbitrarily and capriciously when, despite the AIM Act's requirement that the Agency factor in "the remaining phase-down period," §7675(i)(4)(D), it insisted on imposing compliance deadlines nine years before the end of the phase-down period in the face of numerous barriers to compliance?

## STATUTES AND REGULATIONS

Relevant statutes and regulations appear in the Addendum.

## STATEMENT OF THE CASE

**I.    The retail food refrigeration industry depends on constant, reliable refrigeration and temperature control.**

Food retailers across the Nation share a need for continuous and reliable refrigeration.  JA_[EPA-HQ-OAR-2021-0643-0209("RILA").6].  Producers, cold storage warehouses, and grocery stores require refrigeration that is constant, dependable, and compliant with Federal, State and local food safety laws and regulations.  *See* JA_[RILA.6].

When refrigeration fails, the results can be catastrophic. Food can become unsafe, resulting in lost product that must be replaced at significant cost to the grocer and, ultimately, customers. JA_[RILA.6]. If refrigeration failure is not discovered before products are sold, food contamination can lead to illness. *See* JA_[RILA.6]. Prolonged refrigeration loss can even lead to store closures as the retail food sector operates at extremely low profit margins—roughly 3%. JA_[RILA.10]. Such closures can disrupt entire communities, particularly in rural or socioeconomically disadvantaged areas. JA_[RILA.12].

As a consequence, procuring and maintaining refrigeration represents an outsized portion of food retailers' capital costs and operating expenses. A new supermarket will often spend between $2.5 and 5.5 million on its refrigeration system, and energy and HVAC/refrigeration costs per store often account for 1.25%-2.5% of its operating budget. Anderson Decl. ¶5. Moreover, the store planning, design, and permitting cannot reasonably start until a refrigeration technology has been selected. *See* JA_[RILA.11]. But that all takes years. *See* JA_, _[EPA-HQ-OAR-2021-0643-0215("AHRI").4;RILA.11]. So a given refrigeration technology must be commercially available multiple years prior to the planned opening of a new grocery store. *See* JA_[AHRI.4] (explaining in February 2023 that "many food retailers are already in the planning process for stores to be built in late 2024 or early 2025").

6

The availability of installers and technicians, versed in the chosen refrigeration technology, also are indispensable to the retail food industry. They are needed to guarantee a system's dependable installation and ensure swift resolution of any malfunctions or leaks. JA_[AHRI.4]; *see also* JA_-_[RILA.11-12].

Grocery stores are unique in that their refrigeration systems are typically designed and built into the store as part of the retail environment. *See* JA_[RILA.9]. Customers directly interact with refrigerated display cases when selecting their purchases. So refrigerants and their associated systems must meet high safety standards. Suitable refrigeration systems are thus typically complex and necessitate extensive design, engineering, procurement, and installation timeframes. *See* JA_[RILA.11]. Grocery stores must also have access to safe and reliable temperature controls, such as heating and air-conditioning, for their products and consumers. *See* JA_[RILA.6].

Refrigeration equipment across the grocery sector largely consists of stand-alone units, remote condensing systems, supermarket systems, and cold storage warehouses. Stand-alone units are compact, self-contained refrigeration systems typically used for specific, localized cooling needs—think beverage coolers and ice cream freezers. Remote condensing systems, which consist of two units (usually one inside and one outside the grocery shopping areas), represent the next step up in

complexity.  They are ordinarily used in medium-sized food retail environments such as small supermarkets—common examples are dairy and deli displays.

More complex still are supermarket systems and cold storage warehouses. Supermarket systems are the type of refrigeration system characteristic of a chain supermarket.  This large-scale technology typically employs a centralized rack system that supports multiple refrigeration circuits for different temperature zones within the grocery store, such as produce coolers, frozen food cases, and dairy cabinets, all of which may need to operate at different temperatures.  Finally, cold storage warehouses are large, industrial-scale refrigeration systems designed for the long-term storage and preservation of perishable goods at large volumes.  These facilities can range from large, refrigerated rooms to massive buildings.  Cold storage warehouses are critical for the supermarket supply chain, providing essential links between producers, retailers, and consumers.

Different systems operate at different "charge capacities"—the total amount of refrigerant that the equipment can hold.  As a point of comparison, processing and dispensing equipment may contain less than a pound of refrigerant whereas a remote condensing unit may contain more than 200 pounds.  *See* JA_-_[EPA-HQ-OAR-20210-643-0227-att.7("Substitutes.TSD").5-6].  These differences in charge capacity become relevant when considering the benefits and risks of the particular refrigerant being used.  JA_[EPA-HQ-OAR-2021-0643-0137("Taylor").6].

## II. The American Innovation and Manufacturing ("AIM") Act of 2020

Though "[f]ridges, freezers, and air-conditioning" are "technological marvels," the "United States has long struggled with the environmental impact of refrigeration technology." *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 61-62 (D.C. Cir. 2023) (*HACRDI*). In 1990, Congress decided to "phase … out" "chlorofluorocarbons"—then a widely used refrigerant—because they "deplete the ozone layer." *Id.* at 62; 42 U.S.C. §§7671a, 7671c. The solution? Hydrofluorocarbons ("HFCs"). But as time would reveal, that intervention just "swapped one environmental hazard for another," *HACRDI*, 71 F.4th at 62; HFCs are themselves "potent" greenhouse gases with high global-warming potentials, 86 Fed. Reg. 55116, 55123 (Oct. 5, 2021).

So Congress stepped in again, enacting the American Innovation and Manufacturing Act of 2020 (the "AIM Act"). Pub. L. No. 116-260, Div. S, §103, 134 Stat. 2255 (codified at 42 U.S.C. §7675). The AIM Act directs the Administrator of the U.S. Environmental Protection Agency ("EPA" or the "Agency") to issue a final rule "phasing down the production" of HFCs "in the United States through an allowance allocation and trading program." §7675(e)(3)(A).

To implement the phase-down, "EPA first calculates the baseline levels of HFC production and consumption in the United States" based on levels in prior

years. *HACRDI*, 71 F.4th at 62 (citing §7675(e)(1)(C)); *see* 86 Fed. Reg. 55116 (Oct. 5, 2021) (codified in relevant part at 40 C.F.R. §84.7 (2023)) (the "Framework Rule"). The Agency "then caps maximum annual HFC production and consumption at a percentage of those baselines—for instance, ninety percent in 2023." *HACRDI*, 71 F.4th at 62 (citing §7675(e)(2)(B), (C)). "Over time, the caps come down, eventually reaching fifteen percent in 2036." *Id.* (same).

To enforce the phase-down, the Agency "may by rule restrict, fully, partially, or on a graduated schedule, the use of a regulated substance"—i.e., an HFC—"in the sector or subsector in which the regulated substance is used." §7675(i)(1). Before issuing such a rule, however, EPA "shall, to the extent practicable, factor in" a number of statutory considerations: "the best available data"; "the availability of substitutes for use of the regulated substance … in a sector or subsector" (based on a series of subfactors); "overall economic costs and environmental impacts, as compared to historical trends"; and "the remaining phase-down period for regulated substances issued under" the Framework Rule. §7675(i)(4); *see* 40 C.F.R. §84.7 (mirroring the phase-down period in §7675(e)(2)(C)).

The "availability of substitutes," as noted, has its own set of subfactors for EPA to "tak[e] into account": "technological achievability, commercial demands, affordability for residential and small business consumers, safety, consumer costs,

building codes, appliance efficiency standards, contractor training costs, and other relevant factors …." §7675(i)(4)(B).

This case involves the Agency's Final Rule issued under Section 7675(i).

## III.   The Technology Transition Rule

In 2022, EPA issued a proposed rule that sought to restrict new HFC-based equipment in a variety of sectors and subsectors, including retail food refrigeration, cold storage warehouse systems, and residential and light commercial air conditioning and heat pump systems ("HVAC").  87 Fed. Reg. 76738, 76773 (Dec. 15, 2022), JA_.  EPA proposed to prohibit—by January 1, 2025—the import or domestic manufacture or installation of refrigeration units in the retail food refrigeration sector and the cold storage warehouse sector that contain HFCs with a global-warming potential ("GWP") at or above 150 or 300 units (depending on the amount of refrigerant charge in a given system). JA_[*Id.*] (tbl. 4).  The Agency also proposed to prohibit—by that same date—HVAC systems with a GWP at or above 700 units.  JA_[*Id.*].  And one year later, it would be unlawful to sell or purchase any product that contains HFCs above the threshold GWP.   JA_, _-_[87FR76738,76809-11].

Numerous commenters, including Petitioners, raised concerns about EPA's compressed compliance timeframe.  Commenters explained that "the proposed [GWP] limits or compliance timeframes for these products and equipment, which

[their] members rely on to keep their businesses operational, will not be technologically feasible as proposed and would therefore be impossible for many retailers to implement" on time. JA_[RILA.4]. Indeed, some of these substitutes were not even permitted under relevant building codes or had not received "SNAP approval" from EPA.[1] JA_-_, _, _[RILA.8-9;EPA-HQ-OAR-2021-0643-0193("NGA").3;EPA-HQ-OAR-2021-0643-0220("NRAC").2].

Commenters explained that the grocery-store planning process begins multiple years in advance of construction. JA_, _, _[AHRI.4;NGA.3;RILA.11]. "To require these retailers to immediately switch stores already in the design process to a refrigeration system architecture with a GWP of less than 150 (or 300) [would be] problematic[.]" JA_[AHRI.4]. If equipment were still in development or otherwise not available, then the store would not be able to incorporate that system into its design process, seek applicable permits, or place long-lead procurements. Further, locally available installers and technicians would not have the necessary skills to safely install and service the chosen refrigeration technology in the retail environment. JA_-_[RILA.11-12]. Alternative technologies and corresponding

---

[1] EPA's Significant New Alternatives Policy ("SNAP") program evaluates substitutes for ozone-depleting substances and appropriate uses for those substitutes based on overall risks to human health and the environment. *See* 40 C.F.R. §82.170(a). It has no legally binding effect as to when a substitute may be used. *See* pp. 38-39, *infra*.

installer and technician support were still several years out. JA_-_, _-_[RILA.11-12;AHRI.4-5] The commenters urged EPA to extend the compliance timeframe for all retail food refrigeration systems to January 1, 2032—still four years earlier than the deadline imposed by the Framework Rule. JA_[RILA.11].

EPA responded with the Final Rule in October 2023. 88 Fed. Reg. 73098 (Oct. 24, 2023) ("Final Rule"), JA_. Realizing that 2025 was too soon to expect compliance across the retail food refrigeration, cold storage warehouse, and HVAC sectors, EPA extended some (but not all) of the relevant deadlines. EPA kept in place the January 1, 2025 compliance deadline for stand-alone units and self-contained HVAC systems. It extended other compliance deadlines for retail refrigeration and cold storage warehouse systems, but only until January 1, 2026, and January 1, 2027—far short of both the 2032 deadline urged by industry commentors and the 2036 end of the phase-down period. *Id.*, JA_, _, _, _[88FR73150,73157,73162,73178]. Below is a chart summarizing the relevant subsectors, equipment systems, and compliance deadlines.

| Sectors and Subsectors | Systems | Compliance Year (all dates January 1) |
|---|---|---|
| Retail Food – Supermarkets | With ≥ 200lbs refrigerant charge capacity, excluding high temperature side of cascade system | 2027 |
| | With < 200lbs refrigerant charge capacity | 2027 |

13

| | High temperature side of cascade system | 2027 |
|---|---|---|
| Retail Food – Remote Condensing Units | With ≥ 200lbs refrigerant charge capacity, excluding high temperature side of cascade system | 2026 |
| | With < 200lbs refrigerant charge capacity | 2026 |
| | High temperature side of cascade system | 2026 |
| Retail Food Stand-alone Units | | 2025 |
| Stationary Air Conditioning and Heat Pumps | Residential and light commercial air conditioning and heat pump systems | 2025 |
| Cold Storage Warehouses | With ≥ 200lbs refrigerant charge capacity | 2026 |
| | With < 200lbs refrigerant charge capacity | 2026 |
| | High temperature side of cascade system | 2026 |

Petitioners filed a timely petition for review.  ECF #2033337 (Dec. 26, 2023); *see* 42 U.S.C. §§7675(k)(1)(C), 7607(b)(1) (requiring petitions for review to be filed within 60 days of EPA's final rule).

## SUMMARY OF THE ARGUMENT

The Final Rule is in excess of EPA's statutory authority and arbitrary and capricious for four independent reasons.  Because this Court cannot fill in the gaps left by the Agency, the only proper course is to vacate the challenged deadlines.

**I.** The Final Rule is premised on EPA's misinterpretation of a key statutory term: "availability." The AIM Act requires EPA, "to the extent practicable, [to] factor in … the availability of substitutes for use of the regulated substance" and lists numerous subfactors for EPA to "tak[e] into account" in assessing availability. 42 U.S.C. §7675(i)(4).

The ordinary definition of "available" is "present or ready for immediate use." But EPA thought it sufficient to ask whether "many" of the subfactors "could feasibly be met" by the compliance deadlines. This watered-down understanding of the word "available" (and thus "availability") improperly permits EPA to deem substitutes available whenever it has some belief that most of the subfactors could feasibly be met. That is a different inquiry entirely from the one laid out in the AIM Act.

**II.** Even under its own interpretation of "availability," EPA acted arbitrarily and capriciously when it concluded that sufficient substitutes would be "available" by the compliance deadlines. As to the statutory factors it chose to analyze, the Agency failed to support its conclusions with reasoned analysis. The Final Rule is premised on EPA's conclusion that 18 substitutes would be available for use across the relevant sectors, but the reality is that only a small fraction of the listed substitutes will be available, and not for all the relevant subsectors. Because EPA

never sought to (and could not) justify a version of the Final Rule with so meager a list of available substitutes, the challenged compliance dates are invalid.

**A.** A2Ls, which are flammable, are not available. The obstacles include building codes and the lack of sufficient trained technicians. Although the retail food industry will overcome those barriers over time, EPA's deadlines come too quickly to complete the steps necessary to safely use A2Ls. EPA's conclusions to the contrary are largely unsupported speculation.

**B.** A3s, which are "higher flammability" substitutes, are unavailable except for use in stand-alone refrigeration units. More time is needed before A3s will be available in other subsectors. EPA says A3s should nevertheless be available for HVAC, but does not reconcile that conclusion with its concession that A3s are only safe for smaller-charge equipment.

**C.** Ammonia—a heavily regulated, toxic, and flammable substance—is not available in retail environments for safety reasons. EPA's response to these concerns was meager. The Agency observed that *some* types of equipment in the sector have used ammonia safely, without specifying *what* types of equipment. EPA also failed to address the additional time necessary to provide the training for safe use of ammonia.

**D.** Of the A1s listed as available substitutes for some of the relevant subsectors, two (R-471A and transcritical $CO_2$) are not available.

16

Commenters warned EPA that R-471A was not commercially available during the notice-and-comment period due to its limited production and ongoing patent negotiations. EPA failed to respond to these concerns, which time has proven were prescient. Since the Final Rule was issued, a critical molecule has become unavailable.

Transcritical $CO_2$ is not available either, although it is a closer call. Transcritical $CO_2$ is not technologically achievable because of its poor reliability, and it is not affordable for small business consumers due, in large part, to its inefficiency and high water usage, especially in warmer climates.

**III.** Even if transcritical $CO_2$ is indeed available, EPA did not consider the "overall economic costs and environmental impacts," §7675(i)(4)(C), of forcing a nationwide transition to transcritical $CO_2$ for several equipment systems.

**A.** A nationwide transition to transcritical $CO_2$ in large swaths of the retail food sector would have significant adverse environmental impacts. The technology is inefficient and leads to *increased* energy consumption. In warmer climates, transcritical $CO_2$ systems require water-cooling technology that translates to increased water usage and potential contamination of the local water supply. The systems' inefficiency also means more frequent failures, which lead to more food loss and waste, which in turn leads to even more $CO_2$ emissions as well as methane.

EPA ignored these problems. The Agency did not address water contamination and consumption, and it dismissed the environmental impacts of food waste as "beyond the scope" of its analysis. It was arbitrary and capricious for the Agency to ignore this factor that is central to the AIM Act.

**B.** EPA also did not appropriately consider the economic costs of a nationwide transition to transcritical $CO_2$ across a large swath of the retail food sector. These systems require higher operating costs than HFC refrigerants due to their complexity, energy inefficiencies, and higher leak rates. EPA nevertheless asserted that transitioning to transcritical $CO_2$ would *save* retailers money because upfront costs would be purportedly marginal and annual operating costs would be the same as before. These determinations were wrong. With regard to upfront costs, EPA erroneously relied on an inapposite prior transition rule. And in terms of operating costs, the Agency ignored evidence of these systems' need for frequent service and repairs.

These economic consequences will exacerbate the existence of "food deserts." The costs of complying with a hasty transition to transcritical $CO_2$ will prevent new stores from opening in these areas and hinder existing stores from expanding their refrigerated cooling sections. EPA dismissed these concerns by overlooking the cumulative effect of the inevitable compliance costs of a nationwide transition to transcritical $CO_2$.

**IV.** EPA failed to adequately consider "the remaining phase-down period," §7675(i)(4)(D), operationalized by the Framework Rule. In contrast to the Final Rule's aggressive attempt to effectively phase out HFCs in any new or remodeled supermarket by 2027, the Framework Rule allows *nine more years* for the transition. The AIM Act's mandate that EPA compare these two timelines makes clear that EPA must provide some justification for moving faster here. To the extent EPA gave some reasoned basis for its actions, it certainly did not offer enough to justify that.

