ORAL ARGUMENT SEPTEMBER 12, 2024

No. 23-1347

———————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

FOOD MARKETPLACE, INC., et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

———————————————

Petition for Review of Action of the U.S. Environmental Protection Agency

———————————————

**FINAL BRIEF FOR U.S. ENVIRONMENTAL PROTECTION AGENCY**

———————————————

TODD KIM
*Assistant Attorney General*

DANIEL J. MARTIN
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7411
Of Counsel:                Washington, D.C. 20044
                           (202) 307-1056
KAYTRUE TING               Daniel.Martin3@usdoj.gov
U.S. Environmental Protection Agency
Washington, D.C.           July 11, 2024

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

All parties, intervenors, and amici appearing in this court are listed in the

Brief for Petitioners.

### B.    Rulings Under Review

References to the rulings at issue appear in the Brief for Petitioners.

### C.    Related Cases

The two related cases are listed in the Brief for Petitioners.

/s/ *Daniel J. Martin*
DANIEL J. MARTIN

Counsel for Respondents

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..................................................................................i

TABLE OF AUTHORITIES ........................................................................v

GLOSSARY ........................................................................................ix

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION.....................................................4

STATEMENT OF THE ISSUES...........................................................4

PERTINENT STATUTES AND REGULATIONS.................................5

STATEMENT OF THE CASE................................................................6

    A.    Statutory Background and the AIM Act in Context ............................6

        1.    The Montreal Protocol ..................................................6

        2.    The AIM Act HFC Phasedown....................................7

        3.    Judicial Review ..........................................................10

    B.    The Technology Transitions Rule .......................................10

        1.    The Notice of Proposed Rulemaking........................11

        2.    The Final Technology Transitions Rule ...................12

            a.    EPA's regulatory approach............................12

            b.    EPA's analysis of available substitutes ..........14

            c.    HFC restrictions in the challenged subsectors........................................................16

3.    The Interim Final Rule for Residential and Light Commercial Air-Conditioning and Heat Pump Systems .................................................................. 17

SUMMARY OF ARGUMENT ........................................................... 19

STANDARD OF REVIEW ................................................................ 24

ARGUMENT ..................................................................................... 25

I.    EPA Appropriately Interpreted and Applied the AIM Act's "Availability of Substitutes" Factor. .............................................. 26

   A.    The Clean Air Act's Strict Exhaustion Requirement Bars The Groups' New Statutory Interpretation Argument. ....................... 28

   B.    EPA Correctly Interpreted the AIM Act's "Availability" Factor. ................................................................................... 29

II.   EPA Reasonably Considered the Availability Subfactors When It Set Compliance Deadlines in the Challenged Subsectors ......................... 32

   A.    The Court Should Reject the Food Industry Groups' Rule-Wide Availability Analysis and, as EPA Did, Consider Each Subsector's Compliance Deadline Separately. ..................................................................... 32

   B.    EPA Reasonably Applied the Availability Subfactors When It Established the Challenged Compliance Deadlines. ................................................................ 35

      1.    Retail Food Refrigeration — Stand-Alone Units. .................... 37

      2.    Residential and Light Commercial Air Conditioning and Heat Pumps. ...................... 40

      3.    Cold Storage Warehouse Systems ........................................... 44

      4.    Remote Condensing Units in Retail Food Refrigeration Systems. ............................... 46

     5.     Supermarket Systems ...................................................49

III.  EPA Reasonably Considered the Technology Transitions
Rule's Overall Economic Costs and Environmental Impacts. ......................56

IV.  The Food Industry Groups Forfeited Their Remaining-
Phasedown-Period Argument, Which Fails in Any Event. ...........................60

CONCLUSION ...................................................................................................63

CERTIFICATE OF COMPLIANCE ...................................................................65

ADDENDUM ......................................................................................................66

# TABLE OF AUTHORITIES

## Cases

*Am. Petroleum Inst. v. EPA,*
  862 F.3d 50 (D.C. Cir. 2017), *as modified on reh'g,*
  883 F.3d 918 (D.C. Cir. 2018) ................................................................35

*Bluewater Network v. EPA,*
  370 F.3d 1 (D.C. Cir. 2004) ........................................................... 24, 37

*Growth Energy v. EPA,*
  5 F.4th 1 (D.C. Cir. 2021) ..................................................................28

*Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA,*
  *(HARDI)*, 71 F.4th 59 (D.C. Cir. 2023) ........................................ 6, 24, 28, 59, 61

*MD/DC/DE Broadcasters Ass'n v. FCC,*
  236 F.3d 13 (D.C. Cir. 2001) ..............................................................34

*Maryland v. EPA,*
  958 F.3d 1185 (D.C. Cir. 2020) ..........................................................24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,*
  463 U.S. 29 (1983) ................................................................. 24, 32, 48

*RMS of Ga., LLC v. EPA,*
  64 F.4th 1368 (11th Cir. 2023) ..........................................................6, 7

## Statutes

42 U.S.C. § 7407(d)(3)(E) ....................................................................31

42 U.S.C. § 7502(a)(2)(C) ....................................................................31

42 U.S.C. § 7607 ......................................................................... 10, 24

42 U.S.C. § 7607(b) ............................................................................4

42 U.S.C. § 7607(d)(1)(I) ....................................................................10

42 U.S.C. § 7607(d)(7)(B) .................................................. 10, 28

42 U.S.C. § 7607(d)(9)(A) .......................................................24

42 U.S.C. § 7671k ....................................................................15

42 U.S.C. § 7675 ...................................................................6, 7

42 U.S.C. § 7675(e)(2) ..............................................................7

42 U.S.C. § 7675(e)(2)(C) ....................................................8, 62

42 U.S.C. § 7675(e)(3) ..............................................................7

42 U.S.C. § 7675(e)(4)(B)(iv)(I)(aa)-(ff) .................................61

42 U.S.C. § 7675(h) ..................................................................8

42 U.S.C. § 7675(i) .............................................................8, 56

42 U.S.C. § 7675(i)(1) ...................................................8, 54, 62

42 U.S.C. § 7675(i)(3) ..............................................................9

42 U.S.C. § 7675(i)(3)(A) .......................................................10

42 U.S.C. § 7675(i)(4) ...................................................9, 25, 27

42 U.S.C. § 7675(i)(4)(A) .......................................................60

42 U.S.C. § 7675(i)(4)(B) .............................. 4, 9, 26, 30, 31, 33

42 U.S.C. § 7675(i)(4)(C) .......................................................59

42 U.S.C. § 7675(i)(4)(D) ....................................................4, 62

42 U.S.C. § 7675(i)(6) ..............................................................9

42 U.S.C. § 7675(k)(1)(C) ........................................ 4, 10, 24, 28

**State Statutes**

59 Okla. St. Ann. § 1000.30....................................................................15

Tex. Rev. Stat. § 382.551.......................................................................53

**Code of Federal Regulations**

40 C.F.R. § 84.5 ....................................................................................7

40 C.F.R. § 84.54(a)............................................................................13

40 C.F.R. § 84.54(a)(1)........................................................................40

40 C.F.R. § 84.54(a)(3)........................................................................13

40 C.F.R. § 84.54(a)(4)........................................................................37

40 C.F.R. § 84.54(a)(16)......................................................................31

40 C.F.R. § 84.54(b) ............................................................... 13, 37, 39, 40

40 C.F.R. § 84.54(c)............................................................................13

40 C.F.R. § 84.54(c)(1)........................................................................41

40 C.F.R. § 84.54(c)(9)........................................................................44

40 C.F.R. § 84.54(c)(11)......................................................................47

40 C.F.R. § 84.54(c)(12)......................................................................49

**Federal Registers**

80 Fed. Reg. 19,454 (Apr. 10, 2015) ....................................................42

81 Fed. Reg. 82, 272 (Nov. 18, 2016) ...................................................58

86 Fed. Reg. 55,116 (Oct. 5, 2021)....................................................6, 8

86 Fed. Reg. 57,141 (Oct. 14, 2021)....................................................10

87 Fed. Reg. 61,314 (Oct. 11, 2022)......................................................8

87 Fed. Reg. 76,738 (Dec. 15, 2022)............................................ 11, 61

88 Fed. Reg. 73,098 (Oct. 24, 2023)............. 1, 6, 14, 15, 16, 17, 26, 27, 29, 30, 32,
................................................ 33, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44,
................................................ 45, 46, 47, 48, 49, 50, 51, 52, 54, 56, 58, 62, 63

88 Fed. Reg. 88, 825 (Dec. 26, 2023)............................................ 18, 41

# GLOSSARY

| | |
|---|---|
| AIM Act | American Innovation and Manufacturing Act of 2020 |
| EPA | Environmental Protection Agency |
| HFCs | Hydrofluorocarbons |
| PFAS | Per- and poly- fluoroalkyl substances |
| SNAP | Significant New Alternatives Policy |

## INTRODUCTION

This case is about EPA's implementation of the American Innovation and Manufacturing Act of 2020 (AIM Act), a bipartisan law that targets potent greenhouse gases called hydrofluorocarbons (HFCs). HFCs can have impacts on the climate that are hundreds or thousands of times more potent than carbon dioxide and represent a threat to public health and the environment if their emission continues unchecked.

To meet this threat, Congress directed EPA to phase down American HFC production and consumption to 85% of baseline levels by 2036. Congress put three main arrows in EPA's quiver to do so successfully: an allowance allocation and trading program, an HFC release and reclamation program, and a technology transitions program.

This case is about the third arrow — the "Technology Transitions" program — which allows EPA to require industry to transition to HFC alternatives faster than the market might otherwise. This section of the Act empowers EPA to restrict HFC use in particular industry subsectors, thus complementing the nationwide HFC phasedown by creating consistent transition timeframes within a subsector and leaving HFCs on the table for critical subsectors as the overall supply tightens.

EPA promulgated the rule challenged here under this program. 88 Fed. Reg. 73,098 (Oct. 24, 2023) ("Technology Transitions Rule"). The Technology

Transitions Rule restricts HFC use in three main sectors, one of which is the refrigeration, air-conditioning, and heat-pump sector. The Rule does so by establishing subsector-specific limits on HFCs based on their global warming potential, coupled with staggered compliance deadlines giving each subsector its own timeline to complete the technology transition. EPA estimates that the Rule will reduce cumulative greenhouse gas emissions equivalent to at least 83 million metric tons of carbon dioxide.

Commenters, including regulated industries, largely supported the Technology Transitions Rule. But not everyone was happy. Petitioners Food Marketplace, Inc., the American Frozen Food Institute, and the National Grocers Association (the "Food Industry Groups") did not receive all the compliance deadlines they sought during rulemaking, so they petitioned for review of the Technology Transitions Rule in this Court.

The Food Industry Groups' challenges are not persuasive. The Groups assert that, for five subsectors that impact food retail, EPA failed to adequately assess available HFC substitutes or consider economic costs and environmental impacts. The Groups also present arguments not exhausted before the agency, namely, that EPA did not properly compare the challenged compliance deadlines to the Act's 2036 phasedown step deadline, or correctly interpret the meaning of the statutory term "availability." This Court should either decline to consider those arguments,

or reject them. EPA reasonably considered the AIM Act's technology transitions factors and rationally applied those factors to the facts on the ground to determine the appropriate HFC restrictions in the challenged subsectors.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 7607(b), as made applicable to the AIM Act by 42 U.S.C. § 7675(k)(1)(C). The petition for review was timely filed December 26, 2023, the first business day 60 days after the Technology Transitions Rule was published in the Federal Register.

## STATEMENT OF THE ISSUES

1.   Whether EPA's interpretation of "availability" of HFC substitutes in 42 U.S.C. § 7675(i)(4)(B) should be upheld because:

    a.   the Food Industry Groups failed to exhaust any challenge to EPA's interpretation of the AIM Act; and

    b.   EPA's interpretation is the most reasonable reading of the statute.

2.   Whether EPA adequately considered available HFC substitutes for the challenged subsectors.

3.   Whether EPA adequately considered overall economic costs and environmental impacts of the challenged subsector restrictions.

4.   Whether EPA's assessment of "the remaining phasedown period for [HFCs]" in 42 U.S.C. § 7675(i)(4)(D) should be upheld because:

    a.   the Food Industry Groups failed to exhaust any challenge to EPA's assessment of the phasedown period; and

b.    EPA's assessment of the phasedown period was reasonable.

**PERTINENT STATUTES AND REGULATIONS**

All pertinent statutes and regulations are in the Addenda to this brief and

Petitioner's Opening Brief.

## STATEMENT OF THE CASE

### A.    Statutory Background and the AIM Act in Context

This case concerns the AIM Act, 42 U.S.C. § 7675. The AIM Act regulates

American activities concerning certain highly potent greenhouse gases called

HFCs. *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA* (*HARDI*),

71 F.4th 59, 62 (D.C. Cir. 2023).

### 1.    The Montreal Protocol

HFCs are widely used in several sectors of the economy, including aerosols,

refrigeration, and air conditioning. Technology Transitions Rule at 73,102. In

recent decades, HFCs have come into greater use as replacements for

hydrochlorofluorocarbons and chlorofluorocarbons (sold under tradenames like

Freon), which exposed the world to harmful radiation by depleting the Earth's

ozone layer. *See, e.g.*, *RMS of Ga., LLC v. EPA*, 64 F.4th 1368, 1370 (11th Cir.

