ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 12, 2024

No. 23-1347

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

FOOD MARKETPLACE INC., ET AL.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents*,

On Petition for Review of a
Final Rule of the U.S. Environmental Protection Agency

**FINAL BRIEF OF AMICUS CURIAE
NATURAL RESOURCES DEFENSE COUNCIL
IN SUPPORT OF RESPONDENTS**

CHANTEL JATHAN
JARED E. KNICLEY
DAVID DONIGER
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
(202) 836-9344
cjathan@nrdc.org

*Counsel for Natural Resources Defense Council*

July 12, 2024

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.     Parties and Amici

Except as indicated below, all parties and amicus curiae in this Court are listed in the Brief of Petitioners Food Marketplace, Inc., the American Frozen Food Institute, and the National Grocers Association (collectively, "FMI"). FMI's Brief does not list the Natural Resources Defense Council, Inc. (NRDC), which appears here as an amicus in support of Respondents.

Pursuant to Circuit Rule 26.1, NRDC certifies that it is a 501(c)(3) nonprofit advocacy organization dedicated to protecting public health and the environment. It has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public. No publicly held company has an ownership interest in NRDC.

Pursuant to Circuit Rule 29(b) and Federal Rule 29(a)(2), NRDC certifies that all parties consent to NRDC filing this amicus brief.

## B.     Ruling Under Review

References to the rulings at issue appear in FMI's Brief.

## C.     Related Cases

The two related cases are listed in FMI's Brief.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND
    RELATED CASES ....................................................................i

TABLE OF AUTHORITIES.................................................................iv

GLOSSARY ...................................................................................vi

INTEREST OF AMICUS CURIAE.......................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................2

ARGUMENT ...................................................................................6

I.    Congress authorized EPA to issue transition
    standards...................................................................................6

    A. The AIM Act addresses both HFC supply and
       demand...............................................................................6

    B. The Transitions Rule establishes the first set
       of limits on HFC use across dozens of
       subsectors.........................................................................9

II.    EPA can set a transition standard based on one
    available substitute..................................................................11

III.    Transcritical $CO_2$ is an available substitute
    already in widespread use within the retail food
    refrigeration and cold storage subsectors....................................13

    A. Transcritical $CO_2$ is already in widespread use
       domestically and abroad......................................................13

    B. Transcritical $CO_2$ systems are available in
       warmer climates ...............................................................17

C. The Transitions Rule does not force a nationwide transition to transcritical $CO_2$ systems ................................................................ 19

IV.  Available substitutes support the Transitions Rule's HVAC standard ........................................ 22

A. FMI hasn't shown standing to challenge the HVAC standard ............................................ 23

B. HVAC manufacturers support the HVAC standard ................................................................ 24

C. Multiple available substitutes support the HVAC standard ................................................ 25

CONCLUSION ........................................................ 28

# TABLE OF AUTHORITIES

## Cases

*Am. Frozen Food Inst. v. Train*,
    539 F.2d 107 (D.C. Cir. 1976)..................................................12, 14

*Chamber of Commerce v. EPA*,
    642 F.3d 192 (D.C. Cir. 2011)...........................................24

*Growth Energy v. EPA*,
    5 F.4th 1 (D.C. Cir. 2021)........................................25, 27

*Husqvarna AB v. EPA*,
    254 F.3d 195 (D.C. Cir. 2001)...........................................12

*Int'l Harvester Co. v. Ruckelshaus*,
    478 F.2d 615 (D.C. Cir. 1973)...........................................25

*Nat'l Wildlife Fed'n v. EPA*,
    286 F.3d 554 (D.C. Cir. 2002)...........................................12

*NRDC v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) ...........................................1, 6

*Twin Rivers Paper Co. v. SEC*,
    934 F.3d 607 (D.C. Cir. 2019)...........................................23, 24