**V.** This Court should vacate the portions of the Final Rule setting the compliance deadlines challenged here. EPA's action rests on a misinterpretation of a critical statutory term and arbitrary and capricious reasoning that led to compliance dates the industry simply cannot meet. This is therefore not a case in which an agency may provide a more robust rationale on remand.

Moreover, vacatur will not cause disruption. Regulated parties are continuously working to reduce HFC usage in anticipation of the AIM Act's eventual 2036 deadline. They will continue to do so.

## STANDARD OF REVIEW

The Clean Air Act, incorporated by the AIM Act, authorizes this Court to reverse any action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 42 U.S.C. §§7607(d)(9)(A), (C), 7675(k)(1)(C); *HACRDI*, 71 F.4th at 63 (explaining that this is "the same standard of review [as] under the Administrative Procedure Act" (citation omitted)).

Among other ways, an agency acts in excess of its statutory authority if it misinterprets a statutory term. *See Pharm. Rsch. & Mfrs. of Am. v. FTC*, 790 F.3d 198, 204 (D.C. Cir. 2015).

An agency's action can be arbitrary and capricious for several reasons. For example, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*) (citation omitted). An unsatisfactory explanation includes when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [gave reasoning] so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. Findings, including predictive judgments, underlying the agency's action must be supported by "substantial evidence," *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1111, 1113 (D.C. Cir. 2019) (citation omitted), which is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). Courts "may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43; *see SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

## **STANDING**

Petitioners are national trade associations with members in the food, beverage, and grocery industries.

Petitioner Food Marketplace, Inc. (FMI, The Food Industry Association) is an industry association that works with and on behalf of the entire industry to advance a safer, healthier and more efficient consumer food supply chain. FMI represents members across the food value chain, from grocery stores selling food to customers, to producers and companies providing services. JA_[RILA.2].

Petitioner National Grocers Association is a trade association that represents America's 21,000 independent community grocers who account for 33% of all annual grocery sales—exceeding $250 billion—and more than 1.14 million American jobs. JA_[NGA.1].

Petitioner American Frozen Food Institute is a national trade association for the frozen food industry in the United States. Its members include farmers, fruit and vegetable growers, makers of prepared meals, suppliers and distributors that provide over 670,000 American jobs and represent $72 billion in sales. Garren Decl. ¶¶4-5.

All three Petitioners have associational standing to challenge EPA's Final Rule as representatives of their members.[2] *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). To establish associational standing, (1) there must be at least one member of the association who would have standing "in [its] own right" to bring the lawsuit; (2) the "interests" the association is asserting must be "germane" to the association's purpose; and (3) the association must assert a claim and seek relief that does not "require[] the participation of individual members in the lawsuit." *Id.*

At least one member of all three Petitioner associations would have standing in its own right because it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). There is "'ordinarily little question' of injury, causation, and redress when 'the plaintiff is himself an object of the action … at issue.'" *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013) (citation omitted). That "traditional wisdom" holds true in this case. *Id.*

---

[2] Though all Petitioners have standing, this Court need only ensure that one Petitioner does, as all Petitioners seek the same relief. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

The Final Rule's aggressive deadlines requires use of new, more expensive technology, and the services of a qualified technician for safe installation and operation—all of which will be priced at a premium, to the extent they are even available, due to the compressed timeframe. JA_[RILA.6]; Anderson Decl. ¶¶6-8. As purchasers and installers of refrigeration equipment, Petitioners' members thus must expend more money than they otherwise would have, or incur the cost of delays, on pain of noncompliance. This is a classic "pocketbook injury" caused by EPA's agency action, and this Court can redress that injury by vacating the challenged deadlines. *See Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592 (D.C. Cir. 2023) (concluding standing was "self-evident" based on similar reasoning).

Petitioners also satisfy the remaining two elements of associational standing. They assert their clients' "interests" in using safe, reliable, and environmentally compliant refrigeration technology to continue providing food to their customers— an interest that is "germane" to their organizational purposes of representing retail grocers. *Hunt*, 432 U.S. at 343; *see* JA_, _[RILA.2;NGA.1]; Garren Decl. ¶¶6-7. And neither the claim nor the remedy Petitioners seek (that the challenged deadlines are unlawful and should be vacated) requires the participation of individual members in the lawsuit. *Maine Lobstermen's Ass'n*, 70 F.4th at 593.

# ARGUMENT

## I. EPA interpreted "availability" contrary to the word's plain meaning, which is confirmed by statutory context.

Before EPA may impose any use restriction under the AIM Act, it must first, "to the extent practicable," consider "the *availability* of substitutes for use of the regulated substance … in a sector or subsector." 42 U.S.C. §7675(i)(4)(B) (emphasis added). A substitute is "available" if it is "present or ready for immediate use," "accessible," or "obtainable." *Merriam-Webster's Collegiate Dictionary* 84 (11th ed. 2020) (*Merriam-Webster*) (specifying the former definition as appropriate for defining when "resources" are "available"); *accord e.g.*, *The American Heritage Dictionary* 57 (5th ed. 2012). Whether a substitute is "availabl[e]" is a "limitation" with "real content." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (interpreting "available" under 42 U.S.C. §1997e(a)).

Statutory context supports the plain meaning—not every conceivable substitute is "available." Congress prescribed a number of factors that EPA "shall, to the extent practicable, factor in" when deciding whether any given substitute is available. §7675(i)(4). Those factors include "technological achievability," "safety," and "building codes," among others. §7675(i)(4)(B). Taken as a whole, the wide-ranging and long list of factors reflects a clear interest by Congress in whether "the facts on the ground," *Ross*, 578 U.S. at 643, indicate that a substitute

is "present or ready for immediate use," *Merriam-Webster* 84, not simply whether use is *possible* or *may be feasible* under some circumstances. For example, a substitute that is not lawful under governing "building codes," §7675(i)(4)(B), is not "present or ready for immediate use" because its use is legally prohibited. Likewise, a substitute that is prohibitively costly, not technologically feasible, or unsafe for nearby persons, *see id.*, is not "present or ready for immediate use" because it is, "practically speaking, incapable of use." *Ross*, 578 U.S. at 643.

EPA took a different tack. Instead of determining whether a given substitute would be ready for use contemporaneous with the relevant compliance deadline, the Agency "consider[ed] a substitute to be available based on the expectation that, by the compliance date established in a restriction, *many* of the (i)(4)(B) subfactors *could feasibly* be met." Final Rule, JA_[88FR73131] (emphasis added). This watered-down understanding of "available" cannot be squared with the unambiguous statutory text. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("The traditional deference [under *Chevron* that] courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." (citation omitted)).[3]

---

[3] Although *Chevron* deference is unwarranted due to the AIM Act's unambiguous language, *see Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984), Petitioners note that the Supreme Court is considering whether to overrule *Chevron*. *See Loper Bright Enters. v. Raimondo*, No. 22-451

EPA's standard is not an assessment of whether a substitute is "present or ready for immediate use," but rather an arrogation to itself of potentially unbounded discretion. The phrase "feasibly be met" is no different from saying that the factors will "*possibl[y]*" be met. *Merriam-Webster* 458. And adding the word "could"—i.e., "could feasibly be met"—"suggest[s] less force or certainty" in EPA's already noncommittal prediction. *Id.* at 284. Saying that the Agency believes *without certainty* it is *possible* that *many* (but not all) statutory factors will be met by the compliance deadlines is, quite simply, not what the word "available" means in this context.

This Court's analysis can end here. EPA's conclusion that sufficient substitutes would be "availabl[e]" by the compliance deadlines is colored by the Agency's misinterpretation of what it means for a substitute to be available. And because this Court cannot divine whether EPA would have reached the same conclusion under a proper interpretation, this legal error is sufficient reason to vacate the Final Rule. *Chenery*, 318 U.S. at 94-95.

---

(U.S.); *Relentless, Inc. v. Dep't of Com.*, No. 22-1219 (U.S.), both argued January 17, 2024.

## II. EPA's conclusion that sufficient substitutes would be "available" by the compliance deadlines is arbitrary and capricious.

Even under EPA's distorted understanding of "availability," the Agency acted arbitrarily and capriciously in concluding that numerous substitutes would be available by the compliance deadlines. The statutory "availability" factors include "technological achievability," "safety," and "building codes." 42 U.S.C. §7675(i)(4)(B). EPA did not offer a reasoned explanation why these factors supported its conclusions of availability.

In the Final Rule, the Agency identified 18 total substitutes that it concluded would be available for use across the sectors relevant to this case. Those substitutes can be grouped by "safety group classification"—a designation "consist[ing] of two to three alphanumeric characters" that connote toxicity and flammability levels. JA_[EPA-HQ-OAR-2021-0643-0227-att.4("Safety.TSD").4]. An "A" signifies lower toxicity, and a "B" higher toxicity. JA_[*Id.*]. Flammability then ranges from 1 (no flame propagation) to 3 (higher flammability). JA_[*Id.*]. Of the substitutes listed for these three sectors, ten were A2Ls (with the "L" signifying a particular "burning velocity," *see* JA_[Safety.TSD.5]); three were A3s; four were A1s; and one (ammonia) was a B2L. *Compare* JA_, _-_[Substitutes.TSD.3,5-8], *with* JA_[Safety.TSD.11].

As explained in this Part, most of the listed substitutes are not, and will not by the compliance deadlines be, "available." A2Ls (pp. 30-43) are not available because they are prohibited by many building codes, pose safety risks that can only be remedied by time and more trained technicians, and are not technologically achievable on EPA's timeline. A3s (pp. 43-45) are unavailable (outside of stand-alone units) due to their higher flammability. Of the A1s (pp. 47-52), two are not available (each for different reasons), and the remainder are only listed for limited equipment systems. And ammonia (pp. 45-47) is not available (outside cold storage warehouses) because of both its higher toxicity and flammability. The result is an emaciated list of available substitutes:

| Sectors and subsectors | Equipment | Proposed Substitutes | Substitutes Available |
|---|---|---|---|
| Retail Food - Supermarkets | With ≥ 200lbs refrigerant charge capacity, excluding high temperature side of cascade system | 6 A2Ls 2 A1s Ammonia | **0/9** |
| | With < 200lbs refrigerant charge capacity; or High temperature side of cascade system | 7 A2Ls 3 A1s Ammonia | **1/11** |
| Retail Food – Remote Condensing Units | With ≥ 200lbs refrigerant charge capacity, excluding high temperature side of cascade system | 6 A2Ls 2 A1s Ammonia | **0/9** |
| | With < 200lbs refrigerant charge capacity; or High | 7 A2Ls 3 A1s Ammonia | **1/11** |

| | temperature side of cascade system | | |
|---|---|---|---|
| Retail Food Stand-alone Units | | 3 A3s<br>6 A2Ls<br>2 A1s | **3/11** |
| Stationary Air Conditioning and Heat Pumps | Residential and light commercial air conditioning and heat pump systems | 2 A3s<br>4 A2Ls | **0/6** |
| Cold Storage Warehouses | With ≥ 200lbs refrigerant charge capacity | 6 A2Ls<br>3 A1s<br>Ammonia | **2/10** |
| | With < 200lbs refrigerant charge capacity; or High temperature side of cascade system | 7 A2Ls<br>4 A1s<br>Ammonia | **3/12** |

This vast reduction of compliance options fatally undermines the Final Rule's compliance deadlines. In *MD/DC/DE Broadcasters Association v. FCC (MD/DC/DE I)*, this Court held that an FCC rule built on providing broadcasters with two compliance options could not stand when one compliance option turned out to be a nullity because it was unlawful. 236 F.3d 13, 22 (D.C. Cir.), *pet. for reh'g denied*, 253 F.3d 732 (D.C. Cir. 2001) (*MD/DC/DE II*). As explained more fully below (pp. 52-53), the Final Rule likewise cannot stand as applied to the sectors challenged here once most of the compliance options are exposed as nullities.

## A. A2Ls

### 1. A2Ls are not available.

a. *Building Codes.* The vast majority of building codes in the U.S. do not currently authorize A2L-based refrigerants for use in retail food settings. In EPA's words, "there are not national building codes." Response to Comment ("RTC"), JA_[EPA-HQ-OAR-2021-0643-0227-att.2("RTC").148]. Rather, "[b]uilding codes are established at the subnational level and can differ greatly across jurisdictions." Final Rule, JA_[88FR73136].

Many (but not all) states have adopted some version of the International Building Code ("IBC")—a model building code established by the International Code Council ("ICC") that "establishes minimum requirements for building systems using prescriptive and performance-related provisions." ICC, *Introduction*, *2024 International Building Code* (2d printing Sep. 2021), https://codes.iccsafe.org/content/IBC2024P1/preface#IBC2024P1_FmPREFACE_FMSecChapter1ScopeandAdministration[4]; *International Codes—Adoption by State (January 2024)*, https://www.iccsafe.org/wp-content/uploads/Master-I-Code-Adoption-Chart-Jan-2023.pdf (*IBC Adoption Chart*). Until this year, the IBC prohibited use of A2L refrigerants. JA_, _[EPA-HQ-OAR-2021-643-227-att.5("Building.Code.TSD").3;NGA.3].

---

[4] All websites last visited March 29, 2024.

Though the IBC now authorizes use of A2L refrigerants, JA_[Building.Code.TSD.3], that does not mean every code throughout the country now does so, too.  For starters, not all states have adopted the IBC for all buildings. *See IBC Adoption Chart*.  Furthermore, "[s]tate and local building code agencies do not automatically adopt updates to the model code[]."  Final Rule, JA_[88FR73136].  Some states continue to rely on versions of the IBC from as far back as 2012 or 2015. *See IBC Adoption Chart* (listing 12 and D.C.); JA_[Building.Code.TSD.4] (EPA observing that "some states may choose to continue using an older version," leading to "substantial variation across the United States").  Even for those states planning to adopt the 2024 IBC soon, the adoption process typically takes years—in EPA's estimate, anywhere from one to six.  JA_[Building.Code.TSD.2]; *see, e.g.*, Final Rule, JA_[88FR73160] ("several years").  Consequently, many jurisdictions are unlikely to adopt the new IBC allowing A2Ls in retail environments by the Final Rule's compliance deadlines.

Another legal complication arises from the state-law concept of home rule, which is practiced in forty-four states.  Am. City Cnty. Exch., *Balancing State & Local Power* 6 (Nov. 2023), https://alec.org/wp-content/uploads/2023/11/2023-ACCE-The-Balancing-Act_Web.pdf.  Home-rule municipalities have the power to legislate regarding local affairs independent of (and sometimes even inconsistent with) the state legislature, including by adopting and enforcing building codes.  *See*

2A McQuillin, *The Law of Municipal Corporations* §10:16 (3d ed. Westlaw June 2023); 7A *id.* §24:502.  This means that, in some states, a municipality may impose stricter building codes than the state otherwise provides as a baseline.  Final Rule, JA_[88FR73136] (acknowledging the problem); RTC, JA_[RTC.146] (same).  Indeed, the ICC reports that at least half the states allow "[l]ocal[]" jurisdictions to "make [building codes] more restrictive" than state law.  ICC, *Code Adoption Process by State: Revised June 2019*, https://www.iccsafe.org/wp-content/uploads/Code-Adoption-Process-by-State-June-2019.pdf (cited by EPA at JA_, _[Building.Code.TSD.2,8]).  The number of jurisdictions that may need to update their building codes to allow for A2Ls thus is not 50, but a much higher number that EPA appears not even to know.  *See* Final Rule, JA_[88FR73136] ("The Agency did not review every jurisdiction's building codes as EPA does not view that as practicable."); JA_[Building.Code.TSD.6] (EPA looking at the state level only).

b. *Safety.*  The reason many building codes do not currently allow A2L refrigerants relates to another availability factor: safety.  *See* §7675(i)(4)(B); JA_[Building.Code.TSD.2] (EPA explaining that safety standards inform building codes).

Safety concerns are heightened in the retail context, where there is "ongoing direct interaction" between employees and "the general public."  JA_, _[RILA.6,9]; *see* JA_[EPA-HQ-OAR-2021-0643-0224("Ochsner").3].  "As a result, safety

32

concerns that might be appropriately addressed in the industrial context … through the use of appropriate personal protective equipment … pose a more significant risk in the retail sector."  JA_[RILA.6]; *see also* JA_[Safety.TSD.3] (EPA recognizing that a substitute's "safety" can depend on the setting in which it is used).

"An accident with a toxic or flammable refrigerant," including A2L refrigerants, "is much more difficult to control and prevent injuries" as compared to non-toxic, non-flammable A1s.  JA_[EPA-HQ-OAR-2021-0643-0143.p2].  A representative for the International Association of Fire Fighters told EPA that more time is needed to ensure A2L systems can be safely deployed in a commercial setting.  JA_,  _-_[EPA-HQ-OAR-2021-0643-0230-att.7("RILA.Presentation").3, 16-17].