2023). The international community phased these older chemicals out through the

Montreal Protocol on Substances that Deplete the Ozone Layer, which the United

States joined in 1988. *See id.*

HFCs do not deplete the ozone layer, but they are harmful greenhouse gases

"hundreds to thousands of times more potent than carbon dioxide" whose release is

changing the climate at a pace that threatens human health, society, and the natural

environment. 86 Fed. Reg. 55,116, 123–24 (Oct. 5, 2021). So, just as it had

decades before, the international community came together in 2016 to create the Kigali Amendment to the Montreal Protocol, requiring parties to phase down HFC production and import to a fraction of what they had been. *See RMS*, 64 F.4th at 1370.

## 2. The AIM Act HFC Phasedown

In 2020, Congress enacted a program to implement an HFC phasedown in the United States: the AIM Act. 42 U.S.C. § 7675. The AIM Act's centerpiece is the graduated phasedown of HFC production and consumption to just 15% of baseline levels by 2036. 42 U.S.C. § 7675(e)(2). To meet this ambitious goal, Congress charged EPA with administering the AIM Act and provided multiple avenues of agency action. We briefly describe three of the chief avenues below.

First, Congress directed EPA to issue rules phasing down the production and consumption of regulated HFCs "through an allowance allocation and trading program." 42 U.S.C. § 7675(e)(3). Under that program, no one may produce or import HFCs without an allowance. 40 C.F.R. § 84.5. The number of available allowances decreases over time via a Congressionally set schedule:

| Date | Percentage of Production Baseline | Percentage of Consumption Baseline |
|---|---|---|
| 2020–2023 | 90 percent | 90 percent |
| 2024–2028 | 60 percent | 60 percent |
| 2029–2033 | 30 percent | 30 percent |
| 2034–2035 | 20 percent | 20 percent |
| 2036 and thereafter | 15 percent | 15 percent |

42 U.S.C. § 7675(e)(2)(C). EPA established how it would implement this program in 2021 through its Allocation Framework Rule, 86 Fed. Reg. 55,116, and now allocates allowances annually. *See, e.g.*, 87 Fed. Reg. 61,314 (Oct. 11, 2022).

Second, Congress gave EPA the authority to control any activity regarding "the servicing, repair, disposal, or installation of equipment" that involves HFCs and their substitutes. 42 U.S.C. § 7675(h). This HFC-management authority supports Congressional intent to maximize the reclamation of HFCs and minimize their release, thereby ensuring that consumers can continue to service and use existing equipment with reclaimed HFCs, and preventing further release into the atmosphere to the extent possible.

Third, Congress gave EPA the authority to "restrict, fully, partially, or on a graduated schedule," the use of HFCs in a particular industry sector or subsector. 42 U.S.C. § 7675(i) (the "Technology Transitions" subsection). Unlike the allowance allocation and trading program, which applies economy-wide, this part of the AIM Act gives EPA the power to restrict or prohibit the use of HFCs in individual portions of the economy. *Id.* § 7675(i)(1). As the name "Technology Transitions" suggests, EPA's exercise of authority under this subsection is meant to drive industries to switch from HFC-reliant technology to technology that employs alternatives, thus supporting the HFC phasedown by freeing up HFCs for use in other industries with greater transition friction.

In carrying out a technology-transition rulemaking, EPA must, "to the extent practicable, factor in":

(1) the best available data;

(2) the availability of HFC substitutes in a subsector;

(3) overall economic costs and environmental impacts; and

(4) the remaining phasedown period for regulated substances.

*Id.* § 7675(i)(4). EPA may not make a technology-transition rule effective earlier than one year after promulgation. *Id.* § 7675(i)(6). Individuals or entities may petition EPA to promulgate such regulations, and EPA must do so within two years after deciding to grant a petition. *Id.* § 7675(i)(3).

This case primarily concerns the second factor, the "availability of substitutes for use of the [HFC] that is the subject of the rulemaking." *Id.* § 7675(i)(4)(B). The AIM Act specifies that EPA must factor in availability by taking into account, "to the extent practicable," nine subfactors "and other relevant factors." *Id.* These are: (1) technological achievability, (2) commercial demands, (3) affordability (for residential/small business consumers), (4) safety, (5) consumer costs, (6) building codes, (7) appliance efficiency standards, (8) contractor training costs, and (9) the quantities of HFCs available from reclaiming or prior production/import. *Id.*

9

### 3.    Judicial Review

The AIM Act provides that Clean Air Act Section 307 (42 U.S.C. § 7607) applies to any AIM Act rule EPA promulgates "as though this section were expressly included in title VI[1] of that Act." 42 U.S.C. § 7675(k)(1)(C). In turn, Section 307(d) sets out provisions that apply to the "promulgation or revision of regulations under subchapter VI." 42 U.S.C. § 7607(d)(1)(I). These Clean Air Act provisions apply when EPA promulgates regulations under the AIM Act, including that "[o]nly an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review." *Id.* § 7607(d)(7)(B).

### B.    The Technology Transitions Rule

Shortly after Congress enacted the AIM Act, EPA received several petitions from states, cities, industry, and non-governmental organizations to restrict HFCs in certain industry subsectors. 86 Fed. Reg. 57,141, 57,141 (Oct. 14, 2021); *see* 42 U.S.C. § 7675(i)(3)(A) (permitting citizen petitions). EPA granted 13 such petitions in October 2021 and September 2022. Technology Transitions Rule at 73,099.

---

[1] The AIM Act refers to "title VI," not "subchapter VI," of the Clean Air Act. But the AIM Act's parenthetical citation to "42 U.S.C. 7671 *et seq*." clarifies that the AIM Act is referring to subchapter VI of the Clean Air Act. *See* 42 U.S.C. § 7675(k)(1)(C).

### 1.    The Notice of Proposed Rulemaking

EPA published a notice of proposed rulemaking for these restrictions in December 2022. 87 Fed. Reg. 76,738 (Dec. 15, 2022). Through the proposed rule, EPA sought to accomplish five main goals. *Id.* at 76,751–52 (summary of proposed action). First, EPA proposed and sought comment on new regulatory definitions. *Id.* at 76,752–54. (Section VII.A). Second, EPA presented and sought comment on two means for restricting HFC use, one with generally applicable rules based on an HFC's global warming potential, and one that prohibited specific HFC compounds *Id.* at 76,754–57 (Section VII.B). Third, EPA proposed applying the ultimate restrictions on a sector- or subsector-wide basis, prospectively, to new products or systems entering the market. *Id.* at 76,757–61 (Section VII.C). Fourth, EPA provided its interpretation of AIM Act section (i)(4), which sets the "Factors for Determination" EPA must weigh. *Id.* at 76,761–71 (Section VII.E). Fifth, EPA proposed specific restrictions on HFC use with different prohibitions and compliance deadlines for each proposed subsector. *Id.* at 76,771–95 (Section VII.F).

EPA received 153 comments on the proposed rule. EPA-HQ-OAR-2021-0643. Commenters spanned across 146 industry groups, non-profits, individuals, and state and local governments, providing technical information, implementation concerns, and support for EPA's proposals. Petitioners FMI and NGA submitted

comments that, among other things, requested that EPA extend the proposed

compliance deadlines and decrease the scope of prohibited HFCs, citing concerns

with available substitutes. JA433–36 (NGA Comment); JA439–54 (FMI

Comment). These Petitioners did not comment on EPA's statutory interpretation of

the AIM Act or how EPA should apply the phase-down period factor.

### 2.    The Final Technology Transitions Rule

EPA promulgated the final Technology Transitions Rule in October 2023.

Technology Transitions Rule at 73,098 (codified at 40 C.F.R. Part 84 Subpart B,

40 C.F.R. §§ 84.50–84.64). The Technology Transitions Rule established

restrictions in the foam, aerosols, and refrigeration, air-conditioning, and heat

pump sectors, incorporating public feedback and often changing a subsector's

compliance deadline based on that feedback.

### a.    EPA's regulatory approach

At a high level, for most cases in the final rule EPA adopted the "generally

applicable rule" approach to HFC restrictions over the HFC-specific approach. In

practice, this means that, for each subsector where EPA restricted HFC use, EPA

prohibited using any HFC or HFC blend that had equal to or above a numerical

global warming potential, rather than prohibiting specifically named HFCs. For

instance, rather than ban common refrigerants HFC-134a, R-407C, and R-410A in

the household refrigeration subsector, EPA prohibited manufacturing refrigerators

that used any HFC with a global warming potential of 150 or greater. *See* 40 C.F.R. § 84.54(a)(3).

The final rule also clarified how its restrictions would apply to different types of equipment, differentiating between stand-alone products completed in a factory and systems made up of components that are installed (and often charged with refrigerant) on site. While the proposed rule established restrictions on the manufacture, import, and sale of both factory-completed products and components, EPA elected not to restrict components in the same way as stand-alone products. *Compare* 40 C.F.R. § 84.54(a) (restrictions on products), *with id.* § 84.54(c) (restrictions on systems). The final rule, like the proposed rule, continued to restrict the use of HFCs in systems such as industrial refrigeration and centralized heating and cooling, but EPA specified that the restrictions apply to the installation of new systems. *Id.* § 84.54(c). Importantly, this means that businesses can continue to move HFC-containing components through the market to ensure that, for example, a supermarket using a legacy HFC-refrigeration system can replace a broken component rather than having to replace the entire system.

The final rule also provided a significantly longer timeframe for the sale, distribution, and export of factory-completed products even after such products' initial manufacture or import was prohibited. 40 C.F.R. § 84.54(b). While the proposed rule would have provided only one year for businesses to move products

13

after those products could no longer be manufactured, the final rule provided a three-year "sell-through" period for businesses to clear inventory and prevent the economic and environmental harm from stranded equipment that had been produced but could no longer be sold. Technology Transitions Rule at 73,122.

As with the proposed rule, EPA finalized restrictions on a subsector-by-subsector basis, individually considering the appropriate global warming potential limits and compliance deadlines for each subsector. EPA explained that "[e]ach interpretation, requirement, and use restriction is supported by separate analysis and discussion" because "this rule contains separate parts that we intended to operate independently of one another." *Id.* at 73,203. This approach was in part motivated by the nature of the citizen-petition process that triggered the Technology Transitions Rule; each of the granted citizen petitions requested regulation in different subsectors, but EPA decided that one rulemaking to cover every grant, rather than more than 40 separate rulemakings, would be more efficient for the agency and the public, including regulated entities. *Id.* at 73,128.

> **b.    EPA's analysis of available substitutes**

Before finalizing restrictions, EPA assessed whether and how HFC substitutes would be available for each separate subsector. To do so, EPA individually assessed whether compliance options would be ready for use by the date of each restriction by collectively evaluating the availability subfactors.

JA255. EPA also used this rulemaking to identify examples of sources used to inform its analyses of the availability subfactors and articulated its current views on the meaning of the various subfactors. 88 Fed. Reg. at 73,129–38.

Two programs came up often in EPA's availability analysis. First, title VI of the Clean Air Act vests EPA with authority to administer a program called the Significant New Alternatives Policy, or SNAP. Under SNAP, EPA periodically identifies and evaluates substitutes to ozone-depleting substances using a comparative risk framework. 42 U.S.C. § 7671k. When EPA lists a substitute as acceptable under SNAP, it means that EPA has assessed the substance to be less risky overall to human health and the environment than other substances that could be used for the same purpose. Technology Transitions Rule at 73,114. These listings are important because they signify that SNAP-approved substances are comparatively safe for their designated end-uses, and because many states and localities expressly condition the ability to use a refrigerant locally on EPA SNAP approval. *See, e.g.*, 59 Okla. St. Ann. § 1000.30 (no local laws in Oklahoma may prohibit a refrigerant "designated as acceptable for use pursuant to and in accordance with 42 U.S.C. § 7671k").

Second, EPA, like the refrigeration industry, strongly considers safety ratings put out by the American Society of Heating, Refrigerating and Air-Conditioning Engineers. Technology Transitions Rule at 73,114. The Society's

Standard 34 rates refrigerants on a dual-axis scale, assessing both toxicity and flammability. JA613. A less or non-toxic substance is rated A; more toxic is rated B. A non-flammable substance is rated 1, with less flammable substances a 2, and more flammable substances a 3. (The rating "2L" was recently introduced to indicate lower flammability than "2"). Thus, an "A1" refrigerant is both less-toxic and non-flammable, whereas a "B3" refrigerant is both more toxic and flammable.

### c.    HFC restrictions in the challenged subsectors

Relevant here, EPA established compliance deadlines for four categories of retail food refrigeration, along with restrictions on residential and light commercial air-conditioning and heat pumps. These four retail food subsectors are (1) stand-alone units (like reach-in beverage coolers), (2) refrigerated food processing and dispensing equipment (like slushie makers), (3) remote condensing units (like butchers' display cases), and (4) supermarket systems (like frozen food aisles at grocery stores). Technology Transitions Rule at 73,149.

EPA had proposed a 2025 compliance deadline for all four retail food refrigeration categories, along with the light commercial air-conditioning and cold storage warehouse subsectors. *Id.* But in response to comments, EPA delayed the deadline for remote condensing units to 2026, the deadline for supermarket systems to 2027, and the deadline for cold storage warehouses to 2026. *Id.* at 73,149–50. Consistent with wide positive support in the comments, EPA

16

maintained the light commercial air-conditioning deadline of 2025. *Id.* at 73,179.