## Statutes

42 U.S.C. § 7412(d)(5)....................................................12

42 U.S.C. § 7475(a)(4)....................................................12

42 U.S.C. § 7675(b)(3)....................................................7

42 U.S.C. § 7675(e)(2)(C)....................................................7

42 U.S.C. § 7675(h)....................................................7

42 U.S.C. § 7675(i)....................................................2, 8

42 U.S.C. § 7675(i)(1) ...................................................................8, 9

42 U.S.C. § 7675(i)(4) ......................................................................8

42 U.S.C. § 7675(i)(4)(B).................................................................8

N.J. Stat. Ann. § 52:27D-123.18 (West 2023) ..........................27

Pub. L. No. 116-260, § 103, 134 Stat. 1182 (2020)....................7

Wis. Stat. Ann. § 101.02(1)(r) (West 2023) .............................27

## Regulations

40 C.F.R. § 84.54(a) ........................................................................9

40 C.F.R. § 84.54(c)(11)(i)...........................................................21

40 C.F.R. § 84.54(c)(12)(i)...........................................................21

## Other Authorities

22 Mich. Reg. 12 (Dec. 15, 2023) ..............................................27

40 Va. Reg. Regs. (Dec. 18, 2023) ..............................................27

86 Fed. Reg. 55,116 (Oct. 5, 2021)...............................................7

88 Fed. Reg. 73,098 (Oct. 24, 2023)..........2, 6, 9, 10, 11, 19, 20, 22, 24, 27

European Council Regulation 517/2014, 2014 O.J. (L 150) 195 ...........16

Kigali Amendment, Nov. 23, 2016, S. Treaty Doc. No. 117-1 (2021) .......7

*What's in Your Supermarket?*, Climate Friendly Supermarkets ..........19

# GLOSSARY

| | |
|---|---|
| AIM Act | American Innovation and Manufacturing Act |
| Carbon dioxide | $CO_2$ |
| EPA | U.S. Environmental Protection Agency |
| FMI | Petitioners Food Marketplace, Inc., The American Frozen Food Institute, and The National Grocers Association (collectively) |
| GWP | Global warming potential |
| HFCs | Hydrofluorocarbons |
| HVAC | Residential and light commercial air conditioners and heat pumps |
| NRDC | Natural Resources Defense Council |

## INTEREST OF AMICUS CURIAE

Amicus Natural Resources Defense Council (NRDC) is a nonprofit organization focused on protecting public health and the environment. NRDC has a strong interest in the phasedown of potent climate pollutants, including hydrofluorocarbons (HFCs), to protect the health, welfare, economic, and aesthetic interests of its members. *E.g.*, *NRDC v. Wheeler*, 955 F.3d 68, 77–78 (D.C. Cir. 2020).

Since its founding in 1970, NRDC has worked to ensure enforcement of the Clean Air Act and other laws to address major environmental challenges, including climate change. For decades, NRDC has participated in regulatory, legal, and international advocacy focused on phasing out harmful refrigerants, including ozone-depleting substances and their eventual substitutes, HFCs. NRDC has also participated in regulatory and legal proceedings to implement the HFC phase-down mandated by the American Innovation and Manufacturing Act of 2020 (AIM Act), including by petitioning for standards for several of the subsectors covered by the rule challenged in this case.[1]

---

[1] NRDC affirms that no party's counsel authored this brief in whole or in part, and no person other than NRDC or its counsel made any

## INTRODUCTION AND SUMMARY OF ARGUMENT

The AIM Act is a comprehensive bipartisan statute that addresses the harms posed by HFCs, a class of manmade chemicals commonly used as refrigerants that are potent climate pollutants. The Act directed the Environmental Protection Agency (EPA) to manage HFC emissions, encourage transitions to HFC alternatives, and phase down the HFC supply within the United States.

This case concerns EPA's implementation of the AIM Act's "Technology Transitions" provision. 42 U.S.C. § 7675(i). That provision allows EPA to limit HFC use in individual subsectors of the economy. As the statutory subheading indicates, the goal is to facilitate transitions to next-generation, climate-friendlier HFC alternatives.

Last year, EPA finalized its first rule under the Technology Transitions provision—the Transitions Rule—which set standards across dozens of subsectors. 88 Fed. Reg. 73,098 (Oct. 24, 2023). The Transitions Rule's standards limit the global warming potential (GWP) of refrigerants used in covered equipment. EPA set the final, subsector-

---

monetary contributions intended to fund the preparation or submission of this brief.

specific limits based on a subsector-by-subsector analysis of factors spelled out in the AIM Act, including the availability of low-GWP substitutes within each subsector.

FMI only challenges the transition standards for nine subsectors that they claim harm supermarkets and other retail food establishments. The Transitions Rule's standards for more than thirty other subsectors are not at issue here.

FMI's modesty ends there. Rather than engage directly with EPA's specific analysis supporting its standard for each subsector, FMI: broadly attacks EPA's approach to determining whether a substitute is "available" in a given subsector; questions the availability of nearly a dozen specific substitutes; decries an imagined, compelled "nationwide transition" of supermarkets to a single type of refrigeration system; and insists that the Court must vacate standards even where substitutes are available. As EPA's brief explains, many of FMI's arguments were not preserved. And they also fail on the merits. The challenged standards are well-reasoned and supported by the record.