A2Ls are also concentrated with a hydrofluoroolefin that degrades into trifluoroacetic acid ("TFA"), which can be categorized as a "PFAS" (or per-and polyfluoroalkyl substance).  JA_[RILA.9].  PFAS are chemicals that "break down very slowly" and can thus "build up in people … over time."  89 Fed. Reg. 1822, 1822 (Jan. 11, 2024).  According to EPA, they are harmful to human health and may increase the risk of cancer, weaken immune responses, and interfere with natural hormones.  EPA, *Our Current Understanding of the Human Health & Environmental Risks of PFAS*, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas.  Indeed, addressing

"PFAS contamination is a significant priority for EPA" right now. Mem. from David M. Uhlmann, Assistant Adm'r for Enf't & Compliance Assurance, EPA, to Reg'l Adm'rs, et al., *FY 2024-2027 National Enforcement and Compliance Initiatives* 3 (Aug. 17, 2023), https://www.epa.gov/system/files/documents/2023-08/fy2024-27necis.pdf (*NECI* Mem.). Yet the Final Rule could *increase* exposure to PFAS, and on an expedited schedule.

The retail food industry is committed to overcoming these safety concerns, but putting in the necessary safeguards will require access to technicians with training and education in the use of A2Ls. JA_[RILA.3]. Given A2Ls' novelty and complexity, there are not yet enough of these technicians. *See* JA_-_[RILA.11-12]. So more than anything, overcoming these safety concerns requires time—more than that provided in the Final Rule. JA_-_[RILA.8-10].

c. *Technological achievability.* EPA defines "technological achievability" as "the ability for a substitute to perform its intended function in a sector or subsector." Final Rule, JA_[88FR73131]. A2L-based refrigerants are not technologically achievable by the compliance deadlines.

A2L-based refrigerants are not currently used in retail food settings, and substantial design and testing is necessary before this can change. *See, e.g.*, JA_-_, _, _-_[RILA.9-10;NGA.3;EPA-HQ-OAR-2021-0643-0095("Electro.Freeze").8-9]. This kind of design testing could not be completed before the compliance deadline,

let alone with enough time for companies to plan for, design, procure, and install the technology in new stores and remodels. *See, e.g.*, JA_-_, _[Electro.Freeze.8-9;RILA.11]. Indeed, the process by which Nationally Recognized Testing Laboratories "develop and certify products" as safe for use in compliance with Occupational Safety and Health Administration ("OSHA") standards already takes years—and now faces a substantial backlog due to the pandemic. JA_-_[AHRI.4-5]; *see* U.S. Dep't of Lab., OSHA, *OSHA's Nationally Recognized Testing Laboratory (NRTL) Program*, https://www.osha.gov/nationally-recognized-testing-laboratory-program. Moreover, as noted above, there are insufficient installers and technicians with specialized training in A2Ls, which further contributes to the lack of "achievability." JA_[RILA.3].

### 2. EPA's explanation was arbitrary and capricious.

a. *Building Codes.* EPA deemed substitutes that cannot lawfully be used in the retail food or HVAC sectors nonetheless "available" in those sectors. *See* Final Rule, JA_[88FR73160] (asserting that a "substitute [may] be available before every building code in every jurisdiction across the United States permits its use"). Indeed, "EPA generally considered substitutes as available in a sector or subsector … if it is allowed for *any* use by *any* building code, even if that substitute was not allowed for every application in every jurisdiction." JA_[Building.Code.TSD.2] (emphasis added).

35

That might make sense if EPA provided exemptions for retailers in jurisdictions that outlaw the use of these substitutes, but the Agency expressly declined to allow any such exemptions. RTC, JA_-_[RTC.180-81]. *Cf. Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815-16 (D.C. Cir. 1983) (*ILGWU*) (finding arbitrary and capricious the Secretary of Labor's failure to consider tailoring a rule to "accommodat[e] … differences" in local employment conditions). Because retailers cannot satisfy the Final Rule by violating local law, these substitutes "operate[] as a simple dead end" in those jurisdictions. *Ross*, 578 U.S. at 643. They are, in a word, unavailable. Final Rule, JA_[88FR73136] ("[I]n some cases, jurisdictions need to update their building codes for some substitutes to be available for certain uses.").

Not to worry, EPA insists; when EPA tells states and localities to jump, they ask how high. In the Agency's view, states and localities will now update their building codes so as not to stand in the way of compliance with the Final Rule. *Id.*, JA_[88FR73136]. The Agency "finds it reasonable to consider that updates to building codes *may* already be underway …, and for EPA to establish compliance dates with the *expectation* that jurisdictions will prioritize completing those updates with those deadlines in mind." *Id.*, JA_[*Id.*] (emphasis added). But the only evidence EPA provided to support its expectation was "[i]nformation from

36

stakeholders" that "indicate[d] that several States [were] updating building codes"—with a purportedly non-exhaustive list of only three States. *Id.*, JA_[*Id.*].[5]

That is hardly "substantial evidence" for what fifty states might do—much less the municipalities that have authority under home rule to pass their own building codes. *See Nat'l Lifeline Ass'n*, 921 F.3d at 1113. The "predictive nature of [EPA's] judgment" is not "'a talisman under which any agency decision is by definition unimpeachable.'" *ILGWU*, 722 F.2d at 821 (quoting *State Farm*, 463 U.S. at 50). Although this Court typically defers to (but does not rubber-stamp) "an agency's predictive judgments about areas that are within the agency's field of discretion and expertise," *id.*, EPA has no "discretion [or] expertise" when it comes to state and local lawmaking, and it did not point to evidence in the record sufficient to back up its speculation.

EPA thought its proposal to approve A2Ls under SNAP would solve the dilemma, *see* 88 Fed. Reg. 33722 (May 24, 2023) (SNAP proposal), noting that

---

[5] One of EPA's Technical Support Documents includes a map labeled "Map of Building Code Status for A2L Refrigerants," purporting to show "the current status of state-level building code and legislative changes to enable the use of A2L refrigerants." JA_-_[Building.Code.TSD.5-6]. However, the original map purports only to show "[l]ow GWP [b]uilding [c]ode [s]tatus" without any reference to A2Ls. Presentation by Samantha Slater, Air-Conditioning, Heating, and Refrigeration Inst., *HVACR and Watering Heating Industry Developments: Decarbonization, Heat Pumps & the Low Global Warming Potential Refrigerant Transition* 11 (Aug. 29, 2023), https://www.etcc-ca.com/sites/default/files/Decarb_Market-Samantha_Slater-Final.pdf (cited at JA_-_[Building.Code.TSD.6-7]).

"several states have issued regulations and adopted legislation to allow [SNAP] approved alternatives to be used in buildings." JA_[Building.Code.TSD.5]; *see* Final Rule, JA_[88FR73160]. There are numerous problems with this reasoning.

First, EPA prematurely assumes it will finalize SNAP approval of A2Ls for use in retail environments. EPA conceded that "it is impossible to perfectly predict the outcome of SNAP evaluations that have not yet occurred or the success or failure of equipment redesigns and safety tests." Final Rule, JA_[88FR73131]. If EPA has not yet concluded its testing, it cannot know whether—and certainly not when— these refrigerants will ultimately be approved under SNAP. After all, a "proposed rule is just" that—"a proposal." *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) (Kavanaugh, J.).

Second, even if EPA provides SNAP approval for A2Ls, states need not allow the use of the refrigerant. JA_[Building.Code.TSD.2]; *see* Final Rule, JA_-_[88FR73151-52] ("[U]sers may be unable to utilize certain flammable substitutes identified by EPA for use in retail food refrigeration, even if they are SNAP-approved, until building codes" are updated.). To be sure, most of the states "have amended their regulatory codes or have passed legislation to specifically permit the use of SNAP-listed low-GWP refrigerants." Final Rule, JA_[88FR73160]. So EPA concludes that once it finalizes the SNAP approval, A2Ls will become *de facto* permitted throughout much of the United States. JA_[Building.Code.TSD.5]. But

several states have *not* implemented such legislation, Slater, *supra*, note 5, at 11 (reprinted in JA_[Building.Code.TSD.6]), and, to repeat, EPA refused to provide any mechanism for regulated parties in those states to seek exemptions, RTC, JA_-_[RTC.180-81].

Third, even if EPA provides SNAP approval for A2Ls *and* states then follow suit, that still will not be sufficient in many localities. As already discussed (pp. 31-32), municipalities operating under home rule may choose to impose more protective building codes that disallow the use of A2Ls in retail settings. And given the legitimate safety concerns, it is reasonable to doubt that all jurisdictions will follow EPA's lead. EPA has not pointed to anything to suggest that municipalities *will* follow EPA. Just as when the Secretary in *ILGWU* failed to account for "a very real possibility" that deregulation would not lead to the behavior he desired, 722 F.2d at 823, so too here EPA has failed to account for the very real possibility that SNAP approval will not ineluctably lead to building and fire-safety code updates on the Agency's speedy timeframe.

EPA's ultimate defense to all these barriers is that 2027 (and for some sectors, earlier) is late enough for the remaining jurisdictions to update their building codes. Final Rule, JA_[88FR73160]. But as a threshold matter, that is no answer to the fact that there remain reasons to believe some states and localities will simply refuse to permit the use of A2Ls. The Agency entirely takes for granted that these

jurisdictions have any desire to conform to EPA's wishes, whether by 2025, 2026, 2027, or later—especially when there has been no SNAP approval and no consensus on A2Ls' safety.

EPA also fails to explain why 2027 (at the latest) makes sense even assuming willing jurisdictions. Some state legislatures don't even meet every year. EPA itself acknowledged that even for those states planning to adopt the 2024 IBC soon, the adoption process can take anywhere from one to *six years*. JA_[Building.Code.TSD.2]. And that does not take into account that the retail food industry cannot start the multi-year planning process for new stores until it knows the codes in the relevant jurisdiction. Those planning processes alone ordinarily take two years, so a two-year window for building codes means there could be no new stores for *four years*. *See* JA_, _[AHRI.4;RILA.11].

b. *Safety.* EPA also failed to adequately account for the impact of these safety concerns in determining that A2Ls were available. If not properly designed and tested, the widespread deployment of A2L-based refrigerants in retail food settings will pose a fire-safety risk. JA_[RILA.Presentation.17]. EPA recognized but brushed aside the flammability problem (with no guidance regarding safe transport and disposal of these refrigerants) by noting that the Agency is "currently evaluating" several A2Ls under SNAP based on a recently revised safety standard. Final Rule, JA_[88FR73151]. But as before, the proposed SNAP approval is "a

proposal," *Murray Energy*, 788 F.3d at 334—not support for additional agency action.

EPA further dismissed the impact safety concerns would have on the transition timeline by claiming that "many food retailers already use" flammable refrigerants and "that experience will ease the adoption of flammable refrigerants" in the retail food sector. Final Rule, JA_[88FR73160]. The "experience" on which EPA is drawing is the use of "hydrocarbons," *id.*, JA_[88FR73160]—an A3 refrigerant, *see* 80 Fed. Reg. 19454, 19467 (Apr. 10, 2015), that is technologically different and used only in smaller, less complex systems, *see* p. 44, *infra*. And as discussed below (pp. 43-45), A3 refrigerants are limited in ways EPA did not adequately address.

Finally, EPA dismissed PFAS concerns by downplaying TFA all the while noting that "continued monitoring and assessment are nevertheless advised." Final Rule, JA_[88FR73201] (brackets omitted). The Agency observed that it had once SNAP-approved one A2L for containing TFA for "certain end uses" over a decade earlier. *Id.*, JA_[88FR73202]. EPA made no mention of its two-month-old guidance warning of the dangers of PFAS exposure. *NECI* Mem., *supra*. That "'[u]nexplained inconsistency' between agency actions" is itself arbitrary and capricious. *Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (citation omitted).

c.  *Technological achievability.*  EPA recognized the critical need for trained technicians to assist regulated parties in transitioning to HFC substitutes. Final Rule, JA_, _[88FR73152,73160].  The Agency specifically listed the "training of technicians" as among its "considerations" in assessing the "availability of substitutes under subsection (i)(4)(B)" and even "determined, in consideration of the need for … technician trainings, … that providing additional time to comply [was] reasonable for certain subsectors in retail food refrigeration."  *Id.*, JA_-_[88FR73151-52].

But EPA never explained why the limited extensions it granted sufficiently addressed the technician concern.  It stated that "specialized training" for "the use of flammable substitutes" was "available and underway." *Id.*, JA_[88FR73152]. And the Agency concluded that 2025-2027 (depending on the subsector) was late enough to "ensure that … industry continues training technicians."  *Id.*, JA_[88FR73160]; *see* RTC, JA_, _[RTC.147,205].  But the Agency did not point to any basis for that extrapolation: for example, how much training is currently occurring, whether it is occurring nationally or only in certain areas, and how that might reasonably be expected to meet what EPA understands the need to be.  EPA provided no more than unsupported speculation. *See ILGWU*, 722 F.2d at 822-23.

In response to concerns that the lack of trained technicians would disproportionately harm "retail operations in disadvantaged communities," EPA

relied on an inapposite experience with a previous technology transition from ozone-depleting substances ("ODS") to HFCs.  Final Rule, JA_[88FR73203]; *see* p. 9, *supra* (discussing the initial transition from chlorofluorocarbons to HFCs prior to the AIM Act).  The Agency explained that the ODS transition "did not result in large-scale shortages of equipment or technicians."  Final Rule, JA_[88FR73203]. However, the ODS transition took place when there existed "numerous readily available" (and nonflammable) substitutes, including HFCs.  JA_, _[EPA-HQ-OAR-2021-0643-0129("NuCalgon").6;EPA-HQ-OAR-2021-0643-0075.p2].    And the length of the ODS transition was significantly longer than the timeframe in the Final Rule: 17 years.  *See* EPA, *Phaseout of Class II Ozone-Depleting Substances*, https://www.epa.gov/ods-phaseout/phaseout-class-ii-ozone-depleting-substances (showing that 99.5% reduction was accomplished between 2003 and 2020).  That prior transition is inapposite and insufficient to support EPA's failure to consider the technician shortage that will surely result from the Final Rule.

## B. A3s

### 1. A3s are not available outside of stand-alone units.

A3s—so called due to their "higher flammability," JA_[Safety.TSD.4]—pose "safety" concerns and mitigation requires high "contractor training costs."  42 U.S.C. §7675(i)(4)(B).  Commenters observed that A3 refrigerants "pose potential hazards that are not present with HFC refrigerants" and "anyone using these

43

substances in a professional setting should demonstrate a minimum basic competency regarding proper storage, safe handling, and ignition prevention." JA_[EPA-HQ-OAR-2021-0643-0187("ACCA").2]. That means "specialized or additional training, knowledge, or expertise to ensure their safe handling and use" is required. Final Rule, JA_[88FR73137]. Training comes at a high cost, but a cost nevertheless "dwarfed by the potential costs in terms of property and life that could result from [A3s'] improper handling." JA_, _[ACCA.2; EPA-HQ-OAR-2021-0643-0214.p8].

Because of A3s' safety risks, they are frequently subject to significant charge-capacity restrictions, making reliance on them not "technological[ly] achievab[le]," §7675(i)(4)(B), outside of stand-alone units, which typically have smaller charge sizes, *see, e.g.*, JA_, _, _[EPA-HQ-OAR-2021-0643-0085("Mile.High").4;EPQ-HQ-OAR-2021-0643-0173("Honeywell").4;Chemours.11]. Yet EPA listed two A3s as available substitutes for HVAC systems, *compare* JA_[Substitutes.TSD.3], *with* JA_[Safety.TSD.11], which can have larger charge sizes.

### 2. EPA's explanation was arbitrary and capricious.

The Agency did not grapple with the limited use of A3s given the limitations on their charge capacities. In explaining why A3 refrigerants were a viable substitute for refrigeration stand-alone units, the Agency stated that "charge sizes for [those] units are relatively small," and so refrigeration "stand-alone units containing A3

44

refrigerants have been in use for several years." Final Rule, JA_[88FR73154]. In contrast, when it came to certain equipment with a larger charge size, EPA saw that "additional time" was needed so that manufacturers could "investigate and implement [A1] substitutes … for types of equipment that would not be able to use A3 refrigerants" under the governing safety standard. *Id.*, JA_[88FR73156]. In other words, EPA understood that A3s could serve only limited purposes but did not explain why A3s were appropriate for HVAC. *See id.*, JA_-_[88FR73177-80].; *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) ("A 'fundamental' requirement of administrative law is that an agency 'set forth its reasons' for decision[.]" (citation omitted)).

Even if A3s could be used for anything more than refrigeration stand-alone units, there would remain safety risks and the consequent need for additional training for technicians. *Id.*, JA_[88FR73137]. The Agency appropriately realized that, in order "to mitigate costs associated with high demand for trainings associated with new substitutes" like A3s, it was necessary to "provid[e] additional time for compliance (and, in turn, for those trainings to occur)." *Id.*, JA_[id.]. But the Agency provided no such extension for HVAC, continuing with the originally proposed 2025 compliance deadline. JA_[88FR73178].

## C. Ammonia (R-717)

### 1. Ammonia is not available outside cold storage warehouses.

Ammonia (or R-717) is a heavily regulated, toxic, and flammable substance that is unsafe for use in retail environments, so the safety and skill requirements for proper handling are higher than for other substitutes. *See* JA_, _, _[NGA.2;Electro.Freeze.4;Ochsner.2]. It is not appropriate in public areas. *See* Final Rule, JA_[88FR73155] ("acknowledg[ing]" that building codes may prohibit ammonia, "particularly in public areas"); JA_, _[Electro.Freeze.4;EPA-HQ-OAR-2021-0643-0196]. Indeed, of all the substitutes listed in the Final Rule, ammonia is the only one whose safety group classification (B2L) warns of both toxicity and flammability. JA_, _[Safety.TSD.4,11]; *see also* Final Rule, JA_[88FR73162]. The use of ammonia as a second, isolated stage of a $CO_2$ system is being piloted in some regions, *see* Final Rule, JA_[88FR73162], but it is still years away from meaningful commercial availability. *See* JA_[Mile.High.3]. Further, the hazards associated with ammonia raise significant occupational concerns for installers and technicians. JA_[Mile.High.3]. Consequently, the use of ammonia—even as a secondary stage technology—will require extensive training. *See* JA_-_[NGA.2-3].