The Food Industry Groups challenge the light commercial air-conditioning and cold storage warehouse deadlines and three of the food retail deadlines (but not the dispensing equipment deadline). Pet'rs' Br. 13–14. The relevant subsector restrictions the Groups challenge here are summarized in the below table:

| Regulation | Subsector | Compliance Deadline |
|---|---|---|
| 40 C.F.R. § 84.54(a)(4) | Manufacture/import of retail food refrigeration stand-alone units | January 1, 2025 |
| 40 C.F.R. § 84.54(a)(1), (c)(1) | Manufacture/import of stationary air-conditioning products or installing stationary air-conditioning systems | January 1, 2025 January 1, 2026 |
| 40 C.F.R. § 84.54(c)(9) | Installing cold storage warehouse systems | January 1, 2026 |
| 40 C.F.R. § 84.54(c)(11) | Installing remote condensing units in retail food refrigeration systems | January 1, 2026 |
| 40 C.F.R. § 84.54(c)(12) | Installing supermarket systems | January 1, 2027 |

### 3.    The Interim Final Rule for Residential and Light Commercial Air-Conditioning and Heat Pump Systems

Immediately following the Technology Transitions Rule's promulgation, stakeholders brought a potential inventory-stranding problem to EPA's attention: the 2025 deadline for light-commercial air-conditioning systems might fall before lawfully manufactured and purchased components could be installed. 88 Fed. Reg.

17

88,825, 88,829 (Dec. 26, 2023). To prevent the economic and environmental problems caused by stranded inventory, EPA modified the deadline for installing certain air conditioning and heat pump systems on an interim final basis to January 1, 2026. *Id.* As a result, the compliance deadline for manufacturing or importing *products* in this subsector is 2025, but the deadline for installing most *systems* is 2026.

The Food Industry Groups petitioned for review.

## SUMMARY OF ARGUMENT

The Technology Transitions Rule is a reasonable, well-grounded regulation that implements Congress's direction to support the nation's ambitious goal of 85% HFC phasedown by 2036. Set against EPA's thorough reasoning, the Food Industry Groups' challenges fail to show that EPA's action is arbitrary or capricious. The Court should deny the petition.

I.      The Food Industry Groups begin with an argument that they did not make during the comment period: that EPA misinterpreted "availability" in the AIM Act. This Court strictly enforces the Clean Air Act's exhaustion requirements and so should not reach the merits of this challenge. Regardless, the Food Industry Groups' argument is misplaced, contrary to the plain language of the statute, and would rob the technology-transitions subsection of any force. As an initial matter, the Groups attack a strawman when they claim that EPA interpreted "availability" contrary to its plain meaning. EPA did no such thing, but applied the AIM Act availability subfactors as factors, rather than conjunctive elements. That approach is consistent with the text of the statute and necessary to practically implement the technology-transitions subsection. And to the extent the Groups object to how EPA applied this approach in practice, that is not a challenge to EPA's construction of the statute but an arbitrary and capricious challenge.

**II.    A.**    EPA specifically and reasonably considered available substitutes on a subsector-by-subsector basis. The Court should do the same and conclude that the compliance deadline for each challenged subsector is supported by a reasonable explanation of EPA's availability assessment in that subsector, rather than follow the Food Industry Groups' freewheeling canvassing of substitutes across subsectors and across applications.

**B.**    For each of the challenged compliance deadlines, EPA reasonably considered the availability subfactors before promulgating the HFC restrictions.

**1.**    For stand-alone units, EPA reasonably concluded that substitutes would be available by 2025 because identified available substitutes including propane and isobutane have already been used successfully in currently commercially available equipment such as reach-in beverage coolers in the United States and other countries. Petitioners do not advance a credible argument that substitutes are not available for stand-alone units, and indeed acknowledge that flammable and non-flammable refrigerant compliance options are currently available.

**2.**    For residential and light commercial air-conditioning and heat pumps, EPA reasonably concluded that substitutes would be available by 2025 because of several factors, depending on the application. For applications like window air-conditioning units, many HFC alternatives are already on the market.

20

For bigger systems, updated building codes, safety standards, and SNAP listings are allowing A2L substitutes to come onto the market that will expand the universe of available applications. Moreover, EPA provided a one-year extension for installing manufactured components in new systems, thus allowing legacy HFC components to continue to be installed for another year while new compliant components come on the market.

3.      For cold storage warehouses, EPA reasonably concluded that substitutes would be available by 2026. HFC-substitute ammonia is already the dominant cooling method used in this subsector and, for applications where ammonia may not be practicable, EPA identified alternatives that are non-toxic and SNAP-listed or on their way to being SNAP-listed. EPA also identified technologies likely to emerge such as evaporative cooling, desiccant cooling, and Stirling cycle systems.

4.      For remote condensing units, EPA reasonably concluded that substitutes would be available by 2026 from the combination of (1) already-commercially-available substitutes, (2) expected market innovation from SNAP-listed or soon-to-be-listed refrigerants, and (3) updates to product safety standards in 2021 that permitted a much wider range of mildly flammable A2L refrigerants to be used on the market.

5.      Finally, for supermarket systems, EPA reasonably concluded

that substitutes would be available by 2027 because the broader compliance window will allow for several alternatives to come onto the market, along with those already demonstrated to be effective. Thus, EPA recognized carbon dioxide is currently the primary substitute being used in supermarkets and has demonstrated success in a range of conditions. But where carbon dioxide may not be preferred, EPA reasonably assessed that many alternatives would be available by the compliance deadline, including those that building codes already permit or will permit based on pending SNAP approval. The Food Industry Groups' invocation of building codes as an obstacle is thus overstated. Moreover, the Groups' unsubstantiated assertion that the Technology Transitions Rule will hasten per- and poly-fluoroalkyl substance (PFAS) exposure fails because many alternatives have no chance of degradation to PFAS, and many HFCs currently in use in these subsectors have the same or similar potential to degrade to PFAS.

III.   EPA properly modeled and factored into its rulemaking the Technology Transitions Rule's anticipated overall costs and environmental impacts. While the Food Industry Groups claim that EPA failed to model a nationwide transition to carbon dioxide in the remote condensing unit and supermarket system subsectors, EPA conducted that exact analysis. To the extent that the Groups argue that EPA should have performed that analysis differently, no commenter asked EPA to change its model or provided data that EPA could use to

22

do so on its own, and so these challenges are either forfeited or unsupported by best available data.

IV.    The Food Industry Groups forfeited their remaining phasedown period argument by failing to exhaust it before the agency. No commenter advocated for EPA to take the Groups' approach, under which this AIM Act factor would require EPA to compare a technology transitions compliance deadline to 2036, and then justify why a restriction occurs earlier than that date. But even under the Groups' approach, EPA's action is not arbitrary and capricious. EPA reasonably considered this factor by explaining how the Technology Transitions Rule would support the graduated nationwide HFC phasedown by freeing up the diminishing supply of HFCs for other subsectors where transition was infeasible.

## STANDARD OF REVIEW

The AIM Act provides that Clean Air Act section 307, 42 U.S.C. § 7607, applies to EPA rulemaking as though the AIM Act were expressly included in Clean Air Act subchapter VI. 42 U.S.C. § 7675(k)(1)(C). The Clean Air Act therefore provides a cause of action for review of EPA action under the AIM Act, subject to the Clean Air Act's procedural requirements. *HARDI*, 71 F.4th at 65.

Under the Clean Air Act, the Court may "reverse any . . . action found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A). To determine whether an action is arbitrary and capricious under that Clean Air Act provision, this Court applies the same standard as under the Administrative Procedure Act. *Maryland v. EPA*, 958 F.3d 1185, 1196 (D.C. Cir. 2020). Under that highly deferential standard, the Court should not substitute its policy judgment for EPA's but ask whether EPA has examined the relevant data and articulated a satisfactory explanation. *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004). Where EPA has considered the relevant factors and drawn a rational connection between the facts found and the choices made, its decision must be upheld. *Id*. (citing *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).

## ARGUMENT

This is a quintessential administrative law case in which deference to EPA's technical expertise is appropriate to advance Congress's statutory directives. The AIM Act empowers EPA to restrict HFC use in specific industry subsectors to transition from HFCs to alternative technologies more quickly than would otherwise occur. In promulgating a rule under this authority, EPA must consider four factors: (1) the best available data, (2) the availability of substitutes for use of the HFCs that is the subject of the rulemaking or petition, (3) overall economic costs and environmental impacts, and (4) the remaining phase-down period for HFCs. 42 U.S.C. § 7675(i)(4). EPA reasonably considered all these factors before promulgating the Technology Transitions Rule. EPA's action should therefore be upheld under any standard of review, but particularly under the deferential arbitrary-and-capricious standard's acknowledgement of agency expertise on these highly technical issues.

Set against EPA's well-grounded decisions, the Food Industry Groups bring three arbitrary and capricious challenges to the Technology Transitions Rule, arguing that the Court should vacate the challenged compliance deadlines because (1) there are not available HFC substitutes, (2) EPA did not adequately consider economic costs and environmental impacts of one available substitute, and (3) EPA did not adequately consider HFCs' remaining phasedown period. Pet'rs'

Br. 27, 53, 60. The Groups add that EPA misinterpreted the AIM Act, but they never brought that argument to EPA's attention during rulemaking. *Id.* at 24. These arguments are all either forfeited or unavailing. Because EPA rationally applied the AIM Act's factors to the facts on the ground in promulgating this rule, the Court should uphold the rule and deny the petition.

## I.    EPA Appropriately Interpreted and Applied the AIM Act's "Availability of Substitutes" Factor.

The AIM Act directs EPA, in carrying out a technology-transitions rulemaking, to factor in to the extent practicable the "availability of substitutes for use of the [HFC] that is the subject of the rulemaking . . . in a sector or subsector." 42 U.S.C. § 7675(i)(4)(B). The Act then lists nine non-exclusive subfactors, for EPA to "tak[e] into account" when it factors in availability: (1) technological achievability, (2) commercial demands, (3) affordability (for residential/small business consumers), (4) safety, (5) consumer costs, (6) building codes, (7) appliance efficiency standards, (8) contractor training costs, and (9) the quantities of HFCs available from reclaiming or prior production/import. *Id.*

In the Technology Transitions Rule, EPA explained that it would consider these availability subfactors "collectively, with no one subfactor solely governing the restrictions for any sector or subsector." Technology Transitions Rule at 73,130. EPA also explained that identifying a substitute as available means that the substitute is already ready for use in a particular subsector or expected to be ready

for use by the compliance deadline based on a substitutes' incorporation progress, rather than that the substitute is "already widely used" in that subsector. *Id.* at 73,131.

These two elements of EPA's approach — assessing availability based on the collective subfactors and the likelihood that substitutes will be ready for use by the compliance deadline — best reflect the statutory text and Congress's direction. Assessing availability based on how the subfactors inform whether a substitute is or will be ready flows both from the statute, where Congress directed EPA to consider availability "to the extent practicable," *id.* at 73,130 (quoting 42 U.S.C. § 7675(i)(4)), and from common sense. As EPA explained, "not all the subfactors in (i)(4)(B) may be applicable to each sector or subsector[; f]or example, appliance efficiency standards would not be applicable to aerosols." *Id.* Assessing availability by the compliance deadline instead of at promulgation does likewise: the AIM Act's technology-transitions provisions "would serve little purpose if EPA were only permitted to restrict regulated substances where the [availability subfactors] were already 'satisfied'" because the "transition" will have already occurred. *Id.* at 73,131.

The Food Industry Groups assert that "availability" means "readiness for use," "accessibility," or "obtainability." Pet'rs' Br. 24. From this definition, the Groups assert that EPA misinterpreted "available" because a substitute is not

27

available if even a single availability subfactor has not been "met," contrary to EPA's collective approach. *Id.* at 25. No commenter presented this argument to EPA during rulemaking, so it is forfeited. But even if not forfeited, the Groups' approach contravenes the statute and lacks any practical force. This argument should be ignored or rejected.

### A. The Clean Air Act's Strict Exhaustion Requirement Bars The Groups' New Statutory Interpretation Argument.

The AIM Act adopts the judicial review provision of the Clean Air Act "as though [it] were expressly included in title VI of that Act." 42 U.S.C. § 7675(k)(1)(C). That incorporation includes the Clean Air Act's administrative exhaustion requirement, which this Court "strictly enforce[s]." *Growth Energy v. EPA*, 5 F.4th 1, 24 (D.C. Cir. 2021) (per curiam). Thus, this Court will not entertain an argument that has not been "raised with reasonable specificity during the period for public comment," even when the challenge is purely legal or would have been futile to raise during agency rulemaking. *HARDI*, 71 F.4th at 65 (quoting 42 U.S.C. § 7607(d)(7)(B)).

The Food Industry Groups' statutory interpretation argument cannot clear this hurdle. Neither the Groups nor any of the other 144 commenters commented that EPA should interpret "availability" in a particular manner, let alone that the nine availability subfactors must each be met. Thus this argument is forfeited.

28

### B.    EPA Correctly Interpreted the AIM Act's "Availability" Factor.

The Food Industry Groups' argument begins by attacking a strawman. The Groups contend that EPA erred by failing to interpret available as meaning "ready for use," but EPA did exactly that. For example, EPA used "available" in this way when the agency explained that assessing availability at the time of a compliance deadline was an inherently uncertain predictive exercise:

> In setting compliance dates for the restrictions under [the Technology Transitions subsection], EPA is exercising its judgment and applying best available data regarding how far along a sector or subsector is in the transition to lower-[global warming potential] substitutes to determine when those substitutes will be sufficiently *available* to accommodate a variety of *uses* within the sector or subsector.