NRDC submits this brief to emphasize three points underscoring the reasonableness of EPA's standards, particularly in light of the AIM

Act's intent to spur the transition to lower-GWP substitutes when available.

*First*, a central, though implicit, premise of FMI's brief is that EPA may not set a standard based on only one, or even a few, available substitutes. That is wrong. The AIM Act does not require EPA to identify more than one available substitute for a particular subsector. While EPA did in fact identify multiple available substitutes for *all* subsectors, one is enough.

*Second*, EPA was right to conclude that carbon dioxide ($CO_2$) is an available substitute in the retail food refrigeration and cold storage subsectors. The "availability" of transcritical $CO_2$ systems[2] in those subsectors is not a close call. More than 80,000 retail food and storage applications overseas, and nearly 2,000 retail food stores in the United States, already use transcritical $CO_2$ systems. Transcritical $CO_2$ use is growing fast in the United States, including in warmer climates where

---

[2] Currently, the most common refrigeration system architecture that uses $CO_2$ as a refrigerant is called a "transcritical $CO_2$" system. These systems use $CO_2$ as a refrigerant by itself (not in combination with other refrigerants) and sometimes operate above the critical point of $CO_2$. *See* EPA, ADVANCED REFRIGERATION TECHNOLOGIES (Oct. 4, 2023), https://www.epa.gov/greenchill/advanced-refrigeration-technologies#transcritical.

energy inefficiencies once posed a barrier. Technological advances have helped overcome those efficiency issues. And the increasing popularity of transcritical $CO_2$ systems has helped further drive down costs. Moreover, while $CO_2$ systems likely will be the best compliance option for these subsectors, particularly supermarkets, the Transitions Rule does not compel that outcome. The Rule sets the standards; market forces will determine which available alternative is the best compliance choice for each facility and subsector.

*Finally*, the record supports EPA's standard for the residential and light commercial air conditioners and heat pumps (HVAC) subsector. FMI hasn't shown it has standing to challenge this standard because it hasn't identified a specific member harmed by that standard. But even if FMI has standing, it still fails to show that the standard is unreasonable. FMI ignores that HVAC manufacturers support the standard, which reflects that they have already transitioned to substitutes in commercially available HVAC equipment. FMI's concerns about outdated building codes are also misplaced. Most states have already updated their codes and EPA reasonably predicted that the

remaining handful of states will do so soon. Since EPA signed the Transitions Rule, four such states have already done so.

The Court should deny FMI's petition for review.

ARGUMENT

I.    **Congress authorized EPA to issue transition standards**

A. **The AIM Act addresses both HFC supply and demand**

HFCs are manmade chemicals used in various applications, including for refrigeration, air conditioning, and aerosols. 88 Fed. Reg. at 73,104. HFC use has grown in recent decades, in part because of their use as substitutes to replace ozone-depleting substances phased out under the Clean Air Act and the Montreal Protocol. *Id.* With increased HFC use has come "accelerating" HFC emissions. *Id.* While HFCs do not damage the ozone layer, they "are powerful greenhouse gases that contribute to climate change." *Wheeler*, 955 F.3d at 73. Indeed, HFCs "can be hundreds to thousands of times" more potent than carbon dioxide in terms of their climate-warming potential. 88 Fed. Reg. at 73,104.

The United States has joined more than 150 countries to adopt and ratify the 2016 Kigali Amendment to the Montreal Protocol, which aims to phase down production and consumption of HFCs worldwide.

6

*Id.* For the United States and other developed countries, the Kigali Amendment's central requirement is to reduce baseline (2011-2013) HFC use by at least 85% by 2036. *See* Kigali Amendment art. 2J, Nov. 23, 2016, S. Treaty Doc. No. 117-1 (2021). Full implementation of the Kigali Amendment will avoid as much as half a degree Celsius of global warming by 2100. 86 Fed. Reg. 55,116, 55,124 (Oct. 5, 2021).

In 2020, Congress passed the bipartisan AIM Act to implement the Kigali Amendment in the United States and to authorize EPA to take action to phase down HFC production, curb HFC emissions, and promote the transition to HFC alternatives in end uses. *See* Pub. L. No. 116-260, § 103, 134 Stat. 1182, 2255–71 (2020). The statute requires EPA to phase down HFC production and consumption in steps, starting with a 10 percent reduction by 2023 and reaching an 85 percent reduction by 2036.[3] *See* 42 U.S.C. § 7675(e)(2)(C). It also directs EPA to maximize the reclamation of and minimize the releases from existing HFC uses, *id.* § 7675(h), and to facilitate subsector-based transitions to

---

[3] The AIM Act defines "consumption" as (1) the quantity of HFCs produced in the United States, plus (2) the quantity imported into, minus the quantity exported from, the United States. 42 U.S.C. § 7675(b)(3).

next-generation technologies, *id.* § 7675(i). These AIM Act provisions work together, akin to a three-legged stool: each is needed to ensure that HFC supply and demand are reduced together to allow a timely and orderly transition away from HFCs.