### 2. EPA's explanation was arbitrary and capricious.

Although EPA acknowledged that "in some situations, particularly in public areas, [ammonia] may not be allowed by building codes or may be limited in the

charge size allowed," Final Rule, JA_[88FR73155], its only notable response to concerns about using ammonia in retail food environments was that "some types of equipment for retail food refrigeration [have] been able to use ammonia safely." RTC, JA_[RTC.169]. But EPA does not elaborate *what* "types of equipment." The fact that "*some* types of equipment" have safely used ammonia does not support the leap to saying that the retail environment writ large can safely use ammonia. JA_[Electro.Freeze.4]. Moreover, as noted above (p. 46), ammonia is not yet a commercially available option for the isolated portion of large dual-refrigerant supermarket or remote condensing systems; EPA did not address this point. *See* RTC, JA_-_[RTC.160-62]; Final Rule, JA_-_[88FR73164-70]. Nor did EPA address the time-consuming training necessary to develop the skills to safely use ammonia. *Cf.* Final Rule, JA_[88FR73137] (noting that "the Agency has considered the cost of trainings" generally); RTC, JA_[RTC.142] (answering a "comment about the safety and extensive requirements when using ammonia in refrigeration systems" by "acknowledg[ing] that some companies may prefer to use refrigerants with lower toxicity than ammonia").

### D. A1s (R-471A and transcritical CO2)

#### 1. R-471A

##### a) R-471A is not available.

Commenters warned EPA that R-471A was not "commercially available." JA_[RILA.Presentation.11]. At the time, it was produced only in "[l]imited volumes" for "testing" purposes with no timeline for mass production on the horizon. JA_[RILA.Presentation.11]. Additionally, there was an ongoing patent negotiation over R-471A. JA_[EPA-HQ-OAR-2021-0643-0230-att.5("HEB.Presentation").20].

##### b) EPA's explanation was arbitrary and capricious.

Although EPA identified R-471A as an "A1"-type refrigerant capable of meeting EPA's GWP limits, *see* Final Rule, JA_[88FR73163]; JA_-_[Substitutes.TSD.6-8], it failed to respond to commenters' concerns about commercial availability. Instead, EPA only addressed objections that R-471A was not (at the time of the proposed rule) SNAP-approved. *See* Final Rule, JA_[88FR73150], _[88FR73157], _[88FR73158], _[88FR73159], _[88FR73161], _[88FR73162]; RTC, JA_[RTC.195]. Because EPA had subsequently approved R-471A under SNAP, the Agency viewed any concerns about R-471A as settled. *See, e.g.*, Final Rule, JA_[88FR73162].

This singular reliance on SNAP approval likely resulted from EPA's decision to "consider[] a submission under the SNAP program to be an indicator that a chemical producer or formulator anticipates commercial demand for the submitted alternative." *Id.*, JA_[88FR73131]. To be sure, a SNAP submission may be an "*indicator*" of commercial demand because SNAP submissions frequently come from manufacturers of the would-be substitute. But it is arbitrary and capricious for EPA to pluck out one of many statutorily prescribed "availability" factors ("commercial demands") and conclude that a substitute is available because of an "indicat[ion]" that the *one* factor might be met. *See State Farm*, 463 U.S. at 43.

And as it turns out, time has borne out the commenters' concern regarding the availability of R-471A and rebutted EPA's assuredness. One of FMI's members recently sought to obtain R-471A only to be informed that the refrigerant manufacturer would no longer be able to supply R-471A to the retail food industry due to the unavailability of a critical molecule. Anderson Decl. ¶¶2, 9-11. The message was clear: "R-471A would not be an option for the market." *Id.* ¶11.

### 2. Transcritical CO$_2$ (R-744)

Petitioners acknowledge that the availability of transcritical CO$_2$ is a closer call than the other substitutes, and therefore will later address (pp. 53-59) why, even assuming transcritical CO$_2$ is available, EPA acted arbitrarily and capriciously in

effectively mandating a nationwide transition to transcritical $CO_2$ for several equipment systems. But in truth, transcritical $CO_2$ is not available either.

### a) Transcritical $CO_2$ is not available.

Transcritical $CO_2$ systems will not be "technological[ly] achievab[le]" by the compliance deadlines. 42 U.S.C. §7675(i)(4)(B). Transcritical $CO_2$ systems often suffer poor reliability due to their complexity and relatively new entry into the U.S. market, leading to unplanned failures and system downtime. JA_-_[RILA.7-8]. Failed refrigeration has severe safety consequences in the retail food industry, where quality refrigeration spells the difference between food that is safe for consumption and food that is not. JA_[RILA.8]. And because installers who are able to construct and repair these systems are in limited supply, JA_[RILA.3], equipment failures result in longer downtimes, higher repair costs, and a greater chance of product losses, food safety issues, food waste, and store disruption, *see* JA_-_[RILA.5-6].

Transcritical $CO_2$ systems are also not "affordab[le]," especially for "small business consumers" in certain geographic regions. §7675(i)(4)(B). Where ambient temperatures exceed 80 degrees Fahrenheit, these systems' "[e]nergy consumption sharply increases," leading to a "net increase in $CO_2$ emissions." JA_[RILA.Presentation.8]. As discussed below (pp. 54-55), they require much higher water consumption than other systems to keep energy usage low. Transcritical $CO_2$ systems must operate at very high pressures, JA_-

50

_[Electro.Freeze.4-5], which leads to safety issues, leaks, and more frequent repairs than HFCs. JA_-_, _[RILA.8-9;Honeywell.4]. Leaks are "rapid and are generally catastrophic to system performance." JA_[RILA.8]. Finally, the need to train technicians on new technologies will lead to technician shortages, which has adverse effects on the efficacy of these systems and undermines their technological achievability. *See* JA_[RILA.3]. The consequence of all these shortcomings is higher costs for a substitute that is already not reliable. JA_[RILA.8].

### b) EPA's explanation was arbitrary and capricious.

EPA did not answer concerns that the inefficiency of transcritical $CO_2$ systems, especially in warmer climates, renders those systems not "technological[ly] achievab[le]" or "affordab[le] for … small business consumers." §7675(i)(4)(B). Though EPA acknowledged the "declining efficiencies in high ambient temperatures," it countered that "multiple supermarkets [use] lower-GWP refrigerants" in warmer climates such as Texas and Florida, and that the number of stores in the South, Southwest, and Southeast regions with the highest rating under EPA's GreenChill Partnership has "increased 40 percent from 2021 to 2022." Final Rule, JA_[88FR73158].[6] Notably, the "multiple supermarkets" in Texas and Florida

---

[6] "GreenChill is an EPA voluntary partnership program that works cooperatively with the food retail industry to reduce refrigerant emissions …." EPA, *GreenChill Program*, https://www.epa.gov/greenchill.

appears to equal five—all in major metropolitan areas where there are most likely to be skilled transcritical $CO_2$ technicians. Climate-Friendly Supermarkets, *What's in your supermarket?* https://www.climatefriendlysupermarkets.org/map (cited at Final Rule, JA_n.109[88FR73158n.109]) (use interactive map). (To be sure, the website EPA cites does not claim to provide an exhaustive list, but this is nevertheless far from a robust finding.) As for the 40% increase, EPA does not quantify how many top-rated stores were in these warmer regions in either 2021 or 2022, *see* EPA, *GreenChill Certified Store Achievements*, https://www.epa.gov/greenchill/greenchill-certified-store-achievements (cited at Final Rule, JA_n.110[88FR73158n.110]), so the percentage increase sheds little light on whether transcritical $CO_2$ is available on a large scale, *see Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1042 (10th Cir. 2023) (explaining the limitations of a purely "comparative analysis").[7]

The Agency also did not address leakage concerns. *See* Final Rule, JA_-_[88FR73150-51]. It did acknowledge that "the use of lower-GWP refrigerant options like R-744, with very high pressure, … may require more specialized training" but thought it sufficient to say that "[s]uch trainings are available and underway." *Id.*, JA_[88FR73152]. That is of little help, however, to "areas with

---

[7] For example, the 40% increase from 5 to 7 is not as meaningful as the 40% increase from 100 to 140.

lower population density and/or economically disadvantaged areas" where that specialized training will likely arrive last. JA_-_, _[RILA.11-12;NGA.4].

***

The takeaway from the foregoing discussion is that EPA left the retail food refrigeration sector with substantially fewer substitutes than advertised, as illustrated in the table provided above (p. 28).

Just like the FCC rule in *MD/DC/DE I*, the Final Rule was premised—and indeed must be premised, §7675(i)(4)(B)—on a consideration of available compliance options (here, in the form of available substitutes). 236 F.3d at 22. Once a substantial number of those options are eliminated as unavailable, the Final Rule can only stand as applied to the challenged subsectors if EPA declared its desire for such a result in the Final Rule and the Final Rule "could function sensibly" without those substitutes. *Id.* EPA never asserted that its Section 7675(i)(4) analysis would come out the same way if only a fraction of the substitutes it found "available" were actually available. The Final Rule (as it actually functions) is thus "a rule that [EPA] did not consider," *MD/DC/DE II*, 253 F.3d at 736, and that, given the importance of "availability" under the AIM Act, §7675(i)(4)(B), this Court cannot assume would "sensibly serve the goals for which [the Final Rule] was designed," *MD/DC/DE II*, 253 F.3d at 734; *see Chenery*, 318 U.S. at 94-95.

**III.    Even if transcritical CO₂ is available, EPA failed to adequately consider the "overall economic costs and environmental impacts" of a nationwide transition to transcritical CO₂ in two equipment systems.**

If this Court concludes that transcritical $CO_2$ is available, *but see* Part II.D.2, *supra*, then two equipment systems[8] have only transcritical $CO_2$ as an available substitute.  *Accord* JA_, _[NGA.3;Ochsner.3].   As to those two, EPA failed to "factor in" the "overall economic costs and environmental impacts" of a nationwide transition to transcritical $CO_2$, as it was required to do.  42 U.S.C. §7675(i)(4)(C).   Without even diving into the merits of EPA's "environmental" and "economic" findings, this "fail[ure] to consider an important aspect of the problem" renders the Final Rule arbitrary and capricious.  *State Farm*, 463 U.S. at 43.  Wading into those considerations only confirms as much.

**A. EPA ignored the significant environmental impacts of a nationwide transition to transcritical CO₂ for two equipment systems.**

A nationwide transition to transcritical $CO_2$ systems in the two equipment systems—including the largest supermarket systems—will have significant adverse environmental impacts.  Inefficient transcritical $CO_2$ systems, *see* p. 49-50, *supra*, have led to increased energy consumption across the country, as they consume dramatically more energy than traditional systems when operating in warmer weather.   JA_[RILA.Presentation.8].   A premature nationwide transition to

_____

[8] Remote condensing units—200 pounds or more (2026); Supermarket systems—200 pounds or more (2027).  JA_-_[Substitutes.TSD.6-7].

54

transcritical $CO_2$ systems in large swaths of the retail food sector thus may offset most—if not all—of the carbon reduction gains from replacing HFC-reliant technologies. JA_[RILA.7].

Moreover, in warmer climates transcritical $CO_2$ systems "achieve parity with traditional systems *only* when complex proprietary controls and water-cooling enhancements are added." JA_[RILA.7]. These evaporative water-cooling systems can consume significant quantities of water, JA_[RILA.Presentation.6], by taking water out of the local water supply and treating that water with chemicals before flushing it back to wastewater, risking contamination and increased drought in arid environments. JA_-_, _[RILA.6-8;NGA.4].[9]

Transcritical $CO_2$ systems' high failure and shutdown rates, *see* p. 50, *supra*, result in more food loss and waste. *See* JA_[EPA-HQ-OAR-2021-0643-0174("NAFEM").5]. This, in turn, increases consumption, transportation, and disposal—all of which generate additional $CO_2$ emissions. JA_[NAFEM.5]. And excess food waste in landfills also "generates methane, an even more potent greenhouse gas." JA_[NAFEM.5]

---

[9] Indeed, some jurisdictions are prohibiting the use of such "highly water intensive" "[e]vaporative cooling mechanisms." S. Nev. Water Auth., *Understand laws and ordinances*, https://www.snwa.com/conservation/understand-laws-ordinances/index.html.

In response to concerns about higher energy consumption from a large-scale transition to transcritical $CO_2$, EPA responded only that these "systems *may* also provide additional environmental … benefits via increased energy efficiency in *some* cases." Final Rule, JA_[88FR73158] (emphasis added). EPA ignored concerns about water contamination and consumption. *See* RTC, JA_-_[RTC 245-46] (referring a concern on this topic to Section VI.F.1.c of the preamble); Final Rule, JA_-_[88FR73149-61] (Section VI.F.1.c not mentioning water). And the Agency declined to "factor in the environmental impacts of food waste," which it viewed as "beyond the scope of [the agency's] analysis." RTC, JA_[RTC.177]. This blanket refusal to consider one of the "environmental impacts" arising from the Final Rule, 42 U.S.C. §7675(i)(4)(C)—and indeed the very type of environmental impact (increased greenhouse gases) at the heart of the AIM Act—was arbitrary and capricious. *State Farm*, 463 U.S. at 43; *see HACRDI*, 71 F.4th at 69 (Pillard, J., concurring in part and dissenting in part) (explaining that the AIM Act arose out of a concern for elevated concentrations of greenhouse gases); JA_[EPA-HQ-OAR-2021-0643-0227-att.8("Impact.TSD").6] (EPA naming "the reduction of emissions of greenhouse gases" as "[o]ne of the primary environmental impacts anticipated to result from the [Final Rule]").

**B. EPA failed to accurately assess the economic consequences of a nationwide transition to transcritical CO₂ systems for two equipment systems.**

Transitioning to transcritical $CO_2$ systems also would have significant adverse economic impacts. These systems have higher service costs than existing refrigeration systems due to their complexity, necessitating additional technician training, specialized replacement parts and service equipment, and additional safety precautions. *See, e.g.*, JA_, _, _, _[NGA.4;Taylor.7; Honeywell.4; HEB.Presentation.14]. And supply-chain issues with regard to the specialized equipment will cause price increases. *See* JA_-_, _[NGA.3-4;Taylor.7]. Further, demonstrated energy inefficiencies and high leak rates mean more maintenance, which imposes yet more costs. JA_, _-_[Honeywell.4;RILA.7-8]. All of this is happening against the backdrop of a sector that has razor-thin profit margins. JA_[RILA.10].

Nonetheless, EPA claimed the transition to transcritical $CO_2$ systems would net over $76 million *in savings* in 2025 for "[l]arge [r]etail [f]ood." JA_[EPA-HQ-OAR-2021-0643-0227-att.1("RIA").110] (tbl. A-4), due in part to the lower cost of a ton of $CO_2$ compared to a ton of HFC refrigerants, *see* JA_[RIA.36] (tbl. 4-2), and a prediction that annual operating budgets would see *no* increase, JA_[RIA.112] (tbl. A-5). Those calculations do not hold up. Even if $CO_2$ is cheaper than HFC refrigerants pound-for-pound, that statistic means little without consideration of the

*quantity* of each refrigerant necessary to operate a system successfully. And the conclusion without explanation that there would be *no* increase to annual operating budgets defies evidence that these systems require more frequent service and repairs than HFC systems due to inefficiencies and failures. *See* pp. 49-52, *supra*.

The Agency further claimed that the costs of the transition should be marginal or otherwise comparable to the ODS transition. *See* Final Rule, JA_[88FR73203]. But it was arbitrary for EPA to presume that the transition under the Final Rule would parallel the ODS transition in all respects, including the costs associated with equipment unavailability, technician availability, and supply chain impacts. *See* p. 43, *supra* (explaining why this comparison was erroneous with regard to A2Ls). The transition from ODS to HFCs was between two low-pressure refrigerants over the course of 17 years, not (as here) from a low-pressure to a high-pressure refrigerant in (at most) three. *See* EPA, *Phaseout of Class II Ozone-Depleting Substances*, *supra*; Parker, Sporlan Div., *Temperature Pressure at Sea Level*, https://www.resupplyco.com/customer/docs/Downloadable%20Links/PT%20Chart .pdf (compare HCFC (ODS) pressure levels with 744 pressure levels).

These economic consequences will create or prolong the existence of "food deserts"—disadvantaged areas with limited access to fresh, affordable, and nutritious food that often requires refrigeration. A hasty transition will impede the opening of new grocery stores and expansion of existing ones in these areas given

the industry's extremely low margins.  JA_[RILA.12].  Residents may be forced to travel long distances to reach another store—all at a time when inflation continues to rise.  JA_, _[RILA.Presentation.23;RILA.12].  EPA ignored these concerns, claiming that the Final Rule would not be determinative of these business decisions and imposed only "incremental upfront cost[s]."  Final Rule, JA_[88FR73202].  However, it is not the "incremental upfront cost," but rather all of the previously described compliance obstacles that will prohibit grocers from offering more fresh food options in food deserts.  *See* JA_[RILA.12].