Technology Transitions Rule at 73,131 (emphasis added). There is thus no dispute between EPA and the Groups as to the plain language meaning of "availability' in the AIM Act.

Instead, the Food Industry Groups' other arguments make clear that their real grievance is with EPA's methodology in identifying whether a substitute would be "ready for use" by a given subsector's compliance deadline. Pet'rs' Br. 25. The Groups argue that EPA contravened the AIM Act's plain language because a substitute should not be considered available if it fails to meet a single subfactor. *Id.* at 25. This understanding of the AIM Act contradicts its plain language and sensible agency implementation supporting Congress's ambitious phasedown

29

goals.

*First*, to the extent the Food Industry Groups are arguing that EPA should have found that a substitute was "presently available" at the time of rulemaking instead of by a compliance deadline (which EPA does not take to be the argument), that contention is incorrect. If substitutes were already in widespread use at the time of rulemaking, a technology-transitions rule would be unnecessary and EPA regulation would lose its effect of driving innovation. *See, e.g.*, Technology Transitions Rule at 73,140 ("This rule supports innovation and advances the adoption of substitutes where available, thereby reducing demand for HFCs.").

*Second*, the statute contains no language suggesting that every subfactor is a prerequisite must be met for a substitute to be available. On the contrary, the statute itself recognizes that EPA is engaging in an uncertain, predictive task when it requires technology transitions, directing EPA to "*factor* in," "*to the extent practicable*," the availability of substitutes, "*taking into account*" the availability subfactors, "and other relevant *factors*." 42 U.S.C. § 7675(i)(4)(B) (emphasis added). Congress's choice of words emphasizes that each availability subfactor is only part of the picture of whether a substitute is available, and indeed that availability of substitutes is only one factor in a rulemaking that EPA may not even be able to practicably consider. Had Congress intended for these subfactors to function as necessary elements instead of factors to be considered to the extent

practicable, it would have stated that clearly, as it has in other statutes. *See, e.g.*, 42 U.S.C. § 7407(d)(3)(E) (prohibiting EPA from acting unless five factors are met); 42 U.S.C. § 7502(a)(2)(C) (permitting EPA to grant a request if two conditions are met).

*Third*, reading the availability subfactors as necessary, conjunctive elements instead of factors makes no sense in practice. Consider, for instance, the case of aerosols. 40 C.F.R. § 84.54(a)(16). Was EPA required to find that a can of penetrating lubricant met "appliance efficiency standards" or local "building codes" before it banned HFC-using aerosol sprays? *See* 42 U.S.C. § 7675(i)(4)(B). Or take the more judgment-laden case of a substitute refrigerant that is technologically achievable, safe to use, and allowable under local building codes, but costs more for contractor installation training than existing HFC refrigerants. Do the higher "contractor training costs" necessarily outweigh the other availability subfactors? No. Congress would have spoken more plainly if it had intended such a restrictive scheme. Instead, it trusted EPA to make those judgments based on the statutory subfactors.

*Finally*, to the extent the Food Industry Groups are arguing only that the relevant subfactors must be considered, EPA agrees. *But see* Pet'rs' Br. 25. But whether EPA properly applied the relevant availability subfactors to the facts on the ground in each subsector is a quintessential arbitrary-and-capricious question,

not a statutory interpretation question. *See State Farm*, 463 U.S. at 43. The Groups' statutory interpretation argument should be rejected.

## II.    EPA Reasonably Considered the Availability Subfactors When It Set Compliance Deadlines in the Challenged Subsectors.

The Food Industry Groups' primary challenge is that EPA acted irrationally when it concluded that sufficient compliance options would be available for each of the challenged subsectors. The record belies this assertion. In each of the Technology Transitions Rule's subsectors, EPA conducted a thorough analysis of what substitutes would be or already are available that supports EPA's choice of a feasible compliance deadline. Under any standard of review, but particularly under the highly deferential arbitrary-and-capricious standard, EPA's action is rational and should be upheld.

### A.    The Court Should Reject the Food Industry Groups' Rule-Wide Availability Analysis and, as EPA Did, Consider Each Subsector's Compliance Deadline Separately.

Before the Court wades into the technical record here, it should reject the Food Industry Groups' flawed framing of the case.

As discussed above, EPA intentionally structured the Technology Transitions Rule to apply on a subsector-by-subsector basis, making clear that it was promulgating all challenged deadlines in a single rule for expedience, not because the restrictions were mutually interdependent. *See* Technology Transitions Rule at 73,203 ("Each interpretation, requirement, and use restriction is supported

32

by separate analysis and discussion . . . [because] this rule contains separate parts that we intended to operate independently of one another."). Consistent with this structure and Congress's instruction to consider the availability of substitutes for use in place of HFCs in the particular subsector subject to restriction, *see* 42 U.S.C. § 7675(i)(4)(B), EPA separately assessed availability of substitutes for each subsector, and established restrictions and compliance dates specific to each subsector based on those separate assessments. Thus, the question that EPA was presented with in responding to the rulemaking petitions it received — and the question that is now presented to the Court — is not whether substitutes are available for use "*across* the sectors relevant to this case," as the Food Industry Groups would have it. Pet'rs' Br. 27 (emphasis added). Rather, the question is whether EPA reasonably factored in the availability of substitutes for HFCs in *each* restricted subsector.

The Food Industry Groups' contrary approach does not fit EPA's statutory mandate or its actual analysis here. Consistent with how the regulated industries in these sectors operate, where refrigerants are available in some applications but not others, *see, e.g.*, *id.* at 28 (conceding that ammonia is an available substitute in cold storage warehouses), EPA analyzed substitutes for each subsector to see if the substitute would be available in that specific subsector. *See, e.g.*, Technology Transitions Rule at 73,150 ("For example, the concerns raised by a commenter

about R–744 [carbon dioxide] and R–717 [ammonia] use in retail food refrigeration are relevant to certain subsectors where these options have been identified as substitutes, such as in supermarket systems, but not necessarily others."). Availability is not a one-size-fits-all analysis for the Technology Transitions Rule as a whole, so, contrary to the Groups' proffered framework, the Court should review EPA's actual availability analysis for each subsector.

Two important consequences flow from properly understanding EPA's approach here. First, once the Court moves away from a freewheeling review of each identified substitute out of context, it becomes clear that EPA's subsector restrictions should stand even if the Court disagrees with EPA's availability analysis for any specific substitute. That is because EPA expressly recognized at the time of the rulemaking that not all identified substitutes might become available, but instead structured the Technology Transitions Rule to provide wide latitude for substitutes to come on the market. Thus, EPA used the global-warming-potential-limit approach, rather than prohibiting specific HFCs, and calibrated compliance deadlines for each subsector to have enough time for industry to innovate additional substitutes beyond those EPA identified. This case is therefore not like *MD/DC/DE Broadcasters Association v. FCC*, where the loss of one of two compliance options fundamentally changed the agency's program and "undercut the whole structure of the rule." 236 F.3d 13, 22 (D.C. Cir. 2001).

EPA supported its availability analysis in each subsector by identifying multiple available substitutes, but also accommodated the uncertainty that some of those substitutes might not turn out to be available at the compliance deadline.

Second, the Court should not remand or vacate all challenged compliance deadlines merely because of issues with one or more identified substitutes, as the Food Industry Groups request. Each subsector restriction is designed to operate independently, EPA performed a separate availability analysis for each subsector, and the restrictions do not rely upon each other in order to function. The Court should thus have no "substantial doubt" that EPA would have adopted each of the challenged restrictions even had it known that one or more of the other restrictions might be vacated. *See Am. Petroleum Inst. v. EPA*, 862 F.3d 50, 71 (D.C. Cir. 2017), *as modified on reh'g*, 883 F.3d 918 (D.C. Cir. 2018).

### B. EPA Reasonably Applied the Availability Subfactors When It Established the Challenged Compliance Deadlines.

EPA rationally applied the AIM Act to the facts on the ground for each of the challenged subsectors' HFC restrictions. As discussed above, EPA assessed availability by determining whether substitutes would be ready for use by the compliance deadline as informed by the availability subfactors. EPA also explained how it would assess each subfactor. Technology Transitions Rule at 73,131–38 (Section VI.E.2).

As relevant here, EPA provided separate explanations for technological

achievability, safety, and building codes. *See id.* (Sections IV.E.2.A, C, D); Pet'rs' Br. 27 (challenging EPA's consideration of these three subfactors). EPA considered a substitute to be technologically achievable if it had the ability to "perform its intended function in a sector or subsector." Technology Transitions Rule at 73,131.

For safety, consistent with standard-setting bodies' approaches, EPA did not require a substitute to be "risk free," but looked to industry standards such as American Society of Heating, Refrigerating and Air-Conditioning Engineers standards and product safety standards to determine whether a substitute could be deployed under those standards. *Id.* at 73,134–35; *see also* JA833 (Safety Technical Support Document). EPA also considered whether a substance was listed or in the process of being listed under SNAP, which assesses substances using a comparative risk framework. *Id.*

Finally, for building codes, EPA explained that reviewing substitutes' permissibility under model building codes would be an effective predictor of availability under this subfactor because the vast majority of building codes are updated in response to these model codes. Technology Transitions Rule at 73,136; *see also* JA847–50 (Building Codes Technical Support Document). EPA also reviewed stakeholders' efforts working with States to update building codes or pass legislation allowing for the use of acceptable substitutes under EPA's SNAP

program. EPA did not review every individual code in the country because it was impracticable. Technology Transitions Rule at 73,136.

As explained below, EPA rationally connected the facts on the ground and the ultimate restrictions it promulgated, so its action must be upheld. *See Bluewater Network*, 370 F.3d at 11.

### 1. Retail Food Refrigeration — Stand-Alone Units.

The first challenged compliance deadline is for the manufacture or import of retail food refrigeration stand-alone units. Pet'rs' Br. 14. These products are factory-completed before installation and generally only need to be plugged in to work, like reach-in coolers along a checkout line at a store. Technology Transitions Rule at 73,152. EPA prohibited the manufacture or import of these products that contain HFCs with a global warming potential of 150 or greater, effective January 1, 2025. 40 C.F.R. § 84.54(a)(4). Because stand-alone units are a factory-completed product, new non-compliant units can continue to be distributed, sold, and exported for three years after the manufacturing and import prohibition, until 2028. *Id.* § 84.54(b).

EPA thoroughly explained the basis for its restriction on stand-alone units. *See* Technology Transitions Rule at 73,152–54 (Section VI F.1.c.i – "What restrictions on the use of HFCs is EPA establishing for new stand-alone units and why?"). Specifically as to substitutes, EPA identified eleven possible substitutes

37

below the 150 global warming potential limit that could be available by the 2025

compliance deadline:

| Subsector | 40 C.F.R. § | Restriction | Substitutes | Rating |
|---|---|---|---|---|
| Stand-Alone Units | 84.54(a)(4) | 2025 | R-471A | A1 |
| | | | R-744 (Carbon Dioxide) | A1 |
| | | | HFO-1234yf | A2L |
| | | | HFO-1234ze(E) | A2L |
| | | | R-454C | A2L |
| | | | R-455A | A2L |
| | | | R-457A | A2L |
| | | | R-516A | A2L |
| | | | R-290 (Propane) | A3 |
| | | | R-441A | A3 |
| | | | R-600a (Isobutane) | A3 |

JA861–62 (Available Substitutes Technical Support Document).

EPA concluded that the 150 GWP limit and 2025 compliance deadline were

reasonable in part based on the availability of substitutes for meeting that limit in

time. For instance, some of the identified available substitutes — propane and

isobutane — have been used successfully in stand-alone units in the United States

and other countries, indicating that, among other things, these substitutes are

technologically achievable and that commercial demand exists for this equipment.

Technology Transitions Rule at 73,153. In addition to propane and isobutane, EPA

had conducted safety analyses under SNAP for other identified substitutes, such as

R-471A, a non-toxic, non-flammable refrigerant. *Id.* at 73,154. EPA also expected

that by the compliance deadline, additional identified substitutes would be

available compliance options for manufacturers and importers of stand-alone

38

equipment, noting that some of the highly efficient A2L refrigerants — like R–454C, R–455A, and R–457A — were already incorporated into safety standard updates and model building code updates, and were being actively evaluated under SNAP. *Id.* at 73,153-54.[2] Even the Food Industry Groups recognize that stand-alone units using propane, isobutane, and R-441A are already widely available. Pet'rs' Br. 43–45.

Moreover, the very structure of EPA's restrictions on factory-completed products like stand-alone units provides greater compliance time for small business and retail consumers like those represented by the Food Industry Groups. While manufacturers and importers must meet the 2025 compliance deadline for new equipment coming off the assembly line or moving into U.S. markets, end-users like supermarkets will be able to continue to buy new equipment using legacy HFCs for three additional years. 40 C.F.R. § 84.54(b). The Technology Transitions Rule also does not restrict the sale or distribution of used products, nor does it restrict continued use of existing products.