For technology transitions, Congress empowered EPA to "restrict, fully, partially, or on a graduated schedule, the use of" HFCs on a "sector or subsector" basis. 42 U.S.C. § 7675(i)(1). The Act lays out factors EPA must consider, if practicable, for each subsector-specific restriction. *Id.* § 7675(i)(4). Most relevant here, EPA must consider the "availability" of more climate-friendly "substitutes" within the relevant subsector, "taking into account technological achievability, commercial demands, affordability for residential and small business consumers, safety, consumer costs, building codes, appliance efficiency standards, contractor training costs, and other relevant factors." *Id.* § 7675(i)(4)(B).

The Act's focus on technology transitions by sector and subsector makes sense: the availability of substitutes—and thus the ease, extent, and timing of HFC reductions—will differ across industries. Subsector-specific standards ensure that limits are tailored to the specific industry

8

and that, on the whole, reductions in HFC supply under the Act's phase

down are balanced by reductions in demand.

### B. The Transitions Rule establishes the first set of limits on HFC use across dozens of subsectors

EPA finalized the Transitions Rule—its first regulations under 42

U.S.C. § 7675(i)—last fall, in response to more than a dozen petitions

from industry groups, non-profits including NRDC, and governmental

entities seeking restrictions on HFC use in various sectors and

subsectors. 88 Fed. Reg. at 73,128.  EPA estimates the Rule will reduce

HFC emissions equal to as much as 876 million metric tons of carbon

dioxide through 2050, while saving consumers up to $4.5 billion. *See id.*

at 73,100–01.

The Transitions Rule sets limits on HFC use based on the global

warming potential (GWP) of HFCs or HFC blends used in covered

equipment. 88 Fed. Reg. at 73,206–09 (codified at 40 C.F.R. § 84.54).

Consistent with the AIM Act's instruction to set restrictions by "sector

or subsector," *see* 42 U.S.C. § 7675(i)(1), EPA set a separate standard,

with a separate compliance deadline, for each subsector the Transitions

Rule addressed, 40 C.F.R. § 84.54(a).

EPA set these subsector-specific limits following detailed, subsector-specific assessments of the AIM Act factors, including the availability of lower-GWP substitutes. *Compare, e.g.*, 88 Fed. Reg. at 73,147–49 (data centers), *with id.* at. 73,173–74 (home refrigerators). EPA explained in the preamble to the Transitions Rule its general approach to weighing the Act's "availability" factors. *See* 88 Fed. Reg. at 73,129–38. And it included technical support documents addressing each of those factors. *See, e.g.*, JA843–53 [EPA-HQ-OAR-2021-0643-0227-05 ("Building Code TSD")]; JA877–902 [EPA-HQ-OAR-2021-0643-0227-09 ("Achievability TSD")]. Finally, for each subsector, EPA included a list of available substitutes that would meet the Transitions Rule's limits. JA858–64 [EPA-HQ-OAR-2021-0643-0227-07 ("Substitutes TSD") at 3–9]. The result is a Rule comprised of many independent standards, each supported by a distinct technical analysis of the available substitutes within that specific subsector. *See* 88 Fed. Reg. at 73,141–87.

The Transitions Rule sets performance standards, not technology mandates. While EPA determined that each transition standard is achievable by one or more available technologies, the Rule does not

limit how a regulated entity may comply. EPA does not "endorse[] or recommend[]" any specific means of compliance, *id.* at 73,130–31 n.58, and admits its list of available substitutes for each subsector is "non-exhaustive," *id.* at 73,131. Over time, market forces—not EPA—will select the best compliance options for each subsector.

## II. EPA can set a transition standard based on one available substitute

Implicit in FMI's brief is the premise that EPA cannot set a transition standard based on only one—or even a few—available substitutes. This isn't what EPA did: the agency identified "multiple available substitutes" for each of the challenged standards. EPA Br. 35; *accord* JA858, 861–63 [Substitutes TSD 3, 6–8]. FMI challenges some of those availability findings. But it concedes that for *five* of the nine standards it challenges, there is at least one available substitute that would meet the Transitions Rule's limits. FMI Br. 28–29. FMI nonetheless still asks this Court to vacate those standards. *Id.* at 62.