EPA did not address these increased costs to disadvantaged communities, channeling concerns about food deserts to its discussion of "environmental justice," which is expressly "not used for purposes of EPA's consideration of the statutory factors under the AIM Act."  Final Rule, JA_[88FR73198]; *see* RTC, JA_, _[RTC.165,495].  Its only mention of these economic issues related to food deserts was to address a comment about whether supermarket systems should have a higher GWP limit so as to reduce impact in these areas; the Agency responded that establishments in food deserts "often do not use supermarket systems … but rather use smaller charge systems."  Final Rule, JA_-_[88FR73158-59].  But that just restates the problem: these communities do not have access to larger supermarkets able to provide a variety of fresh, refrigerated food at an affordable cost.  The Agency

simply did not "engage the arguments raised before it." *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 22 F.4th 1018, 1027 (D.C. Cir. 2022) (citation omitted).

In sum, EPA's overall economic analysis is based on unsupported speculation and fails to account for real-world costs, demonstrating an absence of any "rational connection between the facts found and the choice made" to impose the compliance deadlines at issue here. *See State Farm*, 463 U.S. at 43 (citation omitted); *see also ILGWU*, 722 F.2d at 825-26 (declining "to accept the Secretary's conclusory assurances" about the future). The Agency's findings and consideration of overall economic costs under Section 7675(i)(4)(C) are therefore arbitrary and capricious.

## IV. EPA failed to adequately consider "the remaining phase-down period."

The AIM Act requires EPA to factor in "the remaining phase-down period for regulated substances under [EPA's Framework Rule]" before establishing any restrictions on the use of HFCs in a sector or subsector. 42 U.S.C. §7675(i)(4)(D). To the extent there is any remaining doubt that the Agency's analysis was arbitrary and capricious, it should be dispelled by this final statutory factor.

The Final Rule will effectively phase out the use of HFCs in any new or remodeled supermarket store no later than January 1, 2027.[10] For some systems, the

---

[10] Certain HFCs with lower GWPs will still be permitted. *See* JA_ [Substitutes.TSD.3] (listing HFC-32 as available for certain sectors).

deadline is even earlier—as early as January 1, 2025.  *See* p. 13, *supra*.  There is no glide path from the current technologies to the final, stringent GWP limits.

The Framework Rule, by contrast, provides for both a longer and more graduated approach to HFCs not covered by the Final Rule.  It mandates a 40% reduction in HFC usage by 2024, 70% by 2029, 80% by 2034, and 85% by 2036.  40 C.F.R. §84.7(a).  It starkly illustrates how aggressive EPA's deadlines in the Final Rule are when it comes to the relevant sectors.  They require an almost-complete elimination of HFCs in new equipment *nine years* earlier than the deadline set in the Framework Rule for an 85% reduction.

This statutorily mandated comparison plainly contemplates that EPA must provide some justification for the difference between the rules.  Why 2027 instead of 2036?  As already discussed, EPA's response to most of Petitioners' concerns is either bald or sparsely supported speculation that the problems—whether they be building codes, safety issues, or lack of technicians—will resolve by the end of the one-, two-, or three-year period before the compliance deadline.  Reasoned decisionmaking should, and does, require more.  But this last factor makes that especially true here.  In requiring EPA to compare its timelines, it leaves no doubt that EPA must provide an actually reasoned basis for any predictions that underlie a faster approach for a particular sector.  The Agency failed to do so.

## V. This Court should vacate the portions of the Final Rule setting the challenged compliance deadlines.

EPA misinterpreted the AIM Act and acted arbitrarily and capriciously in setting its aggressive compliance deadlines for the retail food industry, cold storage warehouse, and HVAC sectors. "'[V]acatur is the normal remedy' under the [Administrative Procedure Act]," *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020) (citation omitted), and the same approach governs under the Clean Air Act, *see New York v. EPA*, 964 F.3d 1214, 1221-22 (D.C. Cir. 2020).

The Final Rule's "deficiencies" are not in a mere lack of explanation but in setting compliance deadlines that the industry simply cannot meet. *Cf. Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (finding it "conceivable that the Commission may be able to explain" why the agency action was proper). Nor would vacatur cause "disruptive consequences." *Cf. id.* (observing that the Commission "would need to refund" fees and "would be unable to recover [them] under a later-enacted rule"). At the heart of EPA's explanations in the Final Rule is the understanding and expectation that regulated parties and local governments continue to strive to phase out use of HFCs. *See, e.g.*, Final Rule, JA_, _, _[88FR73136,73149,73186]. And both the AIM Act and the Framework Rule ensure that new compliance deadlines—ones that are the result of reasoned

decisionmaking considering all the factors under Section 7675(i)(4)—will come into

place.

## CONCLUSION

For the foregoing reasons, this Court should grant the petition for review and vacate the Final Rule's challenged compliance deadlines.

Dated: April 1, 2024

Respectfully submitted,

/s/ Elbert Lin

| | |
|---|---|
| Matthew W. Morrison | Elbert Lin |
| Sidney L. Fowler | Kevin S. Elliker |
| Shelby L. Dyl | David N. Goldman |
| PILLSBURY WINTHROP SHAW PITTMAN LLP | Hunton Andrews Kurth LLP |
| 1200 Seventeenth Street, NW | Riverfront Plaza, East Tower |
| Washington, DC 20036 | 951 East Byrd Street |
| (202) 663-8036 | Richmond, VA 23219 |
| | (804) 788-8200 |

Emily Huang
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 South Figueroa St., 36th Fl.
Los Angeles, CA 92037
(213) 488-7100

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,644 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Times New Roman font, using Microsoft Word.

Dated: April 1, 2024

/s/ Elbert Lin
Elbert Lin
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of April, 2024, a true copy of Petitioner's

Opening Brief (page proof), along with the accompanying Addendum, was served

on opposing counsel via electronic filing using the appellate CM/ECF system.

/s/ Elbert Lin
Elbert Lin
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

FOOD MARKETPLACE, INC., et al.,

*Petitioners*,

*v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY, MICHAEL S. REGAN

*Respondents.*

On Petition for Review of Final Agency Action
of the United States Environmental Protection Agency

**ADDENDUM PURSUANT TO CIRCUIT RULE 28(a)(5)**
**TO PETITIONERS' OPENING BRIEF**

Matthew W. Morrison
Sidney L. Fowler
Shelby L. Dyl
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
(202) 663-8036

Emily Huang
PILLSBURY WINTHROP SHAW
PITTMAN LLP
725 South Figueroa St., 36th Fl.
Los Angeles, CA 92037
(310) 351-7814

Elbert Lin
Kevin S. Elliker
David N. Goldman
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200

April 1, 2024

**ADDENDUM TO
PETITIONERS' OPENING BRIEF**

**Table of Contents**

Declaration of Paul Anderson ................................................................. 1a

Declaration of Dr. Donna Garren ........................................................ 6a

42 U.S.C. § 7675 ............................................................................... 9a

42 U.S.C. § 7607 ............................................................................. 18a

40 C.F.R. § 84.7 .............................................................................. 23a

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

FOOD MARKETPLACE, INC., et al.,

*Petitioners*,

*v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY, MICHAEL S. REGAN

*Respondents.*

**DECLARATION OF PAUL ANDERSON**

I, Paul Anderson, am over 18 years of age and make the following declaration pursuant to 18 U.S.C. § 1746:

1.    I am employed by H-E-B as Group Vice President, Design and Engineering.  I have been employed in this capacity since 2018.  In my current role I am responsible for the design, engineering, environmental compliance and maintenance and repair of H-E-B stores.

2.    H-E-B is a member of The Food Industry Association—The Food Marketplace, Inc. ("FMI").

3.    I am providing this declaration in support of the petition for review filed by FMI, National Grocers Association, and American Frozen Food Institute,

1

challenging the United States Environmental Protection Agency's final rule addressing technology transitions under the American Innovation and Manufacturing Act of 2020, issued on October 24, 2023. *See* Phasedown of Hydrofluorocarbons: Restrictions on the Use of Certain Hydrofluorocarbons Under the American Innovation and Manufacturing Act of 2020, 88 Fed. Reg. 73098 (Oct. 24, 2023) ("Final Rule").

4.     This declaration is based on my personal knowledge of facts and information pertaining to H-E-B's business and the implications of the Final Rule on that business. My knowledge is based on my history with H-E-B, as well as my extensive work with experts in manufacturing, consulting (design), construction and operations in the United States and in Europe.

5.     In my experience in the retail food industry, a new supermarket will often spend between $2.5 million and $5.5 million on its refrigeration system, between $700,000 and $1.5 million on heating, ventilation, and air conditioning (HVAC) equipment. Energy and HVAC/refrigeration costs per store often account for 1.25% - 2.5% of its operating budget.

6.     The Final Rule forces H-E-B to spend more money than H-E-B would otherwise have spent on refrigeration. The increase is due to adding internal and external resources to analyze and develop realistic design options to comply with the

2

Final Rule. This includes evaluating options to lease new facilities that allow us to pre-order equipment and store HFC equipment for stores already under construction and revamping our compliance programs. If there was more time allowed, these internal and external resources would not be required to bring H-E-B into compliance with the Final Rule by the applicable compliance deadlines.

7.     The Final Rule will continue to require H-E-B to spend more money in the future than H-E-B would otherwise spend on refrigeration. The increase is due to the use of new technology, including but not limited to, refrigerants, equipment, electrical systems, code required safety mechanisms, shortage of trained technicians to install and service these systems, increased utility costs (electrical and water) that would not be necessary but for the Final Rule. H-E-B must continue to shoulder these increased costs in order to come into compliance with the Final Rule by the applicable compliance deadline and remain in compliance thereafter.

8.     Because the Final Rule requires regulated sectors to transition away from HFCs quickly, and there is not yet sufficient supply of the necessary refrigerants and equipment, costs are, and will likely remain, at a premium.

9.     H-E-B began working with original equipment manufacturers (OEMs) of systems for R-471A refrigerants in response to the EPA's Proposed Rule. We have accelerated our efforts with these OEMs in response to EPA's Final Rule. H-

3

E-B actively pursued R-471A for use in new refrigeration systems as the only potentially viable A1 refrigerant, in development, that met the EPA's 150 GWP limit for equipment used in our retail locations. R-471A is not a candidate for existing equipment, however, due to its refrigerant properties.

10. Prior to February 28, 2024, H-E-B's access to R-471A was through the chemical manufacturer, Honeywell, and our primary refrigeration provider, Hussmann. H-E-B started the design and planning for systems using R-471A in July of 2023, a few months prior to this refrigerant's SNAP approval in September 2023. H-E-B worked closely with the chemical and equipment manufacturers. We were deep into the development process and had selected a few locations to test this recently approved refrigerant and associated equipment to determine the efficacy in a supermarket's refrigeration system.

11. On February 28, 2024, I learned first from H-E-B's primary refrigeration equipment provider, Hussmann, via email and subsequently from the refrigerant manufacturer, Honeywell, that Honeywell would no longer be able to supply R-471A to H-E-B or the retail food industry. Honeywell explained that the reason for the immediate stoppage of the development of equipment designed for R-471A was due to the availability of a critical molecule produced by Chemours. When I inquired about the timing of the stoppage and when development could

4

resume, Honeywell informed me that R-471A would not be an option for the market and we should consider other refrigerants.

12.     The lack of availability of R-471A creates compliance burdens for H-E-B's ability to plan, design, and construct new grocery stores because as an owner, I don't have the equipment today, nor is it available to procure, that I need to open a new store and comply with the deadlines in the current rule.  The stores we are opening after 2025 were designed in 2021, well in advance of the Final Rule.

This declaration is made under the provision of 18 U.S.C. § 1746.  I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge, information and belief.

Executed in San Antonio, Texas, on this 28th day of March, 2024.

_Paul Anderson_

Paul Anderson

5

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

FOOD MARKETPLACE, INC., et al.,

*Petitioners*,

*v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY, MICHAEL S. REGAN
*Respondents.*

_____

**DECLARATION OF DR. DONNA GARREN**

_____

I, Donna Garren, am over 18 years of age and make the following declaration

pursuant to 18 U.S.C. § 1746:

1.      I am employed by American Frozen Food Institute ("AFFI") as the

Executive Vice President of Science and Policy.  I have been employed in this

capacity since 2011.  Prior to joining AFFI, I was also employed by United Fruit and

Vegetable Association, National Restaurant Association and Consumer Forum. In

my current role I am responsible for the Regulatory Affairs and Legislative Affairs

programs for AFFI. My extensive background and expertise in food safety, food

science, nutrition, and regulatory affairs are instrumental in building and enhancing

strong and effective legislative and regulatory programs for the food and beverage

industry.

1

2.     I am providing this declaration in support of the petition for review filed by The Food Industry Association—The Food Marketplace, Inc., National Grocers Association, and AFFI, challenging the United States Environmental Protection Agency's final rule addressing technology transitions under the American Innovation and Manufacturing Act of 2020, issued on October 24, 2023. *See* Phasedown of Hydrofluorocarbons: Restrictions on the Use of Certain Hydrofluorocarbons Under the American Innovation and Manufacturing Act of 2020, 88 Fed. Reg. 73098 (Oct. 24, 2023) ("Final Rule").

3.     This declaration is based on my personal knowledge of facts and information pertaining to AFFI's membership and purpose. My knowledge is based on my history with AFFI.

4.     AFFI is a national trade association for the frozen food industry in the United States.

5.     AFFI's members include farmers, fruit and vegetable growers, makers of prepared meals, suppliers and distributors that provide over 670,000 American jobs and represents $72 billion in sales.

6.     AFFI advocates with legislative and regulatory bodies on the issues that impact the business operations of our members and access of frozen foods to consumers. AFFI supports practical policies that will promote a predictable,

science-based regulatory environment and help frozen foods be an essential part of the marketplace.

7.     AFFI's membership includes retail grocers who are directly regulated by the Final Rule.

This declaration is made under the provision of 18 U.S.C. § 1746.  I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge, information and belief.

Executed in Woodbridge, Virginia, on this 29th day of March 2024.


_____
Dr. Donna Garren

**(C) Deep saline formation report**

**(i) Definition of deep saline formation**

**(I) In general**

In this subparagraph, the term "deep saline formation" means a formation of subsurface geographically extensive sedimentary rock layers saturated with waters or brines that have a high total dissolved solids content and that are below the depth where carbon dioxide can exist in the formation as a supercritical fluid.

**(II) Clarification**

In this subparagraph, the term "deep saline formation" does not include oil and gas reservoirs.

**(ii) Report**

In consultation with the Secretary of Energy, and, as appropriate, with the head of any other relevant Federal agency and relevant stakeholders, not later than 1 year after December 27, 2020, the Administrator shall prepare, submit to Congress, and make publicly available a report that includes—

(I) a comprehensive identification of potential risks and benefits to project developers associated with increased storage of carbon dioxide captured from stationary sources in deep saline formations, using existing research;

(II) recommendations for managing the potential risks identified under subclause (I), including potential risks unique to public land; and

(III) recommendations for Federal legislation or other policy changes to mitigate any potential risks identified under subclause (I).

**(D) GAO report**

Not later than 5 years after December 27, 2020, the Comptroller General of the United States shall submit to Congress a report that—

(i) identifies all Federal grant programs in which a purpose of a grant under the program is to perform research on carbon capture and utilization technologies, including direct air capture technologies; and

(ii) examines the extent to which the Federal grant programs identified pursuant to clause (i) overlap or are duplicative.

*[See main edition for text of (h) to (k)]*

(As amended Pub. L. 116–260, div. S, § 102(b), Dec. 27, 2020, 134 Stat. 2243.)

REFERENCES IN TEXT

Section 14 of the Federal Advisory Committee Act, referred to in subsec. (g)(6)(B)(vi), is section 14 of Pub. L. 92–463, which is set out in the Appendix to Title 5, Government Organization and Employees.

AMENDMENTS

2020—Subsec. (c)(3). Pub. L. 116–260, § 102(b)(1), substituted "precursors" for "percursors" in introductory provisions.

Subsec. (g)(1). Pub. L. 116–260, § 102(b)(2)(C)(iii), designated first sentence of introductory provisions as par. (1) and inserted heading. Former par. (1) redesignated subpar. (A) of par. (3).

Subsec. (g)(2). Pub. L. 116–260, § 102(b)(2)(C)(ii), designated second sentence of introductory provisions as par.

(2), inserted heading, substituted "Such strategies and technologies described in paragraph (1) shall be developed" for "Such strategies and technologies shall be developed", and inserted "States, institutions of higher education," after "scientists,". Former par. (2) redesignated subpar. (B) of par. (3).

Subsec. (g)(3). Pub. L. 116–260, § 102(b)(2)(C)(i), designated third sentence of introductory provisions as par. (3), inserted heading, and substituted "The program under this subsection" for "Such program". Former par. (3) redesignated subpar. (C) of par. (3).

Subsec. (g)(3)(A) to (D). Pub. L. 116–260, § 102(b)(2)(A), redesignated pars. (1) to (4) of subsec. (g) as subpars. (A) to (D), respectively, of par. (3).

Subsec. (g)(4), (5). Pub. L. 116–260, § 102(b)(2)(B), designated first and second sentences of concluding provisions as pars. (4) and (5), respectively, and inserted headings. Former par. (4) redesignated subpar. (D) of par. (3).