Against EPA's reasoned consideration, the Food Industry Groups cannot meet their burden of showing that EPA acted irrationally when it established the 2025 and 2028 compliance deadlines for stand-alone units. The Groups represent

---

[2] In fact, EPA approved SNAP-listing all three of these substitutes on May 22, 2024. 89 Fed. Reg. 50,410.

that these restrictions must fall because there are only three available substitutes, because A1s are not technologically available and A2Ls are not currently permitted to be used nationwide. Pet'rs' Br. 29. For the reasons above, above, EPA disagrees with this assessment. But regardless, even if only some of the 11 substitutes EPA identified actually come to fruition by the compliance deadline, this Court can and should uphold EPA's reasonable assessment that there are available substitutes sufficient to support the restriction. See *supra* at 35. And in any case, even the Groups admit that there are three available substitutes on the market already.

### 2.    Residential and Light Commercial Air Conditioning and Heat Pumps.

The second challenged compliance deadline is for residential and light commercial air-conditioning and heat pumps. Pet'rs' Br. 14. This subsector covers both self-contained products such as window air conditioning units, as well as installed split systems like a small business or household's centralized heating and cooling system. Technology Transitions Rule at 73,177. EPA prohibited the manufacture and import of self-contained residential and light commercial air conditioning and heat pump products if they use HFCs with a global warming potential of 700 or greater, effective 2025, 40 C.F.R. 84.54(a)(1), with a corresponding prohibition on the sale, distribution, and export of such products starting 2028, 40 C.F.R. 84.54(b). Similarly, EPA prohibited installation of new systems in this subsector if they use HFCs with a global warming potential of 700

or greater, effective 2026. 40 C.F.R. § 84.54(c)(1).[3]

EPA thoroughly explained the basis for its restriction on this subsector. *See* Technology Transitions Rule at 73,177–80 (Section VI.F.1.k). Particularly as to available substitutes, EPA identified six possible substitutes for use in this subsector by the 2025 compliance deadline:

| Subsector | 40 C.F.R. § | Restriction | Substitutes | Rating |
|---|---|---|---|---|
| Residential and Light Commercial Air-Conditioning and Heat Pump Products or Systems | 84.54(a)(1), (c)(1) | 2025 2026 | HFC-32 R-452B R-454B R-457A R-290 (Propane) R-441A | A2L A2L A2L A2L A3 A3 |

JA858 (Available Substitutes Technical Support Document).

EPA concluded that this subsector could meet its 2025 restriction in part because, like with stand-alone units, technology transitions in the HVAC industry had *already* proven possible. Updated product safety standards allowing several of the identified substitutes came out in November 2019, and EPA SNAP-listed five of the identified substitutes in 2021 — over two years before the Technology Transitions Rule. Technology Transitions Rule at 73,178. The same is true of model building codes; the International Building Code and Residential Building Code were revised in 2021 to update their safety standards, thus permitting the A2L substitutes for use in this subsector. *Id.* EPA thus correctly explained that the

---

[3] As modified by the interim final rule, 88 Fed. Reg. 88,825.

transition in this subsector is already "underway" and "many of the subsequent regulatory steps and industry adaptations incorporating [safety standard] updates have already occurred." *Id.* Perhaps unsurprisingly then, commenters, including manufacturers and importers most impacted by the 2025 deadline, overwhelmingly supported the 2025 compliance deadline for this subsector. *Id.*; *see also* JA812–26 (Response to Comments).

The Food Industry Groups' challenges to this subsector reflect the problem with assessing this case with a substitute-by-substitute approach, rather than the subsector-by-subsector approach used by EPA. The Groups represent the retail food industries and are concerned with the use of light commercial air conditioning systems in those industries. But EPA was clear in its rulemaking that not all substitutes identified for a subsector will necessarily work for all applications within a subsector. Technology Transitions Rule at 73,172. The Groups' assertion that EPA did not explain why A3s were available in the light-commercial-air-conditioning subsector thus misses the mark; EPA *did* explain that SNAP-listing was significant for availability, and A3s like propane and R-441A have been SNAP-listed for some equipment in this subsector, such as portable and window unit air conditioners, since 2015. *See id.* at 73,178; 80 Fed. Reg. 19,454 (Apr. 10, 2015) (relevant SNAP approval). For the remaining applications, EPA's SNAP-listing of certain A2Ls in 2021 indicated that such substitutes were likely to be

available to equipment in this subsector. The Groups' invocation of building codes as an obstacle to A2Ls in this subsector is thus largely illusory because A2Ls have been allowed by model codes since 2021 and equipment manufacturers had signaled their intention to begin using A2Ls as soon as local codes were updated. Technology Transitions Rule at 73,178. Indeed, the record reflects that in August 2023, 41 states had approved the use of A2Ls in either their building codes or through pass-through legislation permitting refrigerants that EPA has approved under the Significant New Policy Alternatives program. JA849–50 (Building Codes Technical Support Document).

So, as with stand-alone units, the Food Industry Groups cannot meet their burden of showing that EPA acted irrationally when it established the 2025 and 2026 compliance deadlines for air-conditioning and heat pumps. The Groups represent that there are zero available substitutes because A3s are not technologically achievable and A2Ls are not currently permitted to be used nationwide. Pet'rs' Br. 29. For the reasons above, that is incorrect because EPA reasonably identified six substitutes that EPA anticipates will be available by the compliance deadlines. For air-conditioning products, A3s are already in use, and for air-conditioning systems, A2Ls have been allowed in model building codes for years, and those updates have been addressed by the vast majority of states. EPA thus reasonably predicted that compliance options would be available by the

deadlines, and that conclusion supports upholding the restriction on this subsector.

### 3.    Cold Storage Warehouse Systems

The third challenged compliance deadline is for cold storage warehouse systems. Pet'rs' Br. 14. Cold storage warehouses are refrigerated facilities that circulate cool air or other refrigerated material throughout the space, maintaining temperature control for the products inside. Technology Transitions Rule at 73,162. EPA prohibited the installation of these systems if they use HFCs with a global warming potential of 150 or greater for high-charge systems, or 300 for lower-charge or high-temperature sides of systems, effective 2026. 40 C.F.R. § 84.54(c)(9).

EPA thoroughly explained the basis for its restriction on cold storage warehouses. *See* Technology Transitions Rule at 73,162–63 (Section VI.F.1.e). EPA identified twelve possible substitutes for use in this subsector by the 2026 compliance deadline:

| Subsector | 40 C.F.R. § | Restriction | Substitutes | Rating |
|---|---|---|---|---|
| Cold Storage Warehouse Systems<br>- Charge Capacity of ≥200 lbs. | 84.54(c)(9) | 2026 | R-471A | A1 |
| | | | R-744 (Carbon Dioxide) | A1 |
| | | | HCFO-1233zd(E) | A1 |
| | | | HFO-1234yf | A2L |
| | | | HFO-1234ze(E) | A2L |
| | | | R-454C | A2L |
| | | | R-455A | A2L |
| | | | R-457A | A2L |
| | | | R-516A | A2L |
| | | | Ammonia | B2L |
| - Charge Capacity of <200 lbs. or high temperature | | | The above, and | |
| | | | R-515B | A1 |
| | | | R-454A | A2L |

JA862–63 (Available Substitutes Technical Support Document).

At the risk of repetition, EPA reasonably predicted that HFC substitutes would be available to meet the restriction by the compliance date in this subsector because they are *already widespread* in cold storage warehouses. Most notably, EPA explained that a "significant portion" of cold storage warehouses have "transitioned from, or completely avoided, using higher-[global warming potential] HFCs." Technology Transitions Rule at 73,162. That is because most cold storage warehouses in the United States use ammonia — a cost-effective and energy-saving refrigerant that complies with the Technology Transitions Rule. *Id.* For those companies that did not already use ammonia, EPA extended the deadline from 2025 in the proposed rule to 2026 in the final rule and identified alternatives that are non-toxic like R-471A (already SNAP-approved) and HFO-1234ze(E)

45

(SNAP-approval already proposed[4]). *Id.* EPA also identified technologies other than vapor compression that could be employed in the subsector to meet the restrictions, such as absorption, evaporative desiccant cooling, and Stirling cycle systems. *Id.*

The Food Industry Groups do not devote any meaningful discussion in their brief to cold storage warehouse systems in particular. They have failed to demonstrate that EPA acted irrationally when it established the 2026 compliance deadline based on twelve possible identified substitutes, sufficient to uphold this subsector restriction. Although the Groups' argument is not entirely clear, even they admit that there are currently two available substitutes. See *supra* at 35.

### 4. Remote Condensing Units in Retail Food Refrigeration Systems.

The fourth challenged compliance deadline is for installing remote condensing units in retail food refrigeration systems. Pet'rs' Br. 14. Remote condensing units are a type of bifurcated cooling unit where the cooled product is on display — for instance, in a butcher shop's display case – and the condensing unit is outside or in a separate utility room. Technology Transitions Rule at 73,157. EPA prohibited the installation of these units if they use HFCs with a global warming potential of 150 or greater for high-charge systems, or 300 for lower-

---

[4] And now SNAP-approved, along with HFO-1234yf, R-454A, R-454C, R-455A, R-457A, and R-516A. *See supra* note 2.

charge or high-temperature sides of systems, effective 2026. 40 C.F.R.

§ 84.54(c)(11).

EPA explained the basis for its restriction on remote condensing units. *See*

Technology Transitions Rule at 73,157 (Section VI.F.1.c.iii). As to substitute

availability, EPA identified eleven substitutes as possible compliance options in

this subsector by the 2026 compliance deadline:

| Subsector | 40 C.F.R. § | Restriction | Substitutes | Rating |
|---|---|---|---|---|
| Remote Condensing Units<br>- Charge Capacity of ≥200 lbs. | 84.54(c)(11) | 2026 | R-471A<br>R-744 (Carbon Dioxide)<br>HFO-1234yf<br>HFO-1234ze(E)<br>R-454C<br>R-455A<br>R-457A<br>R-516A<br>Ammonia | A1<br>A1<br><br>A2L<br>A2L<br>A2L<br>A2L<br>A2L<br>A2L<br>B2L |
| - Charge Capacity of <200 lbs. or high temperature side | | | The above, and<br>R-515B<br>R-454A | <br>A1<br>A2L |

JA861 (Available Substitutes Technical Support Document).

EPA's assessment of available substitutes here falls into two categories.

First, EPA found that some substitutes (carbon dioxide and ammonia) would be

available by the compliance date for the restriction because these substitutes are

already commercially used in global markets, including in the United States.

Technology Transitions Rule at 73,157. Second, EPA reasonably predicted that

additional substitutes would be available because EPA had already SNAP-listed

two substitutes (R-471A[5] and R-515B) and had already proposed listing seven

additional refrigerants five months before promulgating the Technology

Transitions Rule.[6] *Id.*

EPA's discussion of this subsector is briefer than the other four challenged

subsectors because EPA did not receive any comments specific to the compliance

date for remote condensing units during the comment period. *Id.* Nonetheless,

EPA's path can easily be discerned from the rule and record. *See State Farm*, 463

U.S. at 43. EPA established the timing of this compliance date in part based on its

rational conclusion that a number of substitutes would be available in this

subsector by that time from the combination of (1) already-commercially-available

substitutes, (2) expected market innovation from SNAP-listed or soon-to-be-listed

refrigerants, and (3) updates to product safety standards in 2021 that permitted a

much wider range of mildly flammable A2L refrigerants to be used on the market.

Technology Transitions Rule at 73,135 (product safety standards updates), 73,157

---

[5] The Food Industry Groups attempt to bootstrap their arguments with extra-record claims that a molecule critical to R-471A is not presently available. Pet'rs' Br. 49. Aside from being outside the administrative record, the Groups fail to disclose the molecule in question and whether it is permanently or, as is more likely, temporarily unavailable. Had the Groups appropriately disclosed this information to EPA through a petition for reconsideration instead of here, EPA could have responded or taken appropriate action.

[6] Which are all now approved. *See supra* note 2.

(explanation of currently available and soon to be available substitutes).

Because A1s are already in use, A2Ls are in the process of SNAP approval, and active progress is being made on ammonia (as even the Food Industry Groups point out), EPA reasonably predicted that a wide range of substitutes would be available by 2026. Even the Groups concede that one compliance option is available in this subsector. Pet'rs' Br. 28.

### 5.    Supermarket Systems

The final challenged compliance deadline is for installing supermarket systems. Pet'rs' Br. 13. Also known as multiplex or centralized systems, supermarket systems use racks of multiple compressors, each operating to maintain temperatures across different zones in a store. Technology Transitions Rule at 73,157. Many of us are familiar with these systems, at least as end-users, from visiting grocery stores. EPA prohibited installing supermarket systems if they use HFCs with a global warming potential of 150 or greater for high-charge systems, or 300 for lower-charge or high-temperature sides of systems, effective January 1, 2027. 40 C.F.R. § 84.54(c)(12).

EPA thoroughly explained the basis for its restriction on supermarket systems. *See* Technology Transitions Rule at 73,157–61 (Section VI.F.1.c.iv). As to substitute availability, EPA identified eleven substitutes as possible compliance options in this subsector by the 2027 compliance deadline:

| Subsector | 40 C.F.R. § | Restriction | Substitutes | Rating |
|---|---|---|---|---|
| Supermarket Systems<br>- Charge Capacity of ≥200 lbs. | 84.54(c)(12) | 2027 | R-471A<br>R-744 (Carbon Dioxide)<br>HFO-1234yf<br>HFO-1234ze(E)<br>R-454C<br>R-455A<br>R-457A<br>R-516A<br>Ammonia | A1<br>A1<br><br>A2L<br>A2L<br>A2L<br>A2L<br>A2L<br>A2L<br>B2L |
| - Charge Capacity of <200 lbs. or high temperature side | | | The above, and<br>R-515B<br>R-454A | <br>A1<br>A2L |

JA862 (Available Substitutes Technical Support Document).