FMI's premise is wrong: the AIM Act doesn't require multiple available substitutes. It simply says that EPA must, "to the extent practicable, factor in" several considerations, including "the availability of substitutes" in the relevant subsector. 42 U.S.C. § 7675(i)(4). While it

would be arbitrary for EPA to set a transition standard where there were *zero* low-GWP substitutes available, so long as EPA reasonably concludes that at least one substitute is available for a subsector, the AIM Act's availability requirement is satisfied.

Performance standards based on single technologies aren't new to environmental law, or even the Clean Air Act. Congress has long instructed EPA to consider "available" or "achievable" technologies when setting performance standards. *See, e.g.*, 42 U.S.C. § 7412(d)(5) ("generally available control technologies"), (g)(2) ("maximum achievable control technology"); *id.* § 7475(a)(4) ("best available control technology"). And this Court has upheld standards based on single technologies. *See, e.g.*, *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 558–61 (D.C. Cir. 2002); *Am. Frozen Food Inst. v. Train*, 539 F.2d 107, 132 (D.C. Cir. 1976). This is a feature, not a flaw, in technology-forcing laws: An agency sets a standard that is feasible by the compliance deadline. That creates market demand for continued innovation on other ways to meet (and even exceed) that standard. *See Husqvarna AB v. EPA*, 254 F.3d 195, 201 (D.C. Cir. 2001).

### III.  Transcritical CO$_2$ is an available substitute already in widespread use within the retail food refrigeration and cold storage subsectors

The main target of FMI's brief is CO$_2$, a refrigerant with a GWP of 1. CO$_2$ can be used in various types of cooling and heating system architectures, but the most common is called a transcritical CO$_2$ system. By first attacking the many other substitutes EPA identified as available for the retail food subsectors, FMI structures its brief to set up the misleading claim that transcritical CO$_2$ is the *only* potential substitute for those subsectors. From there, it argues transcritical CO$_2$ isn't actually available in those subsectors, FMI Br. 49–53, and that, even if it were, EPA ignored the economic and environmental costs from a "nationwide transition" to transcritical CO$_2$, *id.* at 54–59. EPA explains why FMI is wrong. EPA Br. 50–55, 56–60. NRDC offers a few points of emphasis:

#### A. Transcritical CO2 is already in widespread use domestically and abroad

Transcritical CO$_2$'s availability as a substitute in the retail food sectors isn't a "close[] call." *Contra* FMI Br. 49. Its widespread and expanding use around the world and in the United States shows it is already available for use in retail food and cold storage subsectors.

13

Transcritical $CO_2$ is already a dominant low-GWP refrigeration system in other developed countries. Over 71,000 stores and industrial sites in Europe, and nearly 9,000 in Japan, rely on transcritical $CO_2$:



SJA028 [EPA-HQ-OAR-2021-0643-0228-33 ("ATMO Report") at 18]. This Court has held that two foreign "exemplar[s]" can support a finding that a technology is available in the United States. *See Am. Frozen Food Inst.*, 539 F.2d at 132. Eighty thousand foreign examples should compel that finding.[4]

---

[4] Commercial use at that scale shows both technological achievability and demand. *See* 88 Fed. Reg. at 73,131. But it also shows that other AIM Act factors, like cost-effectiveness and safety, are satisfied. If they weren't, grocery stores around the world would prioritize different low-GWP substitutes.

But the Court need not even look abroad: transcritical $CO_2$ is in the United States, and its use is growing fast. As of December 2023, 1,850 retail food stores in the United States used transcritical $CO_2$ refrigeration systems. SJA026 [ATMO Report 16]. That's nearly *double* the count from only a year earlier:



Figure 21: Transcritical $CO_2$ Installation Growth in U.S.

SJA109 [ATMO Report 99]; *see also* SJA108 [ATMO Report 98]. At this point, over four percent of all supermarkets and grocery stores in North America use transcritical $CO_2$. SJA026 [ATMO Report 16].

FMI does not address these numbers or argue that these trends won't continue. Nor could it. Major retail food chains are committing to

transcritical $CO_2$ or other low-GWP alternatives. The popular bargain grocery store chain ALDI has already installed transcritical $CO_2$ in over 600 stores in the United States, SJA031 [ATMO Report 21], and plans to transition all new *and existing* stores to $CO_2$ or other low-GWP refrigerants by 2035.[5] Target has also announced plans to switch all stores to $CO_2$ by 2040 to reduce its direct operations' emissions by 20%. SJA031 [ATMO Report 21].