Subsec. (g)(6). Pub. L. 116–260, § 102(b)(2)(D), added par. (6).

## SUBCHAPTER III—GENERAL PROVISIONS

### § 7606. Federal procurement

FEDERAL ACQUISITION REGULATION: CONTRACTOR CERTIFICATION OR CONTRACT CLAUSE FOR ACQUISITION OF COMMERCIAL ITEMS

Pub. L. 103–355, title VIII, § 8301(g), Oct. 13, 1994, 108 Stat. 3397, as amended by Pub. L. 115–232, div. A, title VIII, § 836(g)(8), Aug. 13, 2018, 132 Stat. 1874, provided that: "The Federal Acquisition Regulation may not contain a requirement for a certification by a contractor under a contract for the acquisition of commercial products or commercial services, or a requirement that such a contract include a contract clause, in order to implement a prohibition or requirement of section 306 of the Clean Air Act (42 U.S.C. 7606) or a prohibition or requirement issued in the implementation of that section, since there is nothing in such section 306 that requires such a certification or contract clause."

## SUBCHAPTER VII—AMERICAN INNOVATION AND MANUFACTURING

### § 7675. American innovation and manufacturing

**(a) Short title**

This section may be cited as the "American Innovation and Manufacturing Act of 2020".

**(b) Definitions**

In this section:

**(1) Administrator**

The term "Administrator" means the Administrator of the Environmental Protection Agency.

**(2) Allowance**

The term "allowance" means a limited authorization for the production or consumption of a regulated substance established under subsection (e).

**(3) Consumption**

The term "consumption", with respect to a regulated substance, means a quantity equal to the difference between—

(A) a quantity equal to the sum of—

(i) the quantity of that regulated substance produced in the United States; and

(ii) the quantity of the regulated substance imported into the United States; and

(B) the quantity of the regulated substance exported from the United States.

## (4) Consumption baseline

The term "consumption baseline" means the baseline established for the consumption of regulated substances under subsection (e)(1)(C).

## (5) Exchange value

The term "exchange value" means the value assigned to a regulated substance in accordance with subsections (c) and (e), as applicable.

## (6) Import

The term "import" means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, regardless of whether that landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States.

## (7) Produce

### (A) In general

The term "produce" means the manufacture of a regulated substance from a raw material or feedstock chemical (but not including the destruction of a regulated substance by a technology approved by the Administrator).

### (B) Exclusions

The term "produce" does not include—
(i) the manufacture of a regulated substance that is used and entirely consumed (except for trace quantities) in the manufacture of another chemical; or
(ii) the reclamation, reuse, or recycling of a regulated substance.

## (8) Production baseline

The term "production baseline" means the baseline established for the production of regulated substances under subsection (e)(1)(B).

## (9) Reclaim; reclamation

The terms "reclaim" and "reclamation" mean—
(A) the reprocessing of a recovered regulated substance to at least the purity described in standard 700-2016 of the Air-Conditioning, Heating, and Refrigeration Institute (or an appropriate successor standard adopted by the Administrator); and
(B) the verification of the purity of that regulated substance using, at a minimum, the analytical methodology described in the standard referred to in subparagraph (A).

## (10) Recover

The term "recover" means the process by which a regulated substance is—
(A) removed, in any condition, from equipment; and
(B) stored in an external container, with or without testing or processing the regulated substance.

## (11) Regulated substance

The term "regulated substance" means—
(A) a substance listed in the table contained in subsection (c)(1); and
(B) a substance included as a regulated substance by the Administrator under subsection (c)(3).

## (c) Listing of regulated substances

### (1) List of regulated substances

Each of the following substances, and any isomers of such a substance, shall be a regulated substance:

| Chemical Name | Common Name | Exchange Value |
|---|---|---|
| CHF₂CHF₂ | HFC-134 | 1100 |
| CH₂FCF₃ | HFC-134a | 1430 |
| CH₂FCHF₂ | HFC-143 | 353 |
| CHF₂CH₂CF₃ | HFC-245fa | 1030 |
| CF₃CH₂CF₂CH₃ | HFC-365mfc | 794 |
| CF₃CHFCF₃ | HFC-227ea | 3220 |
| CH₂FCF₂CF₃ | HFC-236cb | 1340 |
| CHF₂CHFCF₃ | HFC-236ea | 1370 |
| CF₃CH₂CF₃ | HFC-236fa | 9810 |
| CH₂FCF₂CHF₂ | HFC-245ca | 693 |
| CF₃CHFCHFCF₂CF₃ | HFC-43-10mee | 1640 |
| CH₂F₂ | HFC-32 | 675 |
| CHF₂CF₃ | HFC-125 | 3500 |
| CH₃CF₃ | HFC-143a | 4470 |
| CH₃F | HFC-41 | 92 |
| CH₂FCH₂F | HFC-152 | 53 |
| CH₃CHF₂ | HFC-152a | 124 |
| CHF₃ | HFC-23 | 14800. |

### (2) Review

The Administrator may—
(A) review the exchange values listed in the table contained in paragraph (1) on a periodic basis; and
(B) subject to notice and opportunity for public comment, adjust the exchange values solely on the basis of—
(i) the best available science; and
(ii) other information consistent with widely used or commonly accepted existing exchange values.

### (3) Other regulated substances

### (A) In general

Subject to notice and opportunity for public comment, the Administrator may designate a substance not included in the table contained in paragraph (1) as a regulated substance if—
(i) the substance—
(I) is a chemical substance that is a saturated hydrofluorocarbon; and
(II) has an exchange value, as determined by the Administrator in accordance with the basis described in paragraph (2)(B), of greater than 53; and
(ii) the designation of the substance as a regulated substance would be consistent with the purposes of this section.

### (B) Savings provision

### (i) In general

Nothing in this paragraph authorizes the Administrator to designate as a regulated substance a blend of substances that includes a saturated hydrofluorocarbon for purposes of phasing down production or consumption of regulated substances under subsection (e), even if the saturated hydrofluorocarbon is, or may be, designated as a regulated substance.

### (ii) Authority of Administrator

Clause (i) does not affect the authority of the Administrator to regulate under this

Act[1] a regulated substance within a blend of substances.

### (d) Monitoring and reporting requirements

#### (1) Production, import, and export level reports

##### (A) In general

On a periodic basis, to be determined by the Administrator, but not less frequently than annually, each person who, within the applicable reporting period, produces, imports, exports, destroys, transforms, uses as a process agent, or reclaims a regulated substance shall submit to the Administrator a report that describes, as applicable, the quantity of the regulated substance that the person—

(i) produced, imported, and exported;

(ii) reclaimed;

(iii) destroyed by a technology approved by the Administrator;

(iv) used and entirely consumed (except for trace quantities) in the manufacture of another chemical; or

(v) used as a process agent.

##### (B) Requirements

###### (i) Signed and attested

The report under subparagraph (A) shall be signed and attested by a responsible officer (within the meaning of the Clean Air Act (42 U.S.C. 7401 et seq.)).

###### (ii) No further reports required

A report under subparagraph (A) shall not be required from a person if the person—

(I) permanently ceases production, importation, exportation, destruction, transformation, use as a process agent, or reclamation of all regulated substances; and

(II) notifies the Administrator in writing that the requirement under subclause (I) has been met.

###### (iii) Baseline period

Each report under subparagraph (A) shall include, as applicable, the information described in that subparagraph for the baseline period of calendar years 2011 through 2013.

#### (2) Coordination

The Administrator may allow any person subject to the requirements of paragraph (1)(A) to combine and include the information required to be reported under that paragraph with any other related information that the person is required to report to the Administrator.

### (e) Phase-down of production and consumption of regulated substances

#### (1) Baselines

##### (A) In general

Subject to subparagraph (D), the Administrator shall establish for the phase-down of regulated substances—

(i) a production baseline for the production of all regulated substances in the United States, as described in subparagraph (B); and

(ii) a consumption baseline for the consumption of all regulated substances in the United States, as described in subparagraph (C).

##### (B) Production baseline described

The production baseline referred to in subparagraph (A)(i) is the quantity equal to the sum of—

(i) the average annual quantity of all regulated substances produced in the United States during the period—

(I) beginning on January 1, 2011; and

(II) ending on December 31, 2013; and

(ii) the quantity equal to the sum of—

(I) 15 percent of the production level of hydrochlorofluorocarbons in calendar year 1989; and

(II) 0.42 percent of the production level of chlorofluorocarbons in calendar year 1989.

##### (C) Consumption baseline described

The consumption baseline referred to in subparagraph (A)(ii) is the quantity equal to the sum of—

(i) the average annual quantity of all regulated substances consumed in the United States during the period—

(I) beginning on January 1, 2011; and

(II) ending on December 31, 2013; and

(ii) the quantity equal to the sum of—

(I) 15 percent of the consumption level of hydrochlorofluorocarbons in calendar year 1989; and

(II) 0.42 percent of the consumption level of chlorofluorocarbons in calendar year 1989.

##### (D) Exchange values

###### (i) In general

For purposes of establishing the baselines pursuant to subparagraphs (B) and (C), the Administrator shall use the exchange values listed in the table contained in subsection (c)(1) for regulated substances and the following exchange values for hydrochlorofluorocarbons and chlorofluorocarbons:

| Table 2 | | |
| --- | --- | --- |
| Chemical Name | Common Name | Exchange Value |
| $CHFCl_2$ | HCFC–21 | 151 |
| $CHF_2Cl$ | HCFC–22 | 1810 |
| $C_2HF_3Cl_2$ | HCFC–123 | 77 |
| $C_2HF_4Cl$ | HCFC–124 | 609 |
| $CH_3CFCl_2$ | HCFC–141b | 725 |
| $CH_3CF_2Cl$ | HCFC–142b | 2310 |
| $CF_3CF_2CHCl_2$ | HCFC–225ca | 122 |
| $CF_2ClCF_2CHClF$ | HCFC–225cb | 595 |

| Table 3 | | |
| --- | --- | --- |
| Chemical Name | Common Name | Exchange Value |
| $CFCl_3$ | CFC–11 | 4750 |
| $CF_2Cl_2$ | CFC–12 | 10900 |
| $C_2F_3Cl_3$ | CFC–113 | 6130 |
| $C_2F_4Cl_2$ | CFC–114 | 10000 |
| $C_2F_5Cl$ | CFC–115 | 7370 |

###### (ii) Review

The Administrator may—

(I) review the exchange values listed in the tables contained in clause (i) on a periodic basis; and

---

[1] So in original. Probably means "this section".

(II) subject to notice and opportunity for public comment, adjust the exchange values solely on the basis of—

(aa) the best available science; and

(bb) other information consistent with widely used or commonly accepted existing exchange values.

### (2) Production and consumption phase-down

#### (A) In general

During the period beginning on January 1 of each year listed in the table contained in subparagraph (C) and ending on December 31 of the year before the next year listed on that table, except as otherwise permitted under this section, no person shall—

(i) produce a quantity of a regulated substance without a corresponding quantity of production allowances, except as provided in paragraph (5);

(ii) consume a quantity of a regulated substance without a corresponding quantity of consumption allowances; or

(iii) hold, use, or transfer any production allowance or consumption allowance allocated under this section except in accordance with regulations promulgated by the Administrator pursuant to subsection (g).

#### (B) Compliance

For each year listed on the table contained in subparagraph (C), the Administrator shall ensure that the annual quantity of all regulated substances produced or consumed in the United States does not exceed the product obtained by multiplying—

(i) the production baseline or consumption baseline, as applicable; and

(ii) the applicable percentage listed on the table contained in subparagraph (C).

#### (C) Relation to baseline

On January 1 of each year listed in the following table, the Administrator shall apply the applicable percentage, as described in subparagraph (A):

| Date | Percentage of Production Baseline | Percentage of Consumption Baseline |
|---|---|---|
| 2020–2023 | 90 percent | 90 percent |
| 2024–2028 | 60 percent | 60 percent |
| 2029–2033 | 30 percent | 30 percent |
| 2034–2035 | 20 percent | 20 percent |
| 2036 and thereafter | 15 percent | 15 percent |

#### (D) Allowances

##### (i) Quantity

Not later than October 1 of each calendar year, the Administrator shall use the quantity calculated under subparagraph (B) to determine the quantity of allowances for the production and consumption of regulated substances that may be used for the following calendar year.

##### (ii) Nature of allowances

###### (I) In general

An allowance allocated under this section—

(aa) does not constitute a property right; and

(bb) is a limited authorization for the production or consumption of a regulated substance under this section.

###### (II) Savings provision

Nothing in this section or in any other provision of law limits the authority of the United States to terminate or limit an authorization described in subclause (I)(bb).

### (3) Regulations regarding production and consumption of regulated substances

Not later than 270 days after December 27, 2020, which shall include a period of notice and opportunity for public comment, the Administrator shall issue a final rule—

(A) phasing down the production of regulated substances in the United States through an allowance allocation and trading program in accordance with this section; and

(B) phasing down the consumption of regulated substances in the United States through an allowance allocation and trading program in accordance with the schedule under paragraph (2)(C) (subject to the same exceptions and other requirements as are applicable to the phase-down of production of regulated substances under this section).

### (4) Exceptions; essential uses

#### (A) Feedstocks and process agents

Except for the reporting requirements described in subsection (d)(1), this section does not apply to—

(i) a regulated substance that is used and entirely consumed (except for trace quantities) in the manufacture of another chemical; or

(ii) a regulated substance that is used and not entirely consumed in the manufacture of another chemical, if the remaining amounts of the regulated substance are subsequently destroyed.

#### (B) Essential uses

##### (i) In general

Beginning on December 27, 2020, and subject to paragraphs (2) and (3) and clauses (ii) and (iii), the Administrator may, by rule, after considering technical achievability, commercial demands, affordability for residential and small business consumers, safety, and other relevant factors, including overall economic costs and environmental impacts compared to historical trends, allocate a quantity of allowances for a period of not more than 5 years for the production and consumption of a regulated substance exclusively for the use of the regulated substance in an application, if—

(I) no safe or technically achievable substitute will be available during the applicable period for that application; and

(II) the supply of the regulated substance that manufacturers or users of the regulated substance for that application are capable of securing from chemical manufacturers, as authorized under paragraph (2)(A), including any quantities of a regulated substance available from production

or import, is insufficient to accommodate the application.

**(ii) Petition**

If the Administrator receives a petition requesting the designation of an application as an essential use under clause (i), the Administrator shall—

(I) not later than 180 days after the date on which the Administrator receives the petition—

(aa) make the complete petition available to the public; and

(bb) when making the petition available to the public under item (aa), propose and seek public comment on—

(AA) a determination of whether to designate the application as an essential use; and

(BB) if the Administrator proposes to designate the application as an essential use, making the requisite allocation of allowances; and

(II) not later than 270 days after the date on which the Administrator receives the petition, take final action on the petition.

**(iii) Limitation**

A person receiving an allocation under clause (i) or (iv) or as a result of a petition granted under clause (ii) may not produce or consume a produced quantity of regulated substances that, considering the respective exchange values of the regulated substances, exceeds the number of allowances issued under paragraphs (2) and (3) that are held by that person.

**(iv) Mandatory allocations**

**(I) In general**

Notwithstanding clause (i) and subject to clause (iii) and paragraphs (2) and (3), for the 5-year period beginning on December 27, 2020, the Administrator shall allocate the full quantity of allowances necessary, based on projected, current, and historical trends, for the production or consumption of a regulated substance for the exclusive use of the regulated substance in an application solely for—

(aa) a propellant in metered-dose inhalers;

(bb) defense sprays;

(cc) structural composite preformed polyurethane foam for marine use and trailer use;

(dd) the etching of semiconductor material or wafers and the cleaning of chemical vapor deposition chambers within the semiconductor manufacturing sector;

(ee) mission-critical military end uses, such as armored vehicle engine and shipboard fire suppression systems and systems used in deployable and expeditionary applications; and

(ff) onboard aerospace fire suppression.

**(II) Requirement**

The allocation of allowances under subclause (I) shall be determined through a rulemaking.

**(v) Review**

**(I) In general**

For each essential use application receiving an allocation of allowances under clause (i) or (iv), the Administrator shall review the availability of substitutes, including any quantities of the regulated substance available from reclaiming or prior production, not less frequently than once every 5 years.

**(II) Extension**

If, pursuant to a review under subclause (I), the Administrator determines, subject to notice and opportunity for public comment, that the requirements described in subclauses (I) and (II) of clause (i) are met, the Administrator shall authorize the production or consumption, as applicable, of any regulated substance used in the application for renewable periods of not more than 5 years for exclusive use in the application.

**(5) Domestic manufacturing**

Notwithstanding paragraph (2)(A)(i), the Administrator may, by rule, authorize a person to produce a regulated substance in excess of the number of production allowances held by that person, subject to the conditions that—

(A) the authorization is—

(i) for a renewable period of not more than 5 years; and

(ii) subject to notice and opportunity for public comment; and

(B) the production—

(i) is at a facility located in the United States;

(ii) is solely for export to, and use in, a foreign country that is not subject to the prohibition in subsection (j)(1); and

(iii) would not violate paragraph (2)(B).

**(f) Accelerated schedule**

**(1) In general**

Subject to paragraph (4), the Administrator may, only in response to a petition submitted to the Administrator in accordance with paragraph (3) and after notice and opportunity for public comment, promulgate regulations that establish a schedule for phasing down the production or consumption of regulated substances that is more stringent than the production and consumption levels of regulated substances required under subsection (e)(2)(C).