EPA provided supermarket systems with the latest effective date of the challenged compliance deadlines, reflecting their higher complexity and the acknowledgement that additional time for compliance would ensure that users would have a number of available compliance options to meet the different needs of different systems in different parts of the country. Technology Transitions Rule at 73,158. Thus, in comparison to subsectors with earlier dates and with several HFC substitutes already on the market (like stand-alone units), EPA recognized that at the current time, the same is not true for supermarkets. At the time of the rulemaking, carbon dioxide was the only available substitute already in use in supermarkets, and the later date allows additional alternatives to enter the market. *Id.* EPA reasonably predicted that many of these alternatives would specifically be

50

available by the compliance deadline, including A1s and A2Ls that building codes already permit or will permit based on pending SNAP approval. *Id.*

The Food Industry Groups' contrary challenges do not demonstrate that EPA acted irrationally. First and foremost, the Groups raise a number of concerns about the availability of carbon dioxide as a substitute in supermarket systems, but these concerns all boil down to one central complaint that carbon dioxide is not *currently* a viable substitute for *every* new supermarket being constructed in the United States. Pet'rs' Br. 49–52. While commenters were mixed on this point (California is a notable example of a state with diverse climates and conditions using carbon dioxide), the Groups' challenge is unavailing even assuming its correctness. As explained above, it is no accident that EPA set the compliance date for this subsector more than three years after from the rule's promulgation, thus allowing time for broader deployment of carbon dioxide and the introduction of other alternatives.

*First*, EPA reasonably identified carbon dioxide as one available compliance option by 2027. EPA's assessment that carbon dioxide systems are "technologically achievable" was reasonable because EPA explained that carbon dioxide is already being successfully used in retail food stores throughout the globe and across the country, including in Europe, Canada, and within the United States in the Northeast, California, South, and Southwest. Technology Transitions Rule at

73,157–78. While the Food Industry Groups invoke concerns about reliability (and in turn chance of spoiled food), lack of trained technicians, and energy and water consumption (at 49–52), the Groups cite no actual evidence, let alone "best available data," to support these claims. Moreover, even if these claims had some merit, the concerns do not demonstrate that carbon dioxide cannot be used at all. At most, these concerns indicate that carbon dioxide may not currently be the preferred substitute for all new supermarkets, but that is not the same as technologically unachievable. *See also* Technology Transitions Rule at 73,132 (discussing how consideration of technological achievability is not limited to a geographic region because products and systems can be initially rolled out in smaller markets to start).

*Second*, the supermarket system restrictions are also premised on EPA's reasonable assessment that, by 2027, new supermarkets will have other refrigerant options — like A2Ls — to comply with the Rule's restrictions. While the Food Industry Groups raise building code and safety concerns for these alternatives, their concerns do not demonstrate that EPA's prediction is irrational.

Regarding building codes, the Food Industry Groups are simply wrong that "the vast majority" of building codes in the United States "do not currently authorize A2L-based refrigerants for use in retail food settings." Pet'rs' Br. 30. When EPA promulgated the Technology Transitions Rule, model building codes

had already been updated to authorize the use of A2Ls, and thirteen states had incorporated that authorization for this subsector by updating their respective state and local building codes. JA847–48, 850 (Building Codes Technical Support Document). Thus, between the states that have already chosen to update building codes directly in accordance with model codes, and the states that have elected to preempt local municipal building codes legislatively, building codes *already* did not pose an obstacle to availability in forty states and the District of Columbia by the time of the signature of the final rule.

Nor is the Groups' focus on potential "hold-out" localities adequate to show that EPA's restriction in this subsector is irrational; one of the pathways that most states have employed to overrule municipalities that refuse to update building codes is preemption legislation. As of the signature date of the final rule, nearly 30 states had legislatively preempted local municipalities from prohibiting the use of refrigerants designated as acceptable for use under EPA's SNAP program. JA849–50 (Building Codes Technical Support Document). For instance, in Texas, where HEB supermarkets are located, state law has mandated since 2021 that a "building code or other requirement applicable to commercial or residential buildings or construction may not prohibit the use of a substitute refrigerant authorized pursuant to [SNAP]." Tex. Rev. Stat. § 382.551. States taking this legislative pathway are thus able to quickly permit new HFC alternatives once they are SNAP-listed.

53

To the extent the Food Industry Groups are asserting that the AIM Act does not permit EPA to identify a substitute as available if there is even one locality in the nation that does not authorize that substitute, that interpretation is contrary to the AIM Act. Technology Transitions Rule at 73,131, 73,136. Requiring unanimity in every municipal building code before EPA may level the playing field and establish technology restrictions across a subsector is inconsistent with the authority granted in subsection (i)(1), which permits EPA to fully restrict the use of a regulated substance in a sector or subsector. 42 U.S.C. 7675(i)(1).

Next, regarding safety, the Food Industry Groups' PFAS contentions do not demonstrate that EPA should have found all A2L refrigerants are unavailable. None of the substitute refrigerants identified by EPA in the final rule have been categorized by EPA as a PFAS, nor does EPA categorize trifluoroacetic acid, identified by Petitioners as a degradation product of some identified substitutes, as a PFAS. And while the Groups argue without record support that all A2Ls contain trifluoroacetic acid (at 33–34), that is not factually true. For instance, the identified substitute HFO-1234ze(E) does not. But even in cases where an A2L may do so, and even accepting the Groups' presumption that trifluoroacetic acid is a PFAS, the Technology Transitions Rule does not represent a change in the safety status quo because many HFC refrigerants currently used in this subsector, like HFC-134a, also break down into trifluoroacetic acid. EPA therefore acted reasonably by

not ruling out potentially available substitutes that may hypothetically pose an identical risk.

*Finally*, in light of the foregoing, the Food Industry Groups' position that carbon dioxide is the only available substitute in this subsector is not accurate. Contrary to the Groups' representation that other A1s are not technologically achievable, that A2Ls are not permitted by building codes, and that ammonia is unsafe, EPA reasonably predicted that these or other new alternatives will come on the market, in some cases exactly because of the Technology Transitions Rule. These findings are sufficient to uphold this restriction.

\*    \*    \*

Once properly contextualized away from a food-industry-wide survey of HFC substitutes into a review of how EPA actually assessed the availability of compliance options in each subsector, this case becomes simple. In each of the challenged subsectors, EPA rationally applied the availability subfactors to the best available data before it to identify HFC substitutes that would be available by the relevant compliance deadline. Indeed, EPA often reached this conclusion because substitutes were already in use or on the way into wider acceptance. The Food Industry Groups' challenges that EPA's compliance deadlines were arbitrary and capricious should be rejected.

55

### III. EPA Reasonably Considered the Technology Transitions Rule's Overall Economic Costs and Environmental Impacts.

The AIM Act's third technology transitions factor requires EPA to factor in, to the extent practicable, "overall economic costs and environmental impacts, as compared to historical trends." 42 U.S.C. § 7675(i). Congress did not define these terms, but EPA explained that a reasonable and practicable interpretation of this factor is to look at the anticipated economic costs and environmental impacts of technology transitions rules "as compared to a scenario where historical trends continue into the future (i.e., 'business as usual')." Technology Transitions Rule at 73,139.

Applying that approach, EPA here considered the business-as-usual scenario to be a world where the allowance allocation and trading program exists, but the Technology Transitions Rule does not. *Id.* EPA estimated that adopting the Technology Transitions Rule had the potential to reduce the demand for HFCs by between 700 and 1100 million metric tons of carbon dioxide equivalent, yielding substantial benefits both environmentally (in the form of reduced HFC emissions and thus less climate-change-related harm) and ultimately economically (in the form of cost savings from deploying more efficient technology). JA192, 876 (Cost and Environmental Impacts Technical Support Document). Even a cursory review of EPA's economic costs and environmental impacts technical support document,

56

to say nothing of EPA's analysis in the Technology Transitions Rule preamble, refutes the idea that EPA "failed to consider an important aspect of the problem."

The Food Industry Groups' narrower challenge to just carbon dioxide under this factor fares no better. The Groups assert that two of EPA's compliance dates (in high charge remote condensing units and supermarket systems) are irrational because EPA did not "factor in" the overall economic costs and environmental impacts of a nationwide transition to transcritical carbon dioxide systems. Pet'rs' Br. 53. In fact, this is precisely what EPA analyzed for remote condensing units and supermarket systems and thus factored into its restrictions.

For these two subsectors, EPA estimated the economic costs and environmental impacts by assuming carbon dioxide as the compliance option. JA 188 (Costs and Environmental Impacts Technical Support Document). While EPA's view is that additional substitutes will be available by the 2026 and 2027 compliance deadlines, EPA determined that it was reasonable to assess this factor based on a transition to only carbon dioxide, because, at the time EPA conducted its analysis, carbon dioxide was the primary substitute in use and afforded the best available data. *Id.* at 21–24. Under this model, contrary to the Food Industry Groups' post-hoc assertions about economic and environmental impact, EPA reasonably concluded that a carbon dioxide transition supported the rule. The Groups cannot demonstrate that EPA failed to consider this factor or acted

57

unreasonably.

*First, on overall economic costs,* EPA rationally modeled lower costs based on the best available data before it. In contrast to EPA's model, the Food Industry Groups rely entirely on unsupported claims that new carbon dioxide systems require more service, repair, and ongoing maintenance than legacy HFC systems. Neither the Groups' comments nor their brief provide any data on these supposed higher costs, which are directly contrary to the experience of grocery stores across the country and in Europe that have switched to carbon dioxide with handsome savings. *See* https://www.epa.gov/greenchill/greenchill-certified-store-achievements (noting that stores receiving certification typically use 67% less refrigerant in their systems, save more than $2,200 each year in refrigerant replacement costs, and from 2008 to 2022, saved more than $8.3 million in combined operating costs); *see also* Technology Transitions Rule at 73,158. And with the significant congressionally-mandated reductions in HFC production and importation over the next decade, those legacy costs will only continue to rise, further supporting EPA's model. *Id.* at 73,160. This is unsurprising, given the high refrigerant leak rate typically experienced by retail food stores using the older technology, which in turn results in ongoing costs to replace refrigerant to keep the systems running. *See, e.g.,* 81 Fed. Reg. 82,272, 82,319–21 (Nov. 18, 2016) (surveying average leak rates in commercial refrigeration appliances).

Beyond costs to retail food stores, the Food Industry Groups' post-hoc arguments about food waste and food deserts were not presented to EPA during the comment period and are therefore forfeited. *See HARDI*, 71 F.4th at 65. While certain commenters did point to food waste and food deserts as potential concerns if new grocery stores do not have reliable refrigeration technology, neither the Groups nor any other commenter asserted that EPA's overall-economic-costs arguments model was flawed for failing to incorporate these concerns. Nor did the comments on these points provide any concrete, let alone "best available," data or information that provided evidence of additional food waste impacts from carbon dioxide systems compared to legacy HFC systems. EPA cannot have made changes to its model when no data was available to support the change.

*Second, on overall environmental impacts*, the Food Industry Groups' challenge is both legally and technically flawed. Legally, the Groups ignore that the AIM Act directs EPA to, "to the extent practicable, factor in . . . *overall* economic costs and environmental impacts as compared to historical trends." 42 U.S.C. § 7675(i)(4)(C) (emphasis added). Where the Groups focus on potential adverse environmental impacts that (to the extent they exist) are only associated with warmer climates, EPA took a broader view and focused on the restrictions as a whole, where carbon dioxide systems usually outperform HFCs dramatically.

Technically, even focusing on the supposed warm weather climate problems

59

where carbon dioxide loses energy efficiency, EPA acted rationally based on the "best available data" before it. *See id.* § 7675(i)(4)(A). The only data source that the Food Industry Groups use to support their argument shows that out of 20 carbon dioxide deployments across five cities, in 14 instances energy consumption of the carbon dioxide systems was *lower* than the energy consumption of the reference case higher-global-warming-potential system. In only six instances was energy consumption of a carbon dioxide system higher than that of the reference case. No commenter thus provided EPA with data that in any concrete way showed an alleged "dramatic" increase in energy consumption associated with carbon dioxide systems in warmer climates. And given that the majority of examples of carbon dioxide systems in a wide range of cities indicated a *decrease* (and in some cases a dramatic decrease) in energy consumption compared to reference case, it is unsurprising that EPA's projections do not show that the proffered warm weather edge cases would eliminate any increased energy efficiency.

## IV.     The Food Industry Groups Forfeited Their Remaining-Phasedown-Period Argument, Which Fails in Any Event.

The Food Industry Groups forfeited their argument that the AIM Act requires EPA to compare a proposed technology-transitions restriction to the 2036 85% reduction date. Pet'rs' Br. 60.