The European Union's experience with its 2014 HFC regulations is also instructive. The European Union's 150-GWP limit for new large, centralized refrigeration systems led to rapid growth in the adoption of transcritical $CO_2$, from well under 5,000 stores in 2014 to around 70,000 stores today. SJA078 [ATMO Report 68]. The European Union's limits, like EPA's under the Transitions Rule, are performance standards. *See* European Council Regulation 517/2014, 2014 O.J. (L 150) 195 art. 11(1) & annex II. The market—not regulators—chose transcritical $CO_2$ as a preferred compliance method.

---

[5] *See* Michael Hines, *All ALDI US Stores Will Transition to Natural Refrigerants by 2035*, Nat. Refrigerants News & Marketplace (Jan. 11, 2024), https://tinyurl.com/yc2wa36c.

Given transcritical $CO_2$'s extensive and growing use in retail food settings, both worldwide and domestically, EPA was right to conclude it is an available substitute for the retail food subsectors in the United States.

## B. Transcritical $CO_2$ systems are available in warmer climates

While FMI is right that, in the past, transcritical $CO_2$ was less efficient in warmer climates, technological innovation has largely resolved those concerns. *Contra* FMI Br. 51–52. The best available data in the record support EPA's conclusion that transcritical $CO_2$ is cost-effective and efficient. *See* EPA Br. 58–60.

Ten years ago, the national supermarket chain Sprouts Farmers Market installed a transcritical $CO_2$ system in one of its Georgia stores, "demonstrat[ing] the feasibility of using such systems in warmer climates."[6] Sprouts' key to success was "leveraging the efficiency improvements gained through the integration of technological

---

[6] Hillphoenix, *White Paper: DeCO2ded – Understanding the ROI on CO2 Refrigeration Systems* 5 (Sept. 2019), https://tinyurl.com/2jydm6j5. Hillphoenix makes two of the already-in-use transcritical $CO_2$ systems that EPA cites to support its standards. *See* JA885–86 [Achievability TSD 8–9].

innovations such as adiabatic gas coolers and parallel compression systems."[7] If it can be done in Atlanta, it can be done in any climate.

Thanks in large part to the European Union's regulations and resulting market demand for compliant refrigerants, transcritical $CO_2$ technology has only improved since 2014. Firms specializing in commercial refrigeration have designed several systems to improve efficiency in warm climates. SJA034 [ATMO Report 24]. A system recently introduced in an Italian grocery store saw efficiency improvements of 25–30% at temperatures between 95- and 104-degrees Fahrenheit, compared to standard $CO_2$ equipment. *Id.* Other systems enable efficient operation even above 104 degrees. *Id.*

Taken together, these technological advancements are "leading to growth in $CO_2$ systems in regions previously not considered suitable— such as the southern U.S." *Id.* This non-exhaustive map of supermarkets that have adopted transcritical $CO_2$ or other HFC-free alternatives (green dots) in southern California illustrates that trend:

---

[7] Hillphoenix, *supra* note 6, at 5.

*What's in Your Supermarket?*, Climate Friendly Supermarkets, https://www.climatefriendlysupermarkets.org/map (last visited June 4, 2024); *see also* SJA138 [EPA-HQ-OAR-2021-0643-0228-39] (earlier version of same map, nationwide). EPA recognized this trend when it concluded transcritical $CO_2$ was available nationwide. 88 Fed. Reg. at 73,158–59. FMI again provides no compelling reason to second-guess EPA's expert conclusion.

## C. The Transitions Rule does not force a nationwide transition to transcritical $CO_2$ systems

FMI's insistence that the Transitions Rule forces a "nationwide transition" to transcritical $CO_2$ is a strawman. While the *market* may—

and, given existing market conditions and trends, likely will—push the industry toward adopting transcritical $CO_2$ as a preferred compliance option, the *Transitions Rule* doesn't require that outcome.

Baked into FMI's claim otherwise is its assertion that the other low-GWP substitutes EPA identified for the retail food subsectors are unavailable. FMI Br. 54. EPA explains why that's wrong for each subsector. EPA Br. 38–40 (stand-alone units), 44–46 (cold storage warehouse systems), 47–49 (remote condensing units), 49–51 (supermarket systems). NRDC agrees: since other alternatives *are* available, the Transitions Rule leaves retailers flexibility to choose among several options.

Even FMI doesn't fully buy its own theory: it concedes that, even if all its claims are successful, there still are low-GWP substitutes available for many retail food subsectors. *See* FMI Br. 28–29. A cold storage warehouse, for example, could use ammonia, which FMI admits is an available substitute. FMI Br. 46. And retail food stand-alone units could use any of the three alternatives FMI does not challenge, *see* FMI Br. 29, including isobutane (R-600a), which is already offered in stand-alone units from multiple manufacturers, 88 Fed. Reg. at 73,153.