**(2) Requirements**

Any regulations promulgated under this subsection—

(A) shall—

(i) apply uniformly to the allocation of production and consumption allowances for regulated substances, in accordance with subsection (e)(3);

(ii) ensure that there will be sufficient quantities of regulated substances, including substances available from reclaiming, prior production, or prior import, to meet the needs for—

(I) applications that receive an allocation under clause (i) of subsection (e)(4)(B); and

(II) all applications that receive a mandatory allocation under items (aa) through (ff) of clause (iv)(I) of that subsection; and

(iii) foster continued reclamation of and transition from regulated substances; and

(B) shall not set the level of production allowances or consumption allowances below the percentage of the consumption baseline that is actually consumed during the calendar year prior to the year during which the Administrator makes a final determination with respect to the applicable proposal described in paragraph (3)(C)(iii)(I).

**(3) Petition**

**(A) In general**

A person may petition the Administrator to promulgate regulations for an accelerated schedule for the phase-down of production or consumption of regulated substances under paragraph (1).

**(B) Requirement**

A petition submitted under subparagraph (A) shall—

(i) be made at such time, in such manner, and containing such information as the Administrator shall require; and

(ii) include a showing by the petitioner that there are data to support the petition.

**(C) Timelines**

**(i) In general**

If the Administrator receives a petition under subparagraph (A), the Administrator shall—

(I) not later than 180 days after the date on which the Administrator receives the petition—

(aa) make the complete petition available to the public; and

(bb) when making the petition available to the public under item (aa), propose and seek public comment on the proposal of the Administrator to grant or deny the petition; and

(II) not later than 270 days after the date on which the Administrator receives the petition, take final action on the petition.

**(ii) Factors for determination**

In making a determination to grant or deny a petition submitted under subparagraph (A), the Administrator shall, to the extent practicable, factor in—

(I) the best available data;

(II) the availability of substitutes for uses of the regulated substance that is the subject of the petition, taking into account technological achievability, commercial demands, affordability for residential and small business consumers, safety, consumer costs, building codes, appliance efficiency standards, contractor training costs, and other relevant factors, including the quantities of regulated substances available from reclaiming, prior production, or prior import;

(III) overall economic costs and environmental impacts, as compared to historical trends; and

(IV) the remaining phase-down period for regulated substances under the final rule issued under subsection (e)(3), if applicable.

**(iii) Regulations**

After receiving public comment with respect to the proposal under clause (i)(I)(bb), if the Administrator makes a final determination to grant a petition under subparagraph (A), the final regulations with respect to the petition shall—

(I) be promulgated by not later than 1 year after the date on which the Administrator makes the proposal to grant the petition under that clause; and

(II) meet the requirements of paragraph (2).

**(D) Publication**

When the Administrator makes a final determination to grant or deny a petition under subparagraph (A), the Administrator shall publish a description of the reasons for that grant or denial, including a description of the information considered under subclauses (I) through (IV) of subparagraph (C)(ii).

**(E) Insufficient information**

If the Administrator determines that the data included under subparagraph (B)(ii) in a petition are not sufficient to make a determination under this paragraph, the Administrator shall use any authority available to the Administrator to acquire the necessary data.

**(4) Date of effectiveness**

The Administrator may not promulgate under paragraph (1) a regulation for the production or consumption of regulated substances that is more stringent than the production or consumption levels required under subsection (e)(2)(C) that takes effect before January 1, 2025.

**(5) Review**

**(A) In general**

The Administrator shall review the availability of substitutes for regulated substances subject to an accelerated schedule established under paragraph (1) in each sector and subsector in which the regulated substance is used, taking into account technological achievability, commercial demands, safety, and other relevant factors, including the quantities of regulated substances available from reclaiming, prior production, or prior import, by January 1, 2026 (for the first review), by January 1, 2031 (for the second review), and at least once every 5 years thereafter.

**(B) Public availability**

The Administrator shall make the results of a review conducted under subparagraph (A) publicly available.

**(6) Savings provision**

Nothing in this subsection authorizes the Administrator to promulgate regulations pursuant to this subsection that establish a schedule for phasing down the production or consump-

tion of regulated substances that is less stringent than the production and consumption levels of regulated substances required under subsection (e)(2)(C).

## (g) Exchange authority

### (1) Transfers

Not later than 270 days after December 27, 2020, which shall include a period of notice and opportunity for public comment, the Administrator shall promulgate a final regulation that governs the transfer of allowances for the production of regulated substances under subsection (e)(3)(A) that uses—

(A) the applicable exchange values described in the table contained in subsection (c)(1); or

(B) the exchange value described in the rule designating the substance as a regulated substance under subsection (c)(3).

### (2) Requirements

The final rule promulgated pursuant to paragraph (1) shall—

(A) ensure that the transfers under this subsection will result in greater total reductions in the production of regulated substances in each year than would occur during the year in the absence of the transfers;

(B) permit 2 or more persons to transfer production allowances if the transferor of the allowances will be subject, under the final rule, to an enforceable and quantifiable reduction in annual production that—

(i) exceeds the reduction otherwise applicable to the transferor under this section;

(ii) exceeds the quantity of production represented by the production allowances transferred to the transferee; and

(iii) would not have occurred in the absence of the transaction; and

(C) provide for the trading of consumption allowances in the same manner as is applicable under this subsection to the trading of production allowances.

## (h) Management of regulated substances

### (1) In general

For purposes of maximizing reclaiming and minimizing the release of a regulated substance from equipment and ensuring the safety of technicians and consumers, the Administrator shall promulgate regulations to control, where appropriate, any practice, process, or activity regarding the servicing, repair, disposal, or installation of equipment (including requiring, where appropriate, that any such servicing, repair, disposal, or installation be performed by a trained technician meeting minimum standards, as determined by the Administrator) that involves—

(A) a regulated substance;

(B) a substitute for a regulated substance;

(C) the reclaiming of a regulated substance used as a refrigerant; or

(D) the reclaiming of a substitute for a regulated substance used as a refrigerant.

### (2) Reclaiming

#### (A) In general

In carrying out this section, the Administrator shall consider the use of authority available to the Administrator under this section

to increase opportunities for the reclaiming of regulated substances used as refrigerants.

#### (B) Recovery

A regulated substance used as a refrigerant that is recovered shall be reclaimed before the regulated substance is sold or transferred to a new owner, except where the recovered regulated substance is sold or transferred to a new owner solely for the purposes of being reclaimed or destroyed.

### (3) Coordination

In promulgating regulations to carry out this subsection, the Administrator may coordinate those regulations with any other regulations promulgated by the Administrator that involve—

(A) the same or a similar practice, process, or activity regarding the servicing, repair, disposal, or installation of equipment; or

(B) reclaiming.

### (4) Inapplicability

No regulation promulgated pursuant to this subsection shall apply to a regulated substance or a substitute for a regulated substance that is contained in a foam.

### (5) Small business grants

#### (A) Definition of small business concern

In this paragraph, the term "small business concern" has the same meaning as in section 632 of title 15.

#### (B) Establishment

Subject to the availability of appropriations, the Administrator shall establish a grant program to award grants to small business concerns for the purchase of new specialized equipment for the recycling, recovery, or reclamation of a substitute for a regulated substance, including the purchase of approved refrigerant recycling equipment (as defined in section 609(b) of the Clean Air Act (42 U.S.C. 7671h(b))) for recycling, recovery, or reclamation in the service or repair of motor vehicle air conditioning systems.

#### (C) Matching funds

The non-Federal share of a project carried out with a grant under this paragraph shall be not less than 25 percent.

#### (D) Authorization of appropriations

There is authorized to be appropriated to carry out this paragraph $5,000,000 for each of fiscal years 2021 through 2023.

## (i) Technology transitions

### (1) Authority

Subject to the provisions of this subsection, the Administrator may by rule restrict, fully, partially, or on a graduated schedule, the use of a regulated substance in the sector or subsector in which the regulated substance is used.

### (2) Negotiated rulemaking

#### (A) Consideration required

Before proposing a rule for the use of a regulated substance for a sector or subsector under paragraph (1), the Administrator shall consider negotiating with stakeholders in the sector or subsector subject to the potential rule

in accordance with the negotiated rulemaking procedure provided for under subchapter III of chapter 5 of title 5 (commonly known as the "Negotiated Rulemaking Act of 1990").

**(B) Negotiated rulemakings**

If the Administrator negotiates a rulemaking with stakeholders using the procedure described in subparagraph (A), the Administrator shall, to the extent practicable, give priority to completing that rulemaking over completing rulemakings under this subsection that were not negotiated using that procedure.

**(C) No negotiated rulemaking**

If the Administrator does not negotiate a rulemaking with stakeholders using the procedure described in subparagraph (A), the Administrator shall, before commencement of the rulemaking process for a rule under paragraph (1), publish an explanation of the decision of the Administrator to not use that procedure.

**(3) Petitions**

**(A) In general**

A person may petition the Administrator to promulgate a rule under paragraph (1) for the restriction on use of a regulated substance in a sector or subsector, which shall include a request that the Administrator negotiate with stakeholders in accordance with paragraph (2)(A).

**(B) Response**

The Administrator shall grant or deny a petition under subparagraph (A) not later than 180 days after the date of receipt of the petition.

**(C) Requirements**

**(i) Explanation**

If the Administrator denies a petition under subparagraph (B), the Administrator shall publish in the Federal Register an explanation of the denial.

**(ii) Final rule**

If the Administrator grants a petition under subparagraph (B), the Administrator shall promulgate a final rule not later than 2 years after the date on which the Administrator grants the petition.

**(iii) Publication of petitions**

Not later than 30 days after the date on which the Administrator receives a petition under subparagraph (A), the Administrator shall make that petition available to the public in full.

**(4) Factors for determination**

In carrying out a rulemaking using the procedure described in paragraph (2) or making a determination to grant or deny a petition submitted under paragraph (3), the Administrator shall, to the extent practicable, factor in—

(A) the best available data;

(B) the availability of substitutes for use of the regulated substance that is the subject of the rulemaking or petition, as applicable, in a sector or subsector, taking into account technological achievability, commercial demands,

affordability for residential and small business consumers, safety, consumer costs, building codes, appliance efficiency standards, contractor training costs, and other relevant factors, including the quantities of regulated substances available from reclaiming, prior production, or prior import;

(C) overall economic costs and environmental impacts, as compared to historical trends; and

(D) the remaining phase-down period for regulated substances under the final rule issued under subsection (e)(3), if applicable.

**(5) Evaluation**

In carrying out this subsection, the Administrator shall—

(A) evaluate substitutes for regulated substances in a sector or subsector, taking into account technological achievability, commercial demands, safety, overall economic costs and environmental impacts, and other relevant factors; and

(B) make the evaluation under subparagraph (A) available to the public, including the factors associated with the safety of those substitutes.

**(6) Effective date of rules**

No rule under this subsection may take effect before the date that is 1 year after the date on which the Administrator promulgates the applicable rule under this subsection.

**(7) Applicability**

**(A) Definition of retrofit**

In this paragraph, the term "retrofit" means to upgrade existing equipment where the regulated substance is changed, which—

(i) includes the conversion of equipment to achieve system compatibility; and

(ii) may include changes in lubricants, gaskets, filters, driers, valves, o-rings, or equipment components for that purpose.

**(B) Applicability of rules**

A rule promulgated under this subsection shall not apply to—

(i) an essential use under clause (i) or (iv) of subsection (e)(4)(B), including any use for which the production or consumption of the regulated substance is extended under clause (v)(II) of that subsection; or

(ii) except for a retrofit application, equipment in existence in a sector or subsector before December 27, 2020.

**(j) International cooperation**

**(1) In general**

Subject to paragraph (2), no person subject to the requirements of this section shall trade or transfer a production allowance or, after January 1, 2033, export a regulated substance to a person in a foreign country that, as determined by the Administrator, has not enacted or otherwise established within a reasonable timeframe after December 27, 2020, the same or similar requirements or otherwise undertaken commitments regarding the production and consumption of regulated substances as are contained in this section.

## (2) Transfers

Pursuant to paragraph (1), a person in the United States may engage in a trade or transfer of a production allowance—

(A) to a person in a foreign country if, at the time of the transfer, the Administrator revises the number of allowances for production under subsection (e)(2), as applicable, for the United States such that the aggregate national production of the regulated substance to be traded under the revised production limits is equal to the least of—

(i) the maximum production level permitted for the applicable regulated substance in the year of the transfer under this section, less the production allowances transferred;

(ii) the maximum production level permitted for the applicable regulated substances in the transfer year under applicable law, less the production allowances transferred; and

(iii) the average of the actual national production level of the applicable regulated substances for the 3-year period ending on the date of the transfer, less the production allowances transferred; or

(B) from a person in a foreign country if, at the time of the trade or transfer, the Administrator finds that the foreign country has revised the domestic production limits of the regulated substance in the same manner as provided with respect to transfers by a person in United [2] States under this subsection.

## (3) Effect of transfers on production limits

The Administrator may—

. (A) reduce the production limits established under subsection (e)(2)(B) as required as a prerequisite to a transfer described in paragraph (2)(A); or

(B) increase the production limits established under subsection (e)(2)(B) to reflect production allowances acquired under a trade or transfer described in paragraph (2)(B).

## (4) Regulations

The Administrator shall—

(A) not later than 1 year after December 27, 2020, promulgate a final rule to carry out this subsection; and

(B) not less frequently than annually, review and, if necessary, revise the final rule promulgated pursuant to subparagraph (A).

## (k) Relationship to other law

### (1) Implementation

#### (A) Rulemakings

The Administrator may promulgate such regulations as are necessary to carry out the functions of the Administrator under this section.

#### (B) Delegation

The Administrator may delegate to any officer or employee of the Environmental Protection Agency such of the powers and duties of the Administrator under this section as the Administrator determines to be appropriate.

#### (C) Clean Air Act

Sections 113, 114, 304, and 307 of the Clean Air Act (42 U.S.C. 7413, 7414, 7604, 7607) shall apply to this section and any rule, rulemaking, or regulation promulgated by the Administrator pursuant to this section as though this section were expressly included in title VI of that Act (42 U.S.C. 7671 et seq.).

### (2) Preemption

#### (A) In general

Subject to subparagraph (B), during the 5-year period beginning on December 27, 2020, and with respect to an exclusive use for which a mandatory allocation of allowances is provided under subsection (e)(4)(B)(iv)(I), no State or political subdivision of a State may enforce a statute or administrative action restricting the management or use of a regulated substance within that exclusive use.

#### (B) Extension

##### (i) In general

Subject to clause (ii), if, pursuant to subclause (I) of subsection (e)(4)(B)(v), the Administrator authorizes an additional period under subclause (II) of that subsection for the production or consumption of a regulated substance for an exclusive use described in subparagraph (A), no State or political subdivision of a State may enforce a statute or administrative action restricting the management or use of the regulated substance within that exclusive use for the duration of that additional period.

##### (ii) Limitation

The period for which the limitation under clause (i) applies shall not exceed 5 years from the date on which the period described in subparagraph (A) ends.

(Pub. L. 116–260, div. S, § 103, Dec. 27, 2020, 134 Stat. 2255.)

REFERENCES IN TEXT

The Clean Air Act, referred to in subsecs. (d)(1)(B)(i) and (k)(1)(C), is act July 14, 1955, ch. 360, 69 Stat. 322, which is classified generally to this chapter. Title VI of the Act is classified generally to subchapter VI (§ 7671 et seq.) of this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 7401 of this title and Tables.

CODIFICATION

Section was enacted as the American Innovation and Manufacturing Act of 2020, and also as part of the Consolidated Appropriations Act, 2021, and not as part of the Clean Air Act which comprises this chapter.

## CHAPTER 86—EARTHQUAKE HAZARDS REDUCTION

## § 7704. National Earthquake Hazards Reduction Program

### (a) Establishment

*[See main edition for text of (1) to (3)]*

---

[2] So in original. Probably should be preceded by "the".

the Administrator, any class of contracts, grants or loans from the provisions of this Order. In any such case, the head of the Federal agency granting such exemption shall (A) promptly notify the Administrator of such exemption and the justification therefor; (B) review the necessity for each such exemption annually; and (C) report to the Administrator annually all such exemptions in effect. Exemptions granted pursuant to this section shall be for a period not to exceed one year. Additional exemptions may be granted for periods not to exceed one year upon the making of a new determination by the head of the Federal agency concerned.

(2) The Administrator may, by rule or regulation, exempt any or all Federal agencies from any or all of the provisions of this Order with respect to any class or classes of contracts, grants, or loans, which (A) involve less than specified dollar amounts, or (B) have a minimal potential impact upon the environment, or (C) involve persons who are not prime contractors or direct recipients of Federal assistance by way of contracts, grants, or loans.

(b) Federal agencies shall reconsider any exemption granted under subsection (a) whenever requested to do so by the Administrator.

(c) The Administrator shall annually notify the President and the Congress of all exemptions granted, or in effect, under this Order during the preceding year.

SEC. 9. *Related Actions.* The imposition of any sanction or penalty under or pursuant to this Order shall not relieve any person of any legal duty to comply with any provisions of the Air Act or the Water Act.

SEC. 10. *Applicability.* This Order shall not apply to contracts, grants, or loans involving the use of facilities located outside the United States.