Before the comment period, EPA explained that it was considering the Technology Transitions Rule as supporting the phasedown schedule because

"[i]mposing restrictions on the use of HFCs, and considering the timing of those restrictions, is expected to play a role in reducing the demand for HFCs as well as support innovation." 87 Fed. Reg. at 76,770–71. In other words, restricting HFCs in particular subsectors well in advance of the ultimate timeframe required by the nationwide phasedown will incentivize innovation and free up HFCs for other subsectors that are unable to transition to non-HFC substitutes. *Id.; see, e.g.*, 42 U.S.C. 7675(e)(4)(B)(iv)(I)(aa)-(ff) (mandating issuance of full quantity of allowances necessary to certain uses like etching of semiconductor material, mission-critical military systems, and onboard aerospace fire suppression). Neither the Food Industry Groups nor any other commenter took issue with this straightforward explanation.

Now before this Court, however, the Food Industry Groups propose a new meaning for the AIM Act. The Groups think factoring in the remaining phasedown period requires EPA to "compare its timelines" and explain why EPA is departing from the 2036 nationwide "deadline" for a particular subsector. Pet'rs' Br. 61. The Groups never brought this novel interpretation to EPA's attention "with reasonable specificity during the period for public comment," so this argument is forfeited. *See HARDI*, 71 F.4th at 65.

On the merits, even if not forfeited, the Food Industry Groups' argument does not comport with the statute. Congress directed that EPA "shall, to the extent

practicable, factor in . . . the remaining phase-down period." 42 U.S.C.

§ 7675(i)(4)(D). That means simply that EPA must "include or admit"

consideration of the remaining phasedown period before acting. *See Factor (v)*,

MERRIAM-WEBSTER (2024), available at www.merriam-webster.com/dictionary/

factor. EPA did so, explaining that the Technology Transitions Rule will bolster

the phasedown schedule because it "supports innovation and advances the adoption

of substitutes where available, thereby reducing demand for HFCs." Technology

Transitions Rule at 73,140. Interpreting the AIM Act differently to require EPA to

justify a 'departure' from the remaining phasedown period improperly assumes

that the retail food industry is entitled to a 2036 compliance deadline, despite

Congress's clear directive to EPA to drive "technology transitions" in certain

subsectors. *See* 42 U.S.C. § 7675(i)(1) ("[EPA] may by rule restrict, fully,

partially, or on a graduated schedule, the use of a[n HFC.]").

Moreover, it is not accurate to say that the status quo is unrestricted use of

HFCs until 2036. The Food Industry Groups ignore that Congress mandated

nationwide HFC reductions of 10% to start, 40% by 2024, 70% by 2029, and 80%

by 2034. *Id.* § 7675(e)(2)(C). In line with this graduated schedule, EPA explained

that "most of the phasedown will occur within the next six years [i.e., by 2029],"

and this reduction in HFC supply was "an important factor" in finalizing

corresponding compliance dates and restrictions in the Technology Transitions

Rule. Technology Transitions Rule at 73,140. EPA's decisions to establish compliance dates ahead of the phasedown's significant step-down in 2029 to 30% of baseline levels thus "factored in" the remaining phasedown period and were in keeping with EPA's experience implementing similar restrictions under the ozone-depleting-substances phaseout, where most products were restricted well in advance of ultimate phaseout deadlines. *See id.* at 73,140–41; *see also* JA787 (Response to Comments) ("because of the timeframes for the phasedown . . . it is not helpful to industry as a whole to delay transitions . . . when delay means an extremely tight market for HFCs with the potential for shortages").

## CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

TODD KIM
Assistant Attorney General

/s/ *Daniel J. Martin*
DANIEL J. MARTIN
Environmental Defense Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 307-1056
Daniel.Martin3@usdoj.gov

Of Counsel:

KAYTRUE TING
U.S. Environmental Protection Agency
Washington, D.C.

**CERTIFICATE OF COMPLIANCE**

1.     This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 12,951 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Daniel J. Martin*
DANIEL J. MARTIN

Counsel for Respondents

# ADDENDUM

**Statutes**

42 U.S.C § 7671k.................................................................................ADD01

**Code of Federal Regulations**

40 C.F.R. § 84.54…………………......................................................ADD03

# TABLE OF CONTENTS

**Statutes**

42 U.S.C § 7671k .................................................................................. ADD01


**Code of Federal Regulations**

40 C.F.R. § 84.54 ...............................................................................ADD03

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter VI. Stratospheric Ozone Protection

42 U.S.C.A. § 7671k

§ 7671k. Safe alternatives policy

Currentness

**(a) Policy**

To the maximum extent practicable, class I and class II substances shall be replaced by chemicals, product substitutes, or alternative manufacturing processes that reduce overall risks to human health and the environment.

**(b) Reviews and reports**

The Administrator shall--

**(1)** in consultation and coordination with interested members of the public and the heads of relevant Federal agencies and departments, recommend Federal research programs and other activities to assist in identifying alternatives to the use of class I and class II substances as refrigerants, solvents, fire retardants, foam blowing agents, and other commercial applications and in achieving a transition to such alternatives, and, where appropriate, seek to maximize the use of Federal research facilities and resources to assist users of class I and class II substances in identifying and developing alternatives to the use of such substances as refrigerants, solvents, fire retardants, foam blowing agents, and other commercial applications;

**(2)** examine in consultation and coordination with the Secretary of Defense and the heads of other relevant Federal agencies and departments, including the General Services Administration, Federal procurement practices with respect to class I and class II substances and recommend measures to promote the transition by the Federal Government, as expeditiously as possible, to the use of safe substitutes;

**(3)** specify initiatives, including appropriate intergovernmental, international, and commercial information and technology transfers, to promote the development and use of safe substitutes for class I and class II substances, including alternative chemicals, product substitutes, and alternative manufacturing processes; and

**(4)** maintain a public clearinghouse of alternative chemicals, product substitutes, and alternative manufacturing processes that are available for products and manufacturing processes which use class I and class II substances.

**(c) Alternatives for class I or II substances**

Within 2 years after November 15, 1990, the Administrator shall promulgate rules under this section providing that it shall be unlawful to replace any class I or class II substance with any substitute substance which the Administrator determines

ADD01

may present adverse effects to human health or the environment, where the Administrator has identified an alternative to such replacement that--

**(1)** reduces the overall risk to human health and the environment; and

**(2)** is currently or potentially available.

The Administrator shall publish a list of (A) the substitutes prohibited under this subsection for specific uses and (B) the safe alternatives identified under this subsection for specific uses.

**(d) Right to petition**

Any person may petition the Administrator to add a substance to the lists under subsection (c) or to remove a substance from either of such lists. The Administrator shall grant or deny the petition within 90 days after receipt of any such petition. If the Administrator denies the petition, the Administrator shall publish an explanation of why the petition was denied. If the Administrator grants such petition the Administrator shall publish such revised list within 6 months thereafter. Any petition under this subsection shall include a showing by the petitioner that there are data on the substance adequate to support the petition. If the Administrator determines that information on the substance is not sufficient to make a determination under this subsection, the Administrator shall use any authority available to the Administrator, under any law administered by the Administrator, to acquire such information.

**(e) Studies and notification**

The Administrator shall require any person who produces a chemical substitute for a class I substance to provide the Administrator with such person's unpublished health and safety studies on such substitute and require producers to notify the Administrator not less than 90 days before new or existing chemicals are introduced into interstate commerce for significant new uses as substitutes for a class I substance. This subsection shall be subject to section 7414(c) of this title.

**CREDIT(S)**

(July 14, 1955, c. 360, Title VI, § 612, as added Pub.L. 101-549, Title VI, § 602(a), Nov. 15, 1990, 104 Stat. 2667.)

Notes of Decisions (4)

42 U.S.C.A. § 7671k, 42 USCA § 7671k
Current through P.L. 118-49. Some statute sections may be more current, see credits for details.

---

**End of Document**                                     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    2

| Code of Federal Regulations |
| Title 40. Protection of Environment |
| Chapter I. Environmental Protection Agency (Refs & Annos) |
| Subchapter C. Air Programs |
| Part 84. Phasedown of Hydrofluorocarbons (Refs & Annos) |
| Subpart B. Restrictions on the Use of Hydrofluorocarbons (Refs & Annos) |

40 C.F.R. § 84.54

§ 84.54 Restrictions on the use of hydrofluorocarbons.

Effective: December 26, 2023

Currentness

(a) No person may manufacture or import any product in the following sectors or subsectors that uses a regulated substance as listed in this paragraph:

(1) Effective January 1, 2025, self-contained residential and light commercial air conditioning and heat pump products using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(2) Effective January 1, 2025, residential dehumidifiers using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(3) Effective January 1, 2025, household refrigerators and freezers using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 150 or greater;

(4) Effective January 1, 2025, retail food refrigeration—stand-alone units using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 150 or greater;

(5) Effective January 1, 2025, vending machines using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 150 or greater;

(6) Effective January 1, 2025, refrigerated transport—intermodal containers with the temperature of the refrigerant entering the evaporator (for direct heat exchange systems) or the temperature of the fluid exiting (for chillers) of -50 °C (–58 °F) or higher using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(7) Effective January 1, 2025, self-contained products in refrigerated transport—road and refrigerated transport—marine subsectors using any of the following: R–402A, R–402B, R–404A, R–407B, R–408A, R–410B, R–417A, R–421A, R–421B, R–422A, R–422B, R–422C, R–422D, R–424A, R–428A, R–434A, R–438A, R–507A, R–125/290/134a/600a (55/1/42.5/1.5), RS–44 (2003 formulation) or GHG–X5;

§ 84.54 Restrictions on the use of hydrofluorocarbons., 40 C.F.R. § 84.54...

USCA Case #23-1347    Document #2064245    Filed: 07/11/2024    Page 81 of 88

(8) Self-contained automatic commercial ice machines as follows:

(i) Effective January 1, 2026, ice maker products with a harvest rate as determined in accordance with 10 CFR 431.134, using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 150 or greater as follows:

(A) Batch type, as defined in 10 CFR 431.132, with a harvest rate less than or equal to 1,000 pounds of ice per 24 hours;

(B) Continuous type, as defined in 10 CFR 431.132, with a harvest rate less than or equal to 1,200 pounds of ice per 24 hours;

(ii) Effective January 1, 2027, batch type ice maker products, as defined in 10 CFR 431.132, with a harvest rate greater than 1,000 pounds of ice per 24 hours, as determined in accordance with 10 CFR 431.134, and continuous type ice machine products, as defined in 10 CFR 431.132, with a harvest rate greater than 1,200 pounds of ice per 24 hours, as determined in accordance with 10 CFR 431.134, using any of the following: R–402A, R–402B, R–404A, R–407A, R–407B, R–407C, R–407F, R–408A, R–410A, R–410B, R–411A, R–411B, R–417A, R–417C, R–420A, R–421A, R–421B, R–422A, R–422B, R–422C, R–422D, R–424A, R–426A, R–428A, R–434A, R–437A, R–438A, R–442A, R–507A, HFC–134a, R–125/290/134a/600a (55/1/42.5/1.5), RB–276, RS–24 (2002 formulation), RS–44 (2003 formulation), GHG–X5, G2018C, or Freeze 12;

(9) Self-contained refrigerated food processing and dispensing products as follows:

(i) Effective January 1, 2027, products outside the scope of UL 621, "Ice Cream Makers," Edition 7, dated May 07, 2010, with revisions through September 16, 2020, as of December 26, 2023, with refrigerant charge sizes less than or equal to 500 g using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 150 or greater;

(ii) Effective January 1, 2027, products outside the scope of UL 621, "Ice Cream Makers," Edition 7, dated May 7, 2010, with revisions through September 16, 2020, as of December 26, 2023, with refrigerant charge sizes greater than 500 g, using any of the following: R–402A, R–402B, R–404A, R–407A, R–407B, R–407C, R–407F, R–407H, R–408A, R–410A, R–410B, R–411A, R–411B, R–417A, R–417C, R–420A, R–421A, R–421B, R–422A, R–422B, R–422C, R–422D, R–424A, R–426A, R–427A, R–428A, R–434A, R–437A, R–438A, R–507A, HFC–134a, HFC–227ea, R–125/290/134a/600a (55/1/42.5/1.5), RB–276, RS–24 (2002 formulation), RS–44 (2003 formulation), GHG–X5, or Freeze 12; and

(iii) Effective January 1, 2028, for refrigerated food processing and dispensing products within the scope of UL 621, "Ice Cream Makers," Edition 7, dated May 7, 2010, with revisions through September 16, 2020, as of December 26, 2023, using any of the following: R–402A, R–402B, R–404A, R–407A, R–407B, R–407C, R–407F, R–407H, R–408A, R–410A, R–410B, R–411A, R–411B, R–417A, R–417C, R–420A, R–421A, R–421B, R–422A, R–422B, R–422C, R–422D, R–424A, R–426A, R–427A, R–428A, R–434A, R–437A, R–438A, R–507A, HFC–134a, HFC–227ea, R–125/290/134a/600a (55/1/42.5/1.5), RB–276, RS–24 (2002 formulation), RS–44 (2003 formulation), GHG–X5, or Freeze 12.

(10) Chillers, when a stand-alone product, as follows:

ADD04

§ 84.54 Restrictions on the use of hydrofluorocarbons, 40 C.F.R. § 84.54...