FMI's strongest basis for the alleged "nationwide transition" requirement would appear to be the contention that transcritical $CO_2$ is the only viable substitute for two systems: larger supermarket systems and larger remote condensing units. FMI Br. 54 & n.8.[8] But for that to be true, FMI must show that each of EPA's availability findings for *eight* other substitutes was arbitrary. *See* JA861–62 [Substitutes TSD 6–7]. FMI hasn't done that. For those systems, there are A2L refrigerants already "available for use" or "currently used," JA885–86 [Achievability TSD 8–9], and building codes will soon catch up to the technology nationwide, *infra* Part IV.C. Ammonia is also a viable option in many contexts. *See, e.g.*, EPA Br. 47–48 (remote condensing units). Because no business will be forced to adopt transcritical $CO_2$, the Court should disregard FMI's imagined claims of a compulsory "nationwide transition" to transcritical $CO_2$.

---

[8] For those systems, the Transitions Rule sets a 150-GWP limit, though not effective until 2026 (condensing units) or 2027 (supermarkets). 40 C.F.R. § 84.54(c)(11)(i), (12)(i).

IV.   **Available substitutes support the Transitions Rule's HVAC standard**

FMI also challenges the Transitions Rule's standard for residential and light commercial air conditioners and heat pumps (HVAC). The HVAC subsector is broad, including "equipment for cooling air individual rooms, single-family homes, and small commercial buildings." 88 Fed. Reg. at 73,177. For these types of equipment, EPA set a transition standard of 700 GWP, with different compliance deadlines for manufacturing and import, field assembly, and export. *Id.* at 73,178. EPA based its standard on "multiple . . . substitutes currently available for use" within the subsector. *Id.* These included two substitutes already in use (R-290 and HFC-32), one expected in products soon (R-454B), and two identified by industry as suitable for use in the subsector (R-457A and R-452B). JA882 [Achievability TSD 5].

FMI's challenges to these substitutes turn largely on the undisputed fact that they all are classified as somewhat flammable (so-called "A2Ls") or flammable ("A3s"). EPA ably explains why this characteristic alone does not render them unavailable under the AIM Act's multi-factor standard. *See* EPA Br. 41–44. NRDC again offers just a few points of emphasis:

## A. FMI hasn't shown standing to challenge the HVAC standard

While FMI purports to challenge the HVAC standard, *see* FMI Br. 14, they haven't shown standing to do so. "[N]othing in the administrative record shows a concrete injury" to FMI's members from the HVAC standard. *See Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 614 (D.C. Cir. 2019). Indeed, FMI's comments did not question EPA's proposed 700-GWP limit. *See* JA434–35 [EPA-HQ-OAR-2021-0643-0193 at 2–3] (focusing on "refrigeration" systems); JA442 [EPA-HQ-OAR-2021-0643-0209 ("RILA Comment") at 4] (same).[9]

Nor do FMI's declarations show standing. The only member declaration that FMI submitted focuses on alleged harm from the Transitions Rule's "refrigeration" standards. *See* Anderson Decl. ¶¶ 6–7. And the sole organizational declaration that FMI submitted states only that it has members that are "directly regulated" by the Rule, without identifying specific members or standards. *See* Garren Decl. ¶ 7. "It is 'not enough to aver that unidentified members have been

---

[9] While one FMI comment mentions the proposed HVAC standard, it does so only to question why that limit—700 GWP—wasn't also "appropriate" for refrigeration systems, for which EPA had proposed a 150-GWP limit. JA443 [RILA Comment at 5]. FMI never questioned the rationale for the 700-GWP standard for HVAC equipment.

23

injured."' *Twin Rivers Paper Co.*, 934 F.3d at 613 (quoting *Chamber of Commerce v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011)). FMI's general statements do not meet its burden to identify at least one member harmed by the HVAC standard. *See id.* at 613–14.