SEC. 11. *Uniformity.* Rules, regulations, standards, and guidelines issued pursuant to this order and section 508 of the Water Act [33 U.S.C. 1368] shall, to the maximum extent feasible, be uniform with regulations issued pursuant to this order, Executive Order No. 11602 of June 29, 1971 [formerly set out above], and section 306 of the Air Act [this section].

SEC. 12. *Order Superseded.* Executive Order No. 11602 of June 29, 1971, is hereby superseded.

RICHARD NIXON.

## § 7607. Administrative proceedings and judicial review

### (a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4)[1] or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the[2] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),,[3] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph,[4] the district court of the United States for any district in which such person is found or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

### (b) Judicial review

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,,[3] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5)[1] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, section 7419 of this title, or under section 7420 of this title, or his action under section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such ac-

---

[1] See References in Text note below.
[2] So in original. Probably should be "this".
[3] So in original.

[4] So in original. Probably should be "subsection,".

tion is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

**(c) Additional evidence**

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to [5] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

**(d) Rulemaking**

(1) This subsection applies to—

(A) the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

(B) the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

(C) the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F) of this title, or any regulation under section 7412(m) or (n) of this title,

(D) the promulgation of any requirement for solid waste combustion under section 7429 of this title,

(E) the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

(F) the promulgation or revision of any aircraft emission standard under section 7571 of this title,

(G) the promulgation or revision of any regulation under subchapter IV–A (relating to control of acid deposition),

(H) promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

(I) promulgation or revision of regulations under subchapter VI (relating to stratosphere and ozone protection),

(J) promulgation or revision of regulations under part C of subchapter I (relating to prevention of significant deterioration of air quality and protection of visibility),

(K) promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

(L) promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

(M) promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

(N) action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

(O) the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

(P) the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

(Q) the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II,

(R) the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

(S) the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

(T) the promulgation or revision of any regulation under subchapter IV–A (relating to acid deposition),

(U) the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

(V) such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of title 5.

(2) Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a "rule"). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in

---

[5] So in original. The word "to" probably should not appear.

the appropriate regional office of the Environmental Protection Agency.

(3) In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as the "comment period"). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of—

(A) the factual data on which the proposed rule is based;

(B) the methodology used in obtaining the data and in analyzing the data; and

(C) the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

(4)(A) The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

(B)(i) Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

(ii) The drafts of proposed rules submitted by the Administrator to the Office of Management and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall

be placed in the docket no later than the date of promulgation.

(5) In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

(6)(A) The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

(B) The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

(C) The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

(7)(A) The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

(B) Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b)). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

(8) The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b)) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have

been significantly changed if such errors had not been made.

(9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

(D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

(10) Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

(11) The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

**(e) Other methods of judicial review not authorized**

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

**(f) Costs**

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

**(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties**

In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

**(h) Public participation**

It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section [6] 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

(July 14, 1955, ch. 360, title III, § 307, as added Pub. L. 91–604, § 12(a), Dec. 31, 1970, 84 Stat. 1707; amended Pub. L. 92–157, title III, § 302(a), Nov. 18, 1971, 85 Stat. 464; Pub. L. 93–319, § 6(c), June 22, 1974, 88 Stat. 259; Pub. L. 95–95, title III, §§ 303(d), 305(a),

[6] So in original. Probably should be "sections".

(c), (f)–(h), Aug. 7, 1977, 91 Stat. 772, 776, 777; Pub. L. 95–190, § 14(a)(79), (80), Nov. 16, 1977, 91 Stat. 1404; Pub. L. 101–549, title I, §§ 108(p), 110(5), title III, § 302(g), (h), title VII, §§ 702(c), 703, 706, 707(h), 710(b), Nov. 15, 1990, 104 Stat. 2469, 2470, 2574, 2681–2684.)

REFERENCES IN TEXT

Section 7521(b)(4) of this title, referred to in subsec. (a), was repealed by Pub. L. 101–549, title II, § 230(2), Nov. 15, 1990, 104 Stat. 2529.

Section 7521(b)(5) of this title, referred to in subsec. (b)(1), was repealed by Pub. L. 101–549, title II, § 230(3), Nov. 15, 1990, 104 Stat. 2529.

Section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977), referred to in subsec. (b)(1), was in the original "section 119(c)(2)(A), (B), or (C) (as in effect before the date of enactment of the Clean Air Act Amendments of 1977)", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, § 3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of Pub. L. 95–95, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to subsec. (d)(5) of section 7413 of this title. Section 7413(d) of this title was subsequently amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, no longer relates to final compliance orders. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

Part C of subchapter I, referred to in subsec. (d)(1)(J), was in the original "subtitle C of title I", and was translated as reading "part C of title I" to reflect the probable intent of Congress, because title I does not contain subtitles.

CODIFICATION

In subsec. (h), "subchapter II of chapter 5 of title 5" was substituted for "the Administrative Procedures Act" on authority of Pub. L. 89–554, § 7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5, Government Organization and Employees.

Section was formerly classified to section 1857h–5 of this title.

PRIOR PROVISIONS

A prior section 307 of act July 14, 1955, was renumbered section 314 by Pub. L. 91–604 and is classified to section 7614 of this title.

Another prior section 307 of act July 14, 1955, ch. 360, title III, formerly § 14, as added Dec. 17, 1963, Pub. L. 88–206, § 1, 77 Stat. 401, was renumbered section 307 by Pub. L. 89–272, renumbered section 310 by Pub. L. 90–148, and renumbered section 317 by Pub. L. 91–604, and is set out as a Short Title note under section 7401 of this title.

AMENDMENTS

1990—Subsec. (a). Pub. L. 101–549, § 703, struck out par. (1) designation at beginning, inserted provisions authorizing issuance of subpoenas and administration of oaths for purposes of investigations, monitoring, reporting requirements, entries, compliance inspections, or administrative enforcement proceedings under this chapter, and struck out "or section 7521(b)(5)" after "section 7410(f)".

Subsec. (b)(1). Pub. L. 101–549, § 706(2), which directed amendment of second sentence by striking "under section 7413(d) of this title" immediately before "under section 7419 of this title", was executed by striking "under section 7413(d) of this title," before "under section 7419 of this title", to reflect the probable intent of Congress.

Pub. L. 101–549, § 706(1), inserted at end: "The filing of a petition for reconsideration by the Administrator of

any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action."

Pub. L. 101–549, § 702(c), inserted "or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title," before "or any other final action of the Administrator".

Pub. L. 101–549, § 302(g), substituted "section 7412" for "section 7412(c)".

Subsec. (b)(2). Pub. L. 101–549, § 707(h), inserted sentence at end authorizing challenge to deferrals of performance of nondiscretionary statutory actions.

Subsec. (d)(1)(C). Pub. L. 101–549, § 110(5)(A), amended subpar. (C) generally. Prior to amendment, subpar. (C) read as follows: "the promulgation or revision of any standard of performance under section 7411 of this title or emission standard under section 7412 of this title,".

Subsec. (d)(1)(D), (E). Pub. L. 101–549, § 302(h), added subpar. (D) and redesignated former subpar. (D) as (E). Former subpar. (E) redesignated (F).

Subsec. (d)(1)(F). Pub. L. 101–549, § 302(h), redesignated subpar. (E) as (F). Former subpar. (F) redesignated (G).

Pub. L. 101–549, § 110(5)(B), amended subpar. (F) generally. Prior to amendment, subpar. (F) read as follows: "promulgation or revision of regulations pertaining to orders for coal conversion under section 7413(d)(5) of this title (but not including orders granting or denying any such orders),".

Subsec. (d)(1)(G), (H). Pub. L. 101–549, § 302(h), redesignated subpars. (F) and (G) as (G) and (H), respectively. Former subpar. (H) redesignated (I).

Subsec. (d)(1)(I). Pub. L. 101–549, § 710(b), which directed that subpar. (H) be amended by substituting "subchapter VI" for "part B of subchapter I", was executed by making the substitution in subpar. (I), to reflect the probable intent of Congress and the intervening redesignation of subpar. (H) as (I) by Pub. L. 101–549, § 302(h), see below.

Pub. L. 101–549, § 302(h), redesignated subpar. (H) as (I). Former subpar. (I) redesignated (J).

Subsec. (d)(1)(J) to (M). Pub. L. 101–549, § 302(h), redesignated subpars. (I) to (L) as (J) to (M), respectively. Former subpar. (M) redesignated (N).

Subsec. (d)(1)(N). Pub. L. 101–549, § 302(h), redesignated subpar. (M) as (N). Former subpar. (N) redesignated (O).

Pub. L. 101–549, § 110(5)(C), added subpar. (N) and redesignated former subpar. (N) as (U).

Subsec. (d)(1)(O) to (T). Pub. L. 101–549, § 302(h), redesignated subpars. (N) to (S) as (O) to (T), respectively. Former subpar. (T) redesignated (U).

Pub. L. 101–549, § 110(5)(C), added subpars. (O) to (T).

Subsec. (d)(1)(U). Pub. L. 101–549, § 302(h), redesignated subpar. (T) as (U). Former subpar. (U) redesignated (V).

Pub. L. 101–549, § 110(5)(C), redesignated former subpar. (N) as (U).

Subsec. (d)(1)(V). Pub. L. 101–549, § 302(h), redesignated subpar. (U) as (V).

Subsec. (h). Pub. L. 101–549, § 108(p), added subsec. (h).

1977—Subsec. (b)(1). Pub. L. 95–190 in text relating to filing of petitions for review in the United States Court of Appeals for the District of Columbia inserted provision respecting requirements under sections 7411 and 7412 of this title, and substituted provisions authorizing review of any rule issued under section 7413, 7419, or 7420 of this title, for provisions authorizing review of any rule or order issued under section 7420 of this title, relating to noncompliance penalties, and in text relating to filing of petitions for review in the United States Court of Appeals for the appropriate circuit inserted provision respecting review under section 7411(j), 7412(c), 7413(d), or 7419 of this title, provision authorizing review under section 1857c–10(c)(2)(A), (B), or (C) to the period prior to Aug. 7, 1977, and provisions authorizing review of denials or disapprovals by the Administrator under subchapter I of this chapter.

Pub. L. 95–95, § 305(c), (h), inserted rules or orders issued under section 7420 of this title (relating to noncompliance penalties) and any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter to the enumeration of actions of the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the District of Columbia, added the approval or promulgation by the Administrator of orders under section 7420 of this title, or any other final action of the Administrator under this chapter which is locally or regionally applicable to the enumeration of actions by the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the appropriate circuit, inserted provision that petitions otherwise capable of being filed in the Court of Appeals for the appropriate circuit may be filed only in the Court of Appeals for the District of Columbia if the action is based on a determination of nationwide scope, and increased from 30 days to 60 days the period during which the petition must be filed.

Subsec. (d). Pub. L. 95–95, § 305(a), added subsec. (d).

Subsec. (e). Pub. L. 95–95, § 303(d), added subsec. (e).

Subsec. (f). Pub. L. 95–95, § 305(f), added subsec. (f).

Subsec. (g). Pub. L. 95–95, § 305(g), added subsec. (g).

1974—Subsec. (b)(1). Pub. L. 93–319 inserted reference to the Administrator's action under section 1857c–10(c)(2)(A), (B), or (C) of this title or under regulations thereunder and substituted reference to the filing of a petition within 30 days from the date of promulgation, approval, or action for reference to the filing of a petition within 30 days from the date of promulgation or approval.

1971—Subsec. (a)(1). Pub. L. 92–157 substituted reference to section "7545(c)(3)" for "7545(c)(4)" of this title.

#### EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

#### TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

#### PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

#### MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of

(2) No person may transfer production allowances to or from a person in a foreign country without satisfying the requirements in §84.19. Every production allowance transferred in contravention of this paragraph constitutes a separate violation of this subpart.

(f) *Sale and distribution.* No person may sell or distribute, or offer for sale or distribution, any regulated substance that was produced or imported in violation of paragraphs (a) through (d) of this section, except for such actions needed to re-export the regulated substance. Every kilogram of a regulated substance sold or distributed, or offered for sale or distribution, in contravention of this paragraph constitutes a separate violation of this subpart. Sale or distribution, or offer for sale or distribution, of less than one kilogram of regulated substance in contravention of this paragraph constitutes a separate violation of this subpart.

(g) *False information.* No person may provide false, inaccurate, or misleading information to the EPA when petitioning, reporting, or for any communication required under this subpart.

(h) *Disposable cylinders.* (1) As of July 1, 2025, no person may import or domestically fill a regulated substance in a non-refillable cylinder.

(2) As of January 1, 2027, no person may sell or distribute, or offer for sale or distribution regulated substances contained in a non-refillable cylinder.

(3) Small cans containing less than two pounds of regulated substances that have a self-sealing valve that meets the requirements in 40 CFR 82.154(c)(2) are not subject to this restriction.

(i) *Labeling.* (1) As of January 1, 2022, no person may sell or distribute, offer for sale or distribution, or import containers containing a regulated substance that lacks a label or other permanent markings stating the common name(s), chemical name(s), or ASHRAE designation of the regulated substance(s) or blend contained within, and the percentages of the regulated substances if a blend.

(2) No person other than the importer may repackage regulated substances that were initially unlabeled or mislabeled. In order to repackage the regulated substances, the importer must either:

(i) Expend consumption allowances equal to the amount of allowances that would be required if each cylinder were full of HFC-23; or

(ii) Verify the contents with independent laboratory testing results and affix a correct label on the container that matches the lab-verified test results before the date of importation (consistent with the definition at 19 CFR 101.1) of the container.

(3)(i) No person producing, importing, reclaiming, recycling for fire suppression, or repackaging regulated substances may sell or distribute, or offer for sale or distribution, regulated substances without first testing a representative sample of the regulated substances that they are producing, importing, reclaiming, recycling for fire suppression, or repackaging to verify that the composition of the regulated substance(s) matches the container labeling. For regulated substances sold or distributed or offered for sale and distribution as refrigerants, sampling must be done consistent with appendix A to 40 CFR part 82, subpart F—Specifications for Refrigerants.

(ii) No person may sell or distribute, or offer for sale or distribution, regulated substances as a refrigerant that do not meet the specifications in appendix A to 40 CFR part 82, subpart F—Specifications for Refrigerants.

(j) *Relationship to other laws.* Section (k) of the AIM Act states that sections 113, 114, 304, and 307 of the Clean Air Act (42 U.S.C. 7413, 7414, 7604, 7607) shall apply to this section and any rule, rulemaking, or regulation promulgated by the Administrator pursuant to this section as though this section were expressly included in title VI of that Act (42 U.S.C. 7671 *et seq.*). Violation of this part is subject to Federal enforcement and the penalties laid out in section 113 of the Clean Air Act.

[86 FR 55206, Oct. 5, 2021]

## §84.7 Phasedown schedule.

(a) *Phasedown from baseline.* Total production and consumption of regulated substances in the United States in each year cannot exceed the

amounts (shown as a percentage of baseline) in the following table:

| Date | Percentage of production baseline (percent) | Percentage of consumption baseline (percent) |
|---|---|---|
| (1) 2022–2023 | 90 | 90 |
| (2) 2024–2028 | 60 | 60 |
| (3) 2029–2033 | 30 | 30 |
| (4) 2034–2035 | 20 | 20 |
| (5) 2036 and thereafter | 15 | 15 |

(b) *Annual production and consumption limits.* (1) The production baseline for regulated substances is 382,554,619 metric tons of exchange value equivalent.

(2) The consumption baseline for regulated substances is 303,887,017 metric tons of exchange value equivalent.

(3) Total production and consumption in metric tons of exchange value equivalent for regulated substances in the United States in each year is derived by multiplying the production baseline or consumption baseline by the percentage in paragraph (a) of this section. Total production and consumption allowances issued under this subpart may not exceed the quantities shown in the following table:

| Year | Total production (MTEVe) | Total consumption (MTEVe) |
|---|---|---|
| (i) 2022–2023 | 344,299,157 | 273,498,315 |
| (ii) 2024–2028 | 229,532,771 | 182,332,210 |
| (iii) 2029–2033 | 114,766,386 | 91,166,105 |
| (iv) 2034–2035 | 76,510,924 | 60,777,403 |
| (v) 2036 and thereafter | 57,383,193 | 45,583,053 |

## § 84.9 Allocation of calendar-year production allowances.

(a) The relevant agency official will issue, through a separate notification, calendar year production allowances to entities that produced a regulated substance in 2020. The number of production allowances allocated to each eligible entity for 2022–2023 is calculated as follows:

(1) Take the average of the three highest annual exchange value-weighted production amounts that each eligible entity reported to the agency for calendar years 2011 through 2019;

(2) Sum the "average high year" values determined in step 1 of all eligible entities and determine each entity's percentage of that total;

(3) Determine the amount of general pool production allowances by subtracting the quantity of application-specific allowances for that year as determined in accordance with § 84.13 and the set-aside in § 84.15 from the production cap in § 84.7(b)(3);

(4) Determine individual entities' production allowance quantities by multiplying each entity's percentage determined in step 2 by the amount of general pool allowances determined in step 3.

(b)(1) EPA will allocate calendar year production allowances to individual entities by October 1 of the calendar year prior to the year in which the allowances may be used based on the exchange value-weighted quantities calculated in paragraph (a)(4) of this section.

(2) EPA will provide public notice of the list of companies receiving production allowances as well as the quantities they will be allocated by that date.

(3) In addition to the procedure in paragraph (a) of this section, the relevant agency official will allocate calendar year production allowances to entities that qualified for allowances under § 84.15.

(4) If there are remaining production allowances after distribution from the

342