USCA Case #23-1347    Document #2064245    Filed: 07/11/2024    Page 82 of 88

(i) Effective January 1, 2025, chillers for comfort cooling using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(ii) Effective January 1, 2025, chillers for ice rinks using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(iii) Effective January 1, 2026, chillers for industrial process refrigeration where the temperature of the fluid exiting the chiller is greater than -22 °F (–30 °C) using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(iv) Effective January 1, 2028, chillers for industrial process refrigeration where the temperature of the fluid exiting the chiller is greater than or equal to -50 °C (–58 °F) and less than or equal to -30 °C (–22 °F) using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(11) Effective January 1, 2027, self-contained products in data center, information technology equipment facility, and computer room cooling using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(12) Industrial process refrigeration products, other than chillers, as follows:

(i) Effective January 1, 2026, products with a refrigerant charge capacity of 200 pounds or greater and with the refrigerant temperature entering the evaporator higher than -30 °C (–22 °F) using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 150 or greater;

(ii) Effective January 1, 2026, products with a refrigerant charge capacity less than 200 pounds and with the refrigerant temperature entering the evaporator higher than -30 °C (–22 °F), using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 300 or greater;

(iii) Effective January 1, 2028, where the temperature of the refrigerant entering the evaporator is greater than or equal to -50 °C (–58 °F) and is less than or equal to -30 °C (–22 °F), using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(13) Motor vehicle air-conditioning as follows:

(i) Effective October 24, 2024, for Model Year 2025 and subsequent model year light-duty passenger cars and trucks (vehicles with a gross vehicle weight rating less than 8,500 lb) using or intended to use a regulated substance, or a blend containing a regulated substance, with a global warming potential of 150 or greater;

(ii) For Model Year 2028 and subsequent model year medium-duty passenger vehicles, heavy-duty pick-up trucks, and complete heavy-duty vans, as defined by the Federal Highway Administration at 40 CFR 86.1803–01, which have air

ADD05

conditioning equipment that will not be modified by upfitters using or intended to use a regulated substance, or a blend containing a regulated substance, with a global warming potential of 150 or greater;

(iii) Effective January 1, 2028, certain nonroad vehicles (agricultural tractors greater than 40 horsepower; self-propelled agricultural machinery; compact equipment; construction, forestry, and mining equipment; and commercial utility vehicles) using or intended to use a regulated substance, or a blend containing a regulated substance, with a global warming potential of 150 or greater;

(14) Effective January 1, 2025, foam products (but not including foam products in paragraph (a)(15) of this section) in the following subsectors using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 150 or greater:

(i) Rigid polyurethane appliance foam, commercial refrigeration foam, laminated boardstock, marine flotation foam, sandwich panels, and slabstock;

(ii) Flexible polyurethane;

(iii) Integral skin polyurethane;

(iv) Polystyrene—extruded boardstock, billet, and extruded sheet;

(v) Phenolic insulation board and bunstock;

(vi) Polyisocyanurate laminated boardstock;

(vii) Polyolefin; and

(viii) Rigid polyurethane spray foam (i.e., high-pressure two-component, low-pressure two-component, and one-component foam sealants).

(15) Effective January 1, 2026, foam products in the formulations specified in paragraphs (a)(14)(i) through (viii) of this section that are for use in space and military applications, except spray and pour foams that are for use in space vehicles as defined in § 84.3, which are not subject to a use restriction.

(16) Aerosol products as follows:

(i) Effective January 1, 2025, all aerosol products using a regulated substance with a global warming potential of 150 or greater, except products that use HFC–43–10mee (1,1,1,2,3,4,4,5,5,5–pentafluoropentane) or HFC–245fa (1,1,1,3,3–pentafluoropropane) as an aerosol solvent or those that use HFC–134a in the following specific uses;

(A) Cleaning products for removal of grease, flux and other soils from electrical equipment or electronics;

(B) Refrigerant flushes;

(C) Products for sensitivity testing of smoke detectors;

(D) Lubricants and freeze sprays for electrical equipment or electronics;

(E) Sprays for aircraft maintenance;

(F) Sprays containing corrosion preventive compounds used in the maintenance of aircraft, electrical equipment or electronics, or military equipment;

(G) Pesticides for use near electrical wires or in aircraft, in total release insecticide foggers, or in certified organic use pesticides for which EPA has specifically disallowed all other lower–GWP propellants;

(H) Mold release agents and mold cleaners;

(I) Lubricants and cleaners for spinnerets for synthetic fabrics;

(J) Duster sprays specifically for removal of dust from photographic negatives, semiconductor chips, specimens under electron microscopes, and energized electrical equipment;

(K) Adhesives and sealants in large canisters;

(L) Document preservation sprays;

(M) Wound care sprays;

(N) Topical coolant sprays for pain relief;

(O) Products for removing bandage adhesives from skin.

(ii) Effective January 1, 2028, all aerosol products using a regulated substance with a global warming potential of 150 or greater.

ADD07

§ 84.54 Restrictions on the use of hydrofluorocarbons., 40 C.F.R. § 84.54...

USCA Case #23-1347    Document #2064245    Filed: 07/11/2024    Page 85 of 88

(b) Effective three years after the dates listed for each subsector in paragraph (a) of this section, no person may sell, distribute, offer for sale or distribution, make available for sale or distribution, purchase or receive for sale or distribution, or attempt to purchase or receive for sale or distribution, or export any product that uses a regulated substance as listed in paragraph (a).

(c) No person may install any system, nor have any such system be installed through their position as a designer, owner, or operator of that system, in the following sectors or subsectors that uses a regulated substance as listed in this paragraph (c):

(1) Effective January 1, 2025, residential or light commercial air-conditioning or heat pump systems using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater, except for variable refrigerant flow air-conditioning and heat pump systems. New residential and light commercial air-conditioning and heat pump systems using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater may be installed prior to January 1, 2026, where all specified components of that system are manufactured or imported prior to January 1, 2025.

(2) Effective January 1, 2026, variable refrigerant flow systems for use as residential and light commercial air-conditioning or heat pumps, using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(3) Effective January 1, 2025, chillers for comfort cooling using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(4) Effective January 1, 2025, ice rinks using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(5) Effective January 1, 2026, chillers for industrial process refrigeration where the temperature of the fluid exiting the chiller is greater than -22 °F (–30 °C) using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(6) Effective January 1, 2028, chillers for industrial process refrigeration where the temperature of the fluid exiting the chiller is greater than or equal to -50 °C (–58 °F) and less than or equal to -30 °C (–22 °F) using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(7) Effective January 1, 2025, refrigerated transport—intermodal containers with the temperature of the refrigerant entering the evaporator (for direct heat exchange systems) or the temperature of the fluid exiting (for chillers) of -50 °C (–58 °F) or higher using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(8) Effective January 1, 2025, refrigerated transport—road or refrigerated transport—marine systems using any of the following: R–402A, R–402B, R–404A, R–407B, R–408A, R–410B, R–417A, R–421A, R–421B, R–422A, R–422B, R–422C, R–422D, R–424A, R–428A, R–434A, R–438A, R–507A, R–125/290/134a/600a (55/1/42.5/1.5), RS–44 (2003 formulation) or GHG–X5;

ADD08

§ 84.54 Restrictions on the use of hydrofluorocarbons, 40 C.F.R. § 84.54...

USCA Case #23-1347    Document #2064245    Filed: 07/11/2024    Page 86 of 88

(9) Effective January 1, 2026, cold storage warehouse systems as follows:

(i) Systems with a refrigerant charge capacity of 200 pounds or greater, that are not the high temperature side of a cascade system, using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 150 or greater;

(ii) Systems with a refrigerant charge capacity less than 200 pounds, using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 300 or greater;

(iii) Cascade refrigerant systems using a regulated substance, or a blend containing a regulated substance, on the high temperature side of the system with a global warming potential of 300 or greater;

(10) Industrial process refrigeration systems, other than chiller systems, as follows:

(i) Effective January 1, 2026, systems with a refrigerant charge capacity of 200 pounds or greater and with the refrigerant temperature entering the evaporator higher than -30 °C (–22 °F), that are not the high temperature side of a cascade system, using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 150 or greater;

(ii) Effective January 1, 2026, systems with a refrigerant charge capacity less than 200 pounds and with the refrigerant temperature entering the evaporator higher than -30 °C (–22 °F), using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 300 or greater;

(iii) Effective January 1, 2026, the high temperature side of cascade systems with the refrigerant temperature entering the evaporator higher than -30 °C (–22 °F) using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 300 or greater;

(iv) Effective January 1, 2028, where the temperature of the refrigerant entering the evaporator is greater than or equal to -50 °C (–58 °F) and is less than or equal to -30 °C (–22 °F), using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(11) Effective January 1, 2026, remote condensing units in retail food refrigeration systems as follows:

(i) Systems with a refrigerant charge capacity of 200 pounds or greater, that are not the high temperature side of a cascade system, using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 150 or greater;

(ii) Systems with a refrigerant charge capacity less than 200 pounds using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 300 or greater;

ADD09

(iii) Cascade refrigerant systems using a regulated substance, or a blend containing a regulated substance, on the high temperature side of the system with a global warming potential of 300 or greater;

(12) Effective January 1, 2027, supermarket systems as follows:

(i) Systems with a refrigerant charge capacity of 200 pounds or greater, that are not the high temperature side of a cascade system, using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 150 or greater;

(ii) Systems with a refrigerant charge capacity less than 200 pounds using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 300 or greater;

(iii) Cascade refrigerant systems using a regulated substance, or a blend containing a regulated substance, on the high temperature side of the system with a global warming potential of 300 or greater;

(13) Effective January 1, 2027, data center, information technology equipment facility, and computer room cooling systems using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater;

(14) Effective January 1, 2027, automatic commercial ice machines with a remote condenser using any of the following: R–402A, R–402B, R–404A, R–407B, R–408A, R–410B, R–417A, R–421A, R–421B, R–422A, R–422B, R–422C, R–422D, R–424A, R–428A, R–434A, R–438A, R–507A, R–125/290/134a/600a (55/1/42.5/1.5), RS–44 (2003 formulation), or GHG–X5.

(15) Effective January 1, 2027, refrigerated food processing and dispensing equipment with a remote condenser using any of the following: R–402A, R–402B, R–404A, R–407A, R–407B, R–407C, R–407F, R–407H, R–408A, R–410A, R–410B, R–411A, R–411B, R–417A, R–417C, R–420A, R–421A, R–421B, R–422A, R–422B, R–422C, R–422D, R–424A, R–426A, R–427A, R–428A, R–434A, R–437A, R–438A, R–507A, HFC–134a, HFC–227ea, R–125/290/134a/600a (55/1/42.5/1.5), RB–276, RS–24 (2002 formulation), RS–44 (2003 formulation), GHG–X5, or Freeze 12.

(d) The compliance date for the installation of a system in paragraph (c) of this section for the industrial process refrigeration systems with a January 1, 2026, compliance date, retail food—supermarket, cold storage warehouse, and ice rink subsectors is extended one year beyond the specified compliance date when an approved building permit issued prior to October 5, 2023, specifies the use of a restricted regulated substance, or blend containing a regulated substance, in a system detailed in that permit.

(e) The following actions, upon charging the system to full charge, are considered an installation of a refrigeration, air conditioning, and heat pump system under paragraph (c) of this section:

(1) Assembling a system for the first time from used or new components;

(2) Increasing the cooling capacity, in BTU per hour, of an existing system; or

§ 84.54 Restrictions on the use of hydrofluorocarbons, 40 C.F.R. § 84.54...

USCA Case #23-1347    Document #2064245    Filed: 07/11/2024    Page 88 of 88

(3) Replacing 75 percent or more of evaporators (by number) and 100 percent of the compressor racks, condensers, and connected evaporator loads of an existing system.

(f) Effective upon the dates listed for each subsector in paragraphs (a) and (c) of this section, no person may manufacture, import, sell, distribute, offer for sale or distribution, make available for sale or distribution, purchase or receive for sale or distribution, or attempt to purchase or receive for sale or distribution, or export any product or specified component that is not labeled in accordance with § 84.58.

(g) Every product or system using or intended to use a regulated substance or blend containing a regulated substance that is manufactured, imported, sold, distributed, offered for sale or distribution, made available for sale or distribution, purchased or received for sale or distribution, or attempted to be purchased or received for sale or distribution, or exported in contravention of paragraphs (a) through (f) of this section constitutes a separate violation of this subpart.

(h) No person may provide false, inaccurate, or misleading information to EPA when reporting or providing any communication required under this subpart.

(i) No person may falsely indicate through marketing, packaging, labeling, or other means that a product or specified component uses or is intended to use a regulated substance, blend containing a regulated substance, or substitute that differs from the regulated substance, blend containing a regulated substance, or substitute that is actually used.

(j) Section (k) of the AIM Act states that sections 113, 114, 304, and 307 of the Clean Air Act (42 U.S.C. 7413, 7414, 7604, 7607) shall apply to this section and any rule, rulemaking, or regulation promulgated by the Administrator pursuant to this section as though this section were expressly included in title VI of that Act (42 U.S.C. 7671 et seq.). Violation of this part is subject to Federal enforcement and the penalties laid out in section 113 of the Clean Air Act.

**Credits**
[88 FR 88832, Dec. 26, 2023]

SOURCE: 86 FR 55201, Oct. 5, 2021; 88 FR 73205, Oct. 24, 2023, unless otherwise noted.

AUTHORITY: Pub.L. 116–260, Division S, Sec. 103.

Current through May 17, 2024, 89 FR 43731. Some sections may be more current. See credits for details.

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.