## B. HVAC manufacturers support the HVAC standard

FMI's brief ignores the fact that industry groups representing HVAC *manufacturers* petitioned EPA for HVAC standards. 88 Fed. Reg. at 73,178; *see* SJA001 [EPA-HQ-OAR-2021-0643-0009 at 1]. While the manufacturers requested a slightly weaker standard of 750 GWP, EPA finalized its 700-GWP standard based on the "multiple currently available substitutes" that could meet the standard and the lack of *any* "comments disputing EPA's assessment of availability" for those substitutes. 88 Fed. Reg. at 73,179. As EPA explained, there would be "little practical difference" between the industry-endorsed standard (750) and EPA's selected standard (700), because all available substitutes have GWPs below 700. *Id.*

It's therefore no surprise that HVAC manufacturers don't challenge the standard. The leading manufacturers' trade group "concur[red with EPA] that 700 GWP would allow for commercially

24

available alternatives to be used" in the subsector. JA476 [EPA-HQ-OAR-2021-0643-0215 at 12]. Manufacturers are already producing HVAC equipment that meet the standard. *See* JA882 [Achievability TSD 5]. And they are developing other equipment, with other compliant substitutes, for use soon. *Id.* HVAC manufacturers' conduct supports EPA's finding that its standard is achievable and reasonable.

### C. Multiple available substitutes support the HVAC standard

Despite the manufacturers' support for the HVAC standard, FMI claims that there are no "available" substitutes that would comply. FMI Br. 28–29. But the AIM Act's "availability" standard surely captures the two sub-700-GWP substitutes that are *already* in commercial use within the HVAC subsector. And FMI does not dispute that EPA could also rely on projections for other sub-700-GWP substitutes when setting the standard. *See Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 628 (D.C. Cir. 1973) (rejecting argument that an availability finding "must be based solely on technology in being as of the time of the" rule). This Court "is particularly deferential" to these types of "predictive judgments." *Growth Energy v. EPA*, 5 F.4th 1, 15 (D.C. Cir. 2021) (per curiam) (cleaned up).

FMI's concerns about building codes prohibiting the use of A2L substitutes, *e.g.*, FMI Br. 35–40, are similarly overblown. Model building codes have allowed A2L substitutes in HVAC applications for several years. JA847–48 [Building Code TSD 3–4]. States and localities have been taking action to incorporate model building code updates into their laws. In June 2022, only 14 states had updated their laws to allow A2Ls. SJA008 [EPA-HQ-OAR-2021-0643-0229-27 at 1]. But by summer 2023, more than 40 states had passed legislation or revised regulations to allow A2L use:



**Figure 1.** Map of Building Code Status for A2L Refrigerants

Source: AHRI, 2023

JA849–50 [Building Code TSD 5–6]. Based on that momentum, and industry support for the A2L substitutes, EPA projected that remaining states would follow suit. 88 Fed. Reg. at 73,178.

EPA's assessment "clear[s]" the "modest bar" for predictive judgments. *See Growth Energy*, 5 F.4th at 15. And it has proven prescient: New Jersey and Wisconsin passed legislation late last year. *See* N.J. Stat. Ann. § 52:27D-123.18 (West 2023);Wis. Stat. Ann. § 101.02(1)(r), (7)(m) (West 2023). Kentucky confirmed its codes allow A2Ls if industry safety standards are met.[10] And Michigan and Virginia adopted new regulations permitting A2L use. 22 Mich. Reg. 12 (Dec. 15, 2023); 40 Va. Reg. Regs. 730, 730–32 (Dec. 18, 2023).[11]

As EPA recognized, the "transition . . . to lower-GWP substitutes" in the HVAC subsector was "underway" before the Transitions Rule. 88 Fed. Reg. at 73,178. The Rule, as Congress intended, will help

---

[10] *See* Ltr. from David Moore, Ky. Dep't Hous., Bldgs. & Constr., to Samantha M. Slater, AHRI 1–2 (July 20, 2023), https://tinyurl.com/58vyu7jr.
[11] Because A2Ls are available and support the 700-GWP standard, the Court need not address FMI's complaint that A3s are available for only a part of the HVAC subsector. *See* FMI Br. 43–45.

accelerate that transition. The Court should reject FMI's attempts to second-guess EPA's reasoned analysis underlying the HVAC standard.

## CONCLUSION

The Court should deny FMI's petition for review.

Dated: July 12, 2024

Respectfully submitted,

*/s/ Chantel Jathan*
CHANTEL JATHAN
JARED E. KNICLEY
DAVID DONIGER
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
(202) 836-9344
cjathan@nrdc.org

*Counsel for Natural Resources Defense Council*

28

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,730 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This statement is based on the word court function of Microsoft Office Word.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in 14-point Century, a proportionally spaced font.

Other than the addition of the joint appendix and supplemental joint appendix cites and the correction of typographical errors, this brief is identical to the page-proof brief filed on June 5, 2024.


*/s/ Chantel Jathan*
Chantel Jathan

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2024, I electronically filed the above Brief of Amicus Curiae Natural Resources Defense Council in Support of Respondents with the Clerk of the Court by using the appellate CM/ECF system. I further certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Chantel Jathan*
Chantel Jathan