**SCHEDULED FOR ORAL ARGUMENT ON SEPTEMBER 12, 2024**
**No. 23-1347**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

FOOD MARKETPLACE, INC., et al.,

*Petitioners*,

*v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY, MICHAEL S. REGAN

*Respondents.*

---

On Petition for Review of Final Agency Action
of the United States Environmental Protection Agency

---

**PETITIONERS' REPLY BRIEF**

---

| | |
|---|---|
| Matthew W. Morrison | Elbert Lin |
| Sidney L. Fowler | Kevin S. Elliker |
| Shelby L. Dyl | David N. Goldman |
| PILLSBURY WINTHROP SHAW | HUNTON ANDREWS KURTH |
| PITTMAN LLP | LLP |
| 1200 Seventeenth Street, NW | Riverfront Plaza, East Tower |
| Washington, DC 20036 | 951 East Byrd Street |
| (202) 663-8036 | Richmond, VA 23219 |
| | (804) 788-8200 |

July 12, 2024

# **TABLE OF CONTENTS**

TABLE OF CONTENTS…………………………………………………………..i

TABLE OF AUTHORITIES ................................................................................. ii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS....................................v

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..............................1

ARGUMENT ........................................................................................................3

   I.   EPA misinterpreted the statutory term "availability."....................................3

     A.  The issue is preserved. ................................................................4

     B.  EPA provides no justification for its interpretation of "availability" contained in the Final Rule. ...............................................................5

   II.  EPA's conclusion that sufficient substitutes would be "available" by the compliance deadlines is arbitrary and capricious....................................7

     A.  Analyzing the Final Rule subsector-by-subsector demonstrates its invalidity......................................................................................7

     B.  Each challenged subsector has none or just a fraction of the available substitutes identified...............................................................10

   III.   Even if transcritical $CO_2$ is available, EPA failed to adequately consider the "overall economic costs and environmental impacts" of a nationwide transition to transcritical $CO_2$ in two equipment systems. ...................21

     A.  EPA failed to accurately assess the economic consequences of a nationwide transition to transcritical $CO_2$ systems for two equipment systems. ....................................................................................22

     B.  EPA ignored the significant environmental impacts of a nationwide transition to transcritical $CO_2$ for two equipment systems. .............................24

   IV.   EPA failed to adequately consider "the remaining phase-down period." .26

   V.  This Court should vacate the portions of the Final Rule setting the challenged compliance deadlines. .......................................................28

CONCLUSION ..................................................................................30

CERTIFICATE OF COMPLIANCE....................................................31

CERTIFICATE OF SERVICE .............................................................31

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
934 F.3d 649 (D.C. Cir. 2019)................................................................2

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
937 F.3d 559 (D.C. Cir. 2019) (per curiam)........................................5

*Am. Great Lakes Ports Ass'n v. Schultz*,
962 F.3d 510 (D.C. Cir. 2020)..............................................................28

*Appalachian Power Co. v. EPA*,
135 F.3d 791 (D.C. Cir. 1998) (per curiam)...........................1, 4, 5, 27

*Consolidated Edison Co. of N.Y. v. NLRB*,
305 U.S. 197 (1938)...............................................................................17

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)...................................................................................18

*In re Murray Energy Corp.*,
788 F.3d 330 (D.C. Cir. 2015)...............................................................17

*Int'l Ladies' Garment Workers' Union v. Donovan*,
722 F.2d 795 (D.C. Cir. 1983).........................................................2, 24

*Judulang v. Holder*,
565 U.S. 42 (2011)...................................................................................1

*Loper Bright Enters. v. Raimondo*,
No.22-451, 144 S.Ct. 2244 (2024) .......................................................6

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
70 F.4th 582 (D.C. Cir. 2023)...............................................................16

*MD/DC/DE Broads. Ass'n v. FCC*,
236 F.3d 13 (D.C. Cir.), *pet. for reh'g denied*, 253 F.3d 732 (D.C.
Cir. 2001) ..........................................................................................9, 29

*MD/DC/DE Broads. Ass'n v. FCC*,
    253 F.3d 732 (D.C. Cir. 2001) ................................................................9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................2, 22, 26

*Nat. Res. Def. Council v. EPA*,
    755 F.3d 1010 (D.C. Cir. 2014) ................................................................5

*Nat'l Lifeline Ass'n v. FCC*,
    921 F.3d 1102 (D.C. Cir. 2019) ................................................................2

*Ohio v. EPA*,
    No.23A349, 144 S.Ct. 2040 (2024) ................................................4, 9, 18, 24

*Organized Vill. of Kake v. USDA*,
    795 F.3d 956 (9th Cir. 2015) (en banc) ................................................14

*Portland Cement Ass'n v. Ruckelshaus*,
    486 F.2d 375 (D.C. Cir. 1973) ................................................................1, 2

*Ross v. Blake*,
    578 U.S. 632 (2016) ................................................................3, 7

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ................................................................9, 25

*Sorenson Commc'ns Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014) ................................................................1

*United States v. Ron Pair Enters., Inc.*,
    489 U.S. 235 (1989) ................................................................3

**Statutes**

American Innovation and Manufacturing Act of 2020,
    Pub. L. No. 116-260, Div. S, §103, 134 Stat. 2255 (codified at 42
    U.S.C. §7675) ................................................ 1, 3, 5, 6, 9, 12, 27, 29

Clean Air Act, 42 U.S.C. §§7401 *et seq.* ................................................4

42 U.S.C. §§

    7607(d)(6)(C) ................................................................18

7607(d)(7)(A) ..............................................................................9, 18, 25

7607(d)(7)(B) ..................................................................................4, 27

7607(k)(2)(A) ........................................................................................12

7675(i)(1) ..............................................................................................24

7675(i)(4) ................................................................................................1

7675(i)(4)(B) ..............................................................................3, 6, 9, 12

7675(i)(4)(C) ........................................................................................24

7675(i)(4)(D) ........................................................................................26

**Federal Register**

88 Fed. Reg. 8226 (Feb. 8, 2023) ..........................................................13

88 Fed. Reg. 73098 (Oct. 24, 2023)..... ..1, 2, 5, 6, 7, 8, 9, 10, 12, 14, 15, 16, 17, 18, 19, 20, 21, 22, 25, 26, 27, 28, 29

**Miscellaneous**

*American Heritage Dictionary* (5th ed. 2012)........................................25

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2020) ...................25

## <u>GLOSSARY OF ACRONYMS AND ABBREVIATIONS</u>

AIM            The American Innovation and Manufacturing Act

AFFI           American Frozen Food Institute

CAA            Clean Air Act

CFC            Chlorofluorocarbon

EPA            United States Environmental Protection Agency

FMI            Food Marketplace, Inc. (FMI, The Food Industry Association)

GWP            Global warming potential

HCFC           Hydrochlorofluorocarbon

HFC            Hydrofluorocarbon

HVAC           Heating, ventilation, and air conditioning

ODS            Ozone-Depleting Substances

NGA            National Grocers Association

## <u>INTRODUCTION AND SUMMARY OF THE ARGUMENT</u>

The AIM Act requires EPA to set compliance deadlines for transitioning away from HFCs by 2036 based on a variety of statutory factors. 42 U.S.C. §7675(i)(4). In doing so, EPA has an "unwavering" obligation to provide cogent explanations, *Judulang v. Holder*, 565 U.S. 42, 45 (2011), and to base its predictions about future conditions on reason and substantial evidence, not "'crystal ball' inquiry," *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 391 (D.C. Cir. 1973); *accord Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014). As Petitioners explained in their opening brief, the Agency fell short of this obligation by promulgating a Final Rule that misinterprets a key statutory provision and applies arbitrary and capricious reasoning to compress the 16-year horizon given by Congress and impose total compliance within the retail food industry by 2027.

EPA's response brief avoids many of Petitioners' arguments. The Agency contends that numerous arguments are forfeited because Petitioners did not "rehearse[]" their arguments "word for word" in comments. *Appalachian Power Co. v. EPA*, 135 F.3d 791, 817-18 (D.C. Cir. 1998) (per curiam). EPA never even defends its watered-down interpretation of the statutory term "availability." Moreover, the Agency repeatedly declines to acknowledge, much less refute, Petitioners' arguments on why EPA's judgments were internally contradictory or unreasoned.

1

Where it confronts Petitioners' arguments, EPA cloaks the Final Rule in deference. EPA emphasizes (Br. 29) it was engaging in an "inherently uncertain predictive exercise." But "predictive" judgments are not "'a talisman under which any agency decision is by definition unimpeachable.'" *Int'l Ladies' Garment Workers Union v. Donovan*, 722 F.2d 795, 821 (D.C. Cir. 1983) (*ILGWU*) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (*State Farm*)). EPA's predictions are, like all its judgments, "subject to the restraints of reasonableness," *Portland Cement*, 486 F.2d at 391, and require "substantial evidence," *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1113 (D.C. Cir. 2019). Furthermore, though courts may defer to factually supported "predictive judgments about areas that are within the agency's field of discretion and expertise," *ILGWU*, 722 F.2d at 821, EPA's relevant predictions in the Final Rule do not plausibly fall within that field.

EPA's response brief suggests an entitlement to limitless leeway, but this Court is "not a rubber stamp." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 663 (D.C. Cir. 2019). This Court should grant the petition for review and vacate the challenged deadlines in the Final Rule.

# ARGUMENT

## I. EPA misinterpreted the statutory term "availability."

The AIM Act directs EPA to consider, "to the extent practicable, … the availability of substitutes" when creating use restrictions. 42 U.S.C. §7675(i)(4)(B). An assessment of "availability," in turn, requires "taking into account" an extended list of subfactors, including "technological achievability, commercial demands, affordability for residential and small business consumers, safety, consumer costs, building codes, appliance efficiency standards, contractor training costs, and other relevant factors." *Id.*

The proper interpretation of the term "availability" is that a substitute must be "present or ready for immediate use," "accessible," or "obtainable." That follows from the ordinary definition of the term, as well as the Supreme Court's recognition that the term is a "limitation" with "real content." Pet'rs' Br. 24-26 (quoting *Ross v. Blake*, 578 U.S. 632 (2016)). And it is further confirmed by the statutory list of subfactors, which, taken as a whole, reflect that Congress did not mean to depart from the term's ordinary meaning. *Id.* at 24-25; *see United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (stating that in all but "rare cases," the "plain meaning of legislation should be conclusive" (citation omitted)).

3

In response, EPA does not contest this plain meaning, nor does it ever mention or defend its own interpretation of the term. Instead, the Agency wrongly claims this statutory argument was forfeited before resorting to non-responsive defenses.

## A. The issue is preserved.

EPA's contention (Br. 28) that Petitioners' argument was "forfeited" treats the Clean Air Act's exhaustion requirement as the sort of "hair-splitting" exercise this Court has rejected. *Appalachian Power*, 135 F.3d at 817; *see Ohio v. EPA*, No.23A349, 144 S.Ct. 2040 (2024) (slip op. 15) (quoting *Appalachian Power*'s description of the Act's exhaustion requirement). "[O]bjection[s] to a rule" must be "raised with reasonable specificity" before the Agency to trigger judicial review. 42 U.S.C. §7607(d)(7)(B). But "the word 'reasonable' cannot be read out of the statute." *Appalachian Power*, 135 F.3d at 817. The Clean Air Act merely requires that EPA "is given the first opportunity to bring its expertise to bear on the resolution of a challenge." *Id.* at 817-18.

EPA had that opportunity. Multiple commenters emphasized that "availability" must be considered practically and that a particular statutory subfactor could sometimes be dispositive. *See, e.g.*, JA383 (discussing "significant technological and safety challenges"); JA411 (discussing the need for updated building codes); JA388 (asking about "technic[ological] achievab[ility]"). There

was no obligation to "rehearse[] … word for word" the objection Petitioners now raise. *Appalachian Power*, 135 F.3d at 818.

In any event, "EPA retains a duty to examine key assumptions as part of its affirmative burden of promulgating a nonarbitrary, non-capricious rule," whether commenters challenge those assumptions or not. *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014). Whether "EPA had statutory authority" to take a particular action is such a "'key assumption' underlying EPA's action." *Id.*; *see also Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 589 (D.C. Cir. 2019) (per curiam) ("[T]he key assumption doctrine applies to aspects of a rule that are foundational to its existence, such as assumptions regarding the agency's statutory authority[.]"). Thus, even if no commenter raised the statutory meaning of "availability," EPA must ensure the Final Rule complied with the plain language of the AIM Act.

## B. EPA provides no justification for its interpretation of "availability" contained in the Final Rule.

In the Final Rule, EPA "consider[ed] a substitute to be available based on the expectation that, by the compliance date established in a restriction, *many* of the (i)(4)(B) subfactors *could feasibly be met*." Final Rule, JA034 (emphasis added). Absent from EPA's response brief is any mention, let alone defense, of that interpretation. *See* EPA Br. 26-32. Instead, the Agency now states (Br. 29) that

there is "no dispute between EPA and the Groups as to the plain meaning of 'availability' under the AIM Act."

But EPA's interpretation—that a substitute is "available" so long as "*many* of the (i)(4)(B) subfactors *could feasibly* be met," Final Rule, JA034 (emphasis added)—is not the same as "present or ready for immediate use." EPA's noncommittal definition does not require even moderate certainty that any given factor will be met by the compliance deadline. Rather, a *possibility* that *some* factors will be met is enough. Pet'rs' Br. 26. The Agency may conclude a substitute is "available" without any sound basis for believing that the substitute will be ready, at the time of compliance, for immediate use. EPA's position is inconsistent with both the plain meaning of the word "available" and the explicit and extensive list of statutory subfactors. *Cf. Loper Bright Enters. v. Raimondo*, No.22-451, 144 S.Ct. 2244 (2024) (slip op. 23).

Rather than defend (or even mention) this interpretation, EPA uses its brief to dress down strawmen—namely, that availability means "*presently* available" and that a substitute is not available unless every single subfactor in Subsection (i)(4)(B), no matter how inapplicable, is satisfied. *See, e.g.*, Br. 27-28. Petitioners do not contest that availability is measured at the time of compliance. And Petitioners do not demand satisfaction of every subfactor. Rather, Petitioners argued that "[t]aken as a whole, the wide-ranging and long list of factors reflects a clear interest by

6

Congress in whether 'the facts on the ground,' indicate that a substitute is 'present or ready for immediate use.'" Pet'rs' Br. 24-25 (citations omitted).  Petitioners have not suggested all subfactors must be met, but rather that the list of subfactors supports adhering to the ordinary meaning of the term "available."  In practice, a substitute's failure to meet one subfactor may render it "a simple dead end," *Ross*, 578 U.S. at 643, and therefore unavailable within the plain meaning of the term.  But that does not mean all subfactors or any particular subfactor must always be met.

At bottom, the Final Rule's definition is so equivocal that it not only conflicts with the plain meaning of "available," but effectively nullifies the "availability" requirement.  Realizing that, EPA does everything it can to avoid defending it.  But this Court can and should evaluate that interpretation, and because it is inconsistent with the plain meaning, grant the petition on those grounds alone.

## II. EPA's conclusion that sufficient substitutes would be "available" by the compliance deadlines is arbitrary and capricious.

### A. Analyzing the Final Rule subsector-by-subsector demonstrates its invalidity.

Before defending its assessment of "available" substitutes, EPA swipes at Petitioners' "framing of the case."  EPA Br. 32.  In their opening brief, Petitioners discussed each group of substitutes, noting when appropriate if the analysis differed for particular subsectors.  *See* Pet'rs' Br. 26-51.  The organization was not a "one-size-fits-all analysis," *see* EPA Br. 34, as Petitioners specified how each subsector

was affected, *see* Pet'rs' Br. 28 (breaking down substitutes subsector-by-subsector). The approach simply reflected the best way to discuss problems for proposed substitutes without unnecessary repetition. As demonstrated below, grouping the analysis by subsector (as EPA prefers) confirms that EPA's decision was arbitrary and capricious.

On the merits, the Agency does not dispute in many cases that there are gaps between what the Final Rule envisions and the reality on the ground. EPA thinks that those gaps can be filled within the abbreviated timeline of the Final Rule, but it can point only to its own speculative predictions that industry and lawmakers will quickly fall in line. Whatever cannot be solved by the Agency's speculation, it glosses over by ignoring Petitioners' arguments and, in some cases, its own contradictory record.

Once the unavailable substitutes are removed from each subsector, *see* pp.10-21, *infra*, the deadlines cannot stand. EPA does not, and cannot, deny that the deadline for each subsector was premised on the Agency's expectation that there would be a number of available substitutes in that subsector. *See* JA846 (technical support document explaining that EPA "accounted for" situations in which a substitute would not be available "by establishing a GWP limit that allows for the use of a range of substitutes"). Because a substantial number of those options are, in fact, not available, the Final Rule can only stand as applied to the challenged

subsectors if: (a) EPA announced an intention that the given deadline should survive even with the emaciated list of substitutes, and (b) the deadline "could function sensibly" without those substitutes. *MD/DC/DE Broad. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir.) (*MD/DC/DE I*), *pet. for reh'g denied*, 253 F.3d 732 (D.C. Cir. 2001) (*MD/DC/DE II*); Pet'rs' Br. 51; *see Ohio* (slip op. 12-14) (holding that EPA failed to explain why a plan premised on inclusion of 23 states would function with only a fraction of those states).

Neither condition is met here. EPA "did not consider" a Final Rule in which a fraction of the listed substitutes are available, let alone state that it would have approved such a rule. *MD/DC/DE II*, 253 F.3d at 736. EPA now claims that it "accommodated the uncertainty" by giving "each subsector … enough time for industry to innovate additional substitutes." Br. 34-35 (distinguishing *MD/DC/DE*). But that is not a reason provided in the Final Rule, and thus cannot be considered now as a basis for upholding it. 42 U.S.C. §7607(d)(7)(A); *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). In any event, the argument proves too much. If it were sufficient simply to give industry "enough time … to innovate," then the Agency could promulgate a rule even if *no* known substitutes will be available by the deadline. Yet the AIM Act expressly requires EPA to consider the "availability" of alternative substitutes. §7675(i)(4)(B). Indeed, EPA's reliance on yet-to-be

developed substitutes only reinforces the capaciousness of its definition of "availability." *See* pp.5-7, *supra*.

### B. Each challenged subsector has none or just a fraction of the available substitutes identified.

### 1. Supermarket Systems

Supermarkets that carry frozen food, fresh vegetables, milk, eggs, and numerous other food products requiring refrigeration rely on a large-scale system that will reliably sustain various temperatures in customer-accessible units. For this critical subsector, the Final Rule identified eleven substitute refrigerants—ammonia, seven A2Ls, and three A1s (including $CO_2$). EPA Br. 50. That sounds like a lot, but it is a mirage. A2Ls are unavailable because of building- and fire-code restrictions put in place to protect the public (putting supermarkets to the choice of noncompliance with EPA or local authorities). $CO_2$'s inefficiency makes it neither affordable nor technologically achievable. And both ammonia and A2Ls present significant safety concerns that the Agency has not properly addressed.

The flaws in EPA's "predictive" analysis are most evident in its response to safety-driven building codes, which Petitioners identified as a significant impediment to the availability of A2Ls. Pet'rs' Br. 29-31. Though the Agency points (Br. 53) to model building codes and state legislation that preempts local municipal codes, it ultimately does not dispute that there is a bloc of jurisdictions where those substitutes are not permitted by building codes. EPA's math is not

10

exactly clear or well-supported.  At one point, it asserts (Br. 53) that "nearly 30 states" have preempted local building codes (which is necessary to get around the additional hurdle of home-rule, *see* Pet'rs' Br. 31).  But the document it cites simply says that some "[s]tate legislatures" (no quantity given) "have … passed legislation that allows for SNAP-approved alternatives to be installed irrespective of current state or local building codes."  JA849.  In the end, EPA appears to concede that building codes pose an obstacle to availability in at least ten states.

The problem is that EPA provides no reasonable basis for concluding that, by the 2027 compliance deadline, the building-code issue in those ten (or more) states will be resolved.  In fact, EPA does not talk about those jurisdictions at all.  It offers no prediction *whatsoever* for how specifically those remaining (unidentified) jurisdictions will come into line in the next three years.  The Agency doesn't suggest that those states will adopt the most recent model building codes or that they will preempt local building codes.  And even if EPA had suggested as much, it would not receive any deference given that it has no special expertise in that area.

EPA's only response (Br. 54) appears to be its view that it should not have to wait for "unanimity in every municipal building code" before finding a substitute available.  But Petitioners are not saying that it must.  The statutory requirement of "availability" requires the Agency to have a reasonable basis for predicting that building codes will not still be an obstacle in certain jurisdictions on the compliance

11

date.  EPA itself acknowledged in the Final Rule "that, in some cases, jurisdictions need to update their building codes for some substitutes to be available for certain uses."  Final Rule, JA039. Yet it has offered no explanation to show that such updates will occur.

EPA cannot simply sit back and *assume* that the remaining states and localities will fall into place.  The AIM Act is, as EPA touts (Br. 8, 30, 62), a technology-driving statute, but it is not a *law*-driving statute.  Had Congress intended to force state and local laws to line up, it could have preempted them.  *Cf.* 42 U.S.C. §7675(k)(2)(A) (preempting state law as related to a different subsection).  Instead, Congress instructed EPA to consider "availability" in light of—not *despite*—building codes.  §7675(i)(4)(B).

EPA's defense of the availability of transcritical $CO_2$ presents a different arbitrary-and-capricious problem—ignoring relevant evidence.  EPA brushes off (Br. 52) Petitioners' concerns of increased energy and water consumption from use of transcritical $CO_2$ systems in warmer climates as lacking "actual evidence."  But Petitioners provided such evidence in a comment discussed elsewhere in EPA's brief.  *See* note 5, *infra*.  A graph of energy consumption of various $CO_2$ systems in different climates showed that, for Houston (the warmest climate in the study), only

$CO_2$ systems involving "adiabatic" cooling[1] expended close to or less energy than the reference case, which used a higher-GWP refrigerant.  JA445.  EPA then retreats to saying that these concerns merely "indicate" that $CO_2$ systems are not a "preferred substitute for all new supermarkets," Br. 52, but that is just another way of ignoring the evidence.  $CO_2$ systems are not simply *disliked*; they are unreliable, less efficient, and require specialized training.

Finally, the Agency also fails to salvage ammonia or rebut the PFAS concerns about A2Ls.  EPA does not even attempt to defend its selection of ammonia, which is not available given the safety considerations for the use of this toxic and flammable substance in the retail supermarket space.  *See* Pet'rs' Br. 44-46.  And the Agency downplays (Br. 54) the PFAS risk from TFA, a byproduct of various A2Ls by denying that the *A2Ls* had been categorized as PFAS (which Petitioners have not argued) and nitpicking that TFA has not been so listed by EPA.  Yet just last year, EPA stated that TFA is a "member[] of the broad class of compounds known as [PFAS], even though [it is] not listed or targeted for specific Agency action."  88 Fed. Reg. 8226, 8230 (Feb. 8, 2023); *see also id.* (noting that "[t]he Environmental Effects Assessment Panel for the Montreal Protocol … has considered the production of TFA as a persistent breakdown product of … HFOs").

---

[1] "Adiabatic gas coolers use water to assist with heat rejection and reduce energy consumption[.]"  JA436.

The unexplained inconsistency between this earlier statement, EPA's recent prioritization of combatting PFAS exposure, *see* Pet'rs' Br. 33, and the Final Rule is arbitrary and capricious. *Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc).

The foregoing issues leave EPA's superficially broad list of supermarket systems substitutes unworkable. All that remains is an A1 called R-515B, which is limited to smaller supermarket systems. *See* EPA Br. 50; JA862.[2] The Court cannot uphold the Final Rule based on the one substitute that remains. *See* pp.8-9, *supra*.

| Subsector | Equipment | Proposed Substitutes | Substitutes Available |
|---|---|---|---|
| Supermarket Systems | With ≥ 200lbs refrigerant charge capacity, excluding high temperature side of cascade system | 6 A2Ls 2 A1s Ammonia | **0/9** |
| | With < 200lbs refrigerant charge capacity; or High temperature side of cascade system | 7 A2Ls 3 A1s Ammonia | **1/11** |

**2. HVAC**

In the retail food setting, it is critical to control the air temperature for both the comfort of customers and the preservation of product. Yet there are zero viable substitutes for the residential and light commercial air conditioning and heat pump

---

[2] The other proposed A1 is R-471A, which EPA failed to justify against comments about anticipated commercial unavailability. *See* Pet'rs' Br. 46-47.

systems ("HVAC") subsector when one sets aside EPA's arbitrary and capricious reasoning. The lack of available options in this sector is even more problematic because EPA imposed a compliance deadline of 2025 for HVAC systems supermarkets routinely use—less than one year from now and two years earlier than the deadline for supermarket systems.

| Subsector | Equipment | Proposed Substitutes | Substitutes Available |
|---|---|---|---|
| Stationary Air Conditioning and Heat Pumps | Residential and light commercial air conditioning and heat pump systems | 2 A3s 4 A2Ls | **0/6** |

The Final Rule listed four A2Ls, but they are categorically unavailable for several reasons, including those discussed above. Building codes prohibit A2Ls because they are flammable, which presents significant safety concerns in the retail environment. EPA once again concedes (Br. 43) that at least ten states remain an obstacle on that front and yet provides no explanation for how those states will come into line by 2025. Supermarkets will not flout those laws, nor should they be expected to do so without real data from functioning, available systems that use A2Ls in a retail space. And finally, EPA still does not acknowledge the risks posed by A2Ls degrading into PFAS, particularly for handling and disposal of refrigerants. Pet'rs' Br. 29-42; pp.10-14, *supra*.

As for the two listed A3s, they are unavailable due to their higher flammability. Pet'rs' Br. 42-44. To be sure, the two listed A3s "have been SNAP-

listed for *some* equipment in this subsector," like "portable and window unit air conditioners." EPA Br. 42-43 (emphasis added). But the Agency cannot reasonably contend that that equipment is appropriate for large supermarkets. The Agency never addresses Petitioners' arguments why A3s cannot feasibly be used in a retail food setting—namely that they require specialized training and knowledge and are subject to significant charge-capacity reductions. *See* Pet'rs' Br. 42-44.

*Amicus* Natural Resources Defense Council ("NRDC") is incorrect that Petitioners lack standing to challenge the restrictions in the HVAC subsector. *See* Br. of NRDC as *Amicus Curiae* 23-24. Petitioners' members include grocery stores, Pet'rs' Br. 21, which often spend between $700,000 and $1.5 million in installing HVAC for new locations and 1.25-2.5% of their operating budgets on HVAC equipment, Anderson Decl. ¶5. Because members will be forced to bear increased compliance costs in installing and operating HVAC equipment in their stores as a result of the Final Rule's HVAC deadlines, they are suffering an injury in fact that is traceable to EPA and reparable by an order of this Court. *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592 (D.C. Cir. 2023); Pet'rs' Br. 23.

### 3. Remote Condensing Units

Remote condensing units, such as dairy and deli displays, are particularly prominent in smaller supermarkets. As with supermarket systems, EPA identified a

16

series of A1s (again including R-471A and $CO_2$), A2Ls, and ammonia as substitutes. Its conclusions that these would be "available" are wrong because they rely on conclusory assertions of fact and agency actions that post-date the Final Rule.

EPA's defense (Br. 47-48) of $CO_2$ and ammonia for remote condensing units relies on the premise that those substitutes are "already commercially used in global markets." To support that "global" use, however, the Agency relies on a single conclusory statement regarding R-744 (so just $CO_2$, *not* ammonia), *see* Final Rule, JA060, and a technical support document that points back to a *single* manufacturer's website for a $CO_2$ system, *see* JA885. Proof that one manufacturer has one $CO_2$ system is not "substantial evidence" for the assertion that the substitute is "already commercially used in global markets," EPA Br. 47-48. *See Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938) (requiring "more than a mere scintilla").

EPA further defends (Br. 48) its list of substitutes by contending that it had approved two substitutes under SNAP and proposed approving seven more. But the seven *proposed* SNAP approvals cannot support the Final Rule. Pet'rs' Br. 37. A "'proposed rule is just' that—'a proposal.'" *Id.* (quoting *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) (Kavanaugh, J.)). In its response brief, EPA tries to bolster the relevance of the SNAP proposals by flagging multiple times (Br. 39 n.2, 46 n.4, 48 & n.6) that some substitutes were ultimately SNAP-approved *after* the Final Rule was issued. Yet this Court cannot "consult[] explanations and

17

information offered after the rule's promulgation." *Ohio* (slip op. 14 n.11) (citing 42 U.S.C. §7607(d)(6)(C), (7)(A)).  Only "the agency's reasoning *at the time of the agency action*" matters.  *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22-23 (2020) (citation omitted).  These ex-post SNAP approvals cannot retroactively support a Final Rule that was inadequately reasoned when EPA issued it.  *Id.*[3]

That again leaves just R-515B, which is limited to smaller remote condensing units.  *See also* note 2, *supra* (noting EPA's failure to address R-471A).  And that one substitute cannot support a deadline premised on the availability of eleven.  *See* pp.8-9, *supra*.

| Subsector | Equipment | Proposed Substitutes | Substitutes Available |
|---|---|---|---|
| Remote Condensing Units | With ≥ 200lbs refrigerant charge capacity, excluding high temperature side of cascade system | 6 A2Ls 2 A1s Ammonia | **0/9** |
|  | With < 200lbs refrigerant charge capacity; or High temperature side of cascade system | 7 A2Ls 3 A1s Ammonia | **1/11** |

---

[3] Indeed, EPA elsewhere is careful to note whether or not evidence existed as of the "signature date of the final rule."  Br. 53; *see also* Br. 48 n.5 (criticizing Petitioners' inclusion of a declaration confirming commenters' warnings that R-471A would not be commercially available).

### 4. Cold Storage Warehouses

Cold storage warehouses are critical for long-term storage and preservation of perishable goods at large volumes.  The focus of EPA's argument for this subsector is that one substitute (ammonia) is already in use.  Br. 45.  But even EPA recognized that ammonia, which is toxic, may not be appropriate in certain settings, and therefore other substitutes were needed.  *See* RTC, JA759.  Out of those other eleven substitutes, only two are actually available.

Beyond ammonia, the Final Rule listed four A1s and seven A2Ls for this subsector.  EPA Br. 45.  The A2Ls are unavailable for the reasons already explained: building-code prohibitions, safety concerns from flammability and PFAS exposure, and the lack of technological achievability in the retail food setting.  Pet'rs' Br. 29-42; pp.10-14, *supra*.  EPA says those A2Ls are now SNAP-approved, but that doesn't resolve any of these issues.  For one thing, as noted earlier, even under EPA's theory, SNAP approval addresses building codes in "nearly 30 states" but does not affect more than 20 states for which EPA has no answer.  And in any event, ex-post SNAP approvals cannot supply a reasoned basis for an earlier Final Rule.  *See* pp.17-18, *supra*.

As for the four A1s, two are not available: R-471A and $CO_2$, which have been addressed above.  So besides ammonia, the only available substitutes are two A1s, with one limited to smaller cold storage warehouse systems.  *See* EPA Br. 45;

19

JA862-JA863.   Such a small fraction in no way resembles the list of twelve

substitutes that EPA considered in promulgating the Final Rule.  *See* pp.8-9, *supra*.

| Subsector | Equipment | Proposed Substitutes | Substitutes Available |
|---|---|---|---|
| Cold Storage Warehouses | With ≥ 200lbs refrigerant charge capacity | 6 A2Ls 3 A1s Ammonia | **2/10** |
| | With < 200lbs refrigerant charge capacity; or High temperature side of cascade system | 7 A2Ls 4 A1s Ammonia | **3/12** |

### 5.  Stand-Alone Units

Food retailers rely on stand-alone units to provide compact cooling for a small

quantity of goods, as with beverage coolers and ice cream freezers.  EPA focuses

mostly on one category of substitutes—A3s—which Petitioners have acknowledged

are available for stand-alone units.  But as discussed above (pp.8-9), that is not a

sufficient basis for upholding an agency action predicated on the availability of

*eleven* substitutes.

As to the eight other substitutes, six are A2Ls and two are A1s.  The A2Ls

face the same building-code problems already discussed.  EPA observes (Br. 39) that

"some of the highly efficient A2L refrigerants … were already incorporated into

safety standard updates and model building code updates, and were being actively

evaluated under SNAP."  But EPA itself concedes that model codes do not solve the

building-code obstacles in every jurisdiction, and the Agency offers no explanation

for how or when the other jurisdictions will come around.  And SNAP approvals, as discussed, are similarly limited in their ability to change building codes, *even assuming* ex-post SNAP approvals can support the Final Rule.  The two A1s are R-471A and $CO_2$, which are unavailable for reasons by now familiar.  Indeed, EPA does not even attempt to defend $CO_2$ for use in stand-alone units.  A meager three substitutes are not enough to prop up a deadline premised on eleven substitutes.  *See* pp.8-9, *supra*.

| Subsector | Equipment | Proposed Substitutes | Substitutes Available |
|---|---|---|---|
| Stand-alone Units | | 3 A3s<br>6 A2Ls<br>2 A1s | **3/11** |

### III.  Even if transcritical CO2 is available, EPA failed to adequately consider the "overall economic costs and environmental impacts" of a nationwide transition to transcritical CO2 in two equipment systems.

Assuming for the sake of argument that transcritical $CO_2$ is available—which Petitioners have acknowledged is a closer call than the other unavailable substitutes—then two equipment systems[4] have only transcritical $CO_2$ as an available substitute and would be transitioning nationwide to that substitute.  Pet'rs' Br. 52.  EPA says it "factor[ed] in" the costs of such a nationwide transition to transcritical $CO_2$, *see* EPA Br. 57, but the Agency did so in a manner that overlooked

---

[4] Remote condensing units—200 pounds or more (2026); Supermarket systems—200 pounds or more (2027).  JA861-JA862.

"important aspect[s]" of the transition, *State Farm*, 463 U.S. at 43. In particular, EPA did not account for the decreased efficiency of transcritical $CO_2$ in warmer climates and incorrectly dismisses such concerns as too local or not grounded in evidence.

### A. EPA failed to accurately assess the economic consequences of a nationwide transition to transcritical CO2 systems for two equipment systems.

A variety of commenters agreed that transcritical $CO_2$ systems have higher service costs than existing refrigeration systems due to such factors as increased complexity, additional advanced technician training, specialized replacement parts and service equipment, and additional safety precautions. Pet'rs' Br. 54-55 (citing comments). Those costs will also increase because of supply-chain issues, energy inefficiencies, and high leak rates of transcritical $CO_2$ systems, particularly in warmer climates, which lead to increased system downtime. *Id.*; *see* Pet'rs' Br. 48-50. Petitioners have explained (Br. 55-56) why EPA's assurances in the Final Rule that transitioning to transcritical $CO_2$ systems would yield tens of millions of dollars in savings do not withstand scrutiny.

EPA does no better in its response brief. The Agency first ignores the distinction between warmer and cooler climates. It points (Br. 58) to "the experience of grocery stores across the country and in Europe that have switched to carbon dioxide with handsome savings," citing two data points showing average savings by

22

participants in EPA's GreenChill Partnership. The cited website, however, provides no breakdown as to *which* locations are seeing these savings. As Petitioners have repeatedly emphasized, the Agency must consider the disproportionate costs that will befall stores in warmer climates due to transcritical $CO_2$'s systemic inefficiency in those regions. Pet'rs' Br. 48-50, 53-54. EPA has provided no information on how many of these GreenChill stores are even in these warmer regions. Pet'rs' Br. 49-50.

The Agency further predicts (Br. 58-59) that costs for retaining higher-GWP equipment will "continue to rise" in part because of the "high refrigerant leak rate typically experienced by retail food stores using the older technology." But EPA provides no point of comparison to suggest that this leak rate is higher than that associated with transcritical $CO_2$ systems. In contrast, commenters were explicit that overreliance on transcritical $CO_2$ systems in "commercial refrigeration" would yield "[h]igher leak rates due to higher operational pressures, meaning increased direct system emissions." JA417.

EPA also dismisses (Br. 59) concerns about the costs to food deserts by contending that commenters did not "assert[] that EPA's overall-economic-costs arguments model was flawed for failing to incorporate these concerns," despite conceding that "certain commenters did point to food waste and food deserts as potential concerns." Commenters had no obligation to parse their words so finely.

*Ohio* (slip op. 16 n.12).  The Agency, by contrast, had a duty to consider this issue once commenters put EPA on notice of it.  *Id.*

### B. EPA ignored the significant environmental impacts of a nationwide transition to transcritical CO2 for two equipment systems.

On the environmental front, the inefficiency of transcritical $CO_2$ systems will lead to increased energy consumption, particularly in warmer climates where this substitute requires "complex proprietary controls and water-cooling enhancements" just to reach "parity" with traditional refrigerants.  JA445; Pet'rs' Br. 53-54.  Those water-cooling enhancements mean increased water usage and risk of local water contamination.  JA668; JA444-JA446; JA436.  And the high failure and shutdown rates of transcritical $CO_2$ systems will cause increased food loss and food waste, which in turn "generate[] methane, an even more potent greenhouse gas."  JA423.

EPA minimizes these "environmental impacts" by treating them as geographically isolated and insisting that it must look at "'overall … environmental impacts,'" meaning (in EPA's view) nationwide environmental impacts.  Br. 59-60 (quoting 42 U.S.C. §7675(i)(4)(C)).  The Agency does not explain why "overall environmental impacts" exclude focused attention to the environmental impacts in a given region, especially given EPA's discretion to tailor its action based on regional differences.  *See* §7675(i)(1) (EPA "may by rule restrict, fully, partially, or on a graduated schedule"); *see also ILGWU*, 722 F.2d at 815-16 (finding arbitrary and capricious the failure to consider "accommodat[ing] … differences" in local

24

conditions). Nor is there merit to EPA's contention that the word "overall" is a geographic reference requiring an exclusively nationwide focus. The Agency did not say so in the Final Rule, and thus is barred from making that argument now. *See* Final Rule, JA041-JA042 (explaining how EPA interpreted this statutory factor); §7607(d)(7)(A); *Chenery*, 318 U.S. at 94. That is also not the best reading of the word "overall." A better ordinary reading of "overall environmental impacts" is all types of environmental impacts must be considered and weighed. *See Merriam-Webster's Collegiate Dictionary* 883 (11th ed. 2020); *American Heritage Dictionary* 597 (5th ed. 2012); Final Rule, JA041 (interpreting "overall" to allow consideration of environmental "impacts that may be difficult to quantify").

The Agency then ignores pertinent data to paint a misleading picture of the efficiency of $CO_2$ systems. The Agency discusses (Br. 60) a graph supplied in Petitioners' comments that reports "20 [$CO_2$] deployments across five cities" using four varieties of $CO_2$ systems.[5] EPA touts (Br. 60) that of the 20 deployments, "in 14 instances energy consumption of the [$CO_2$] systems was *lower* than the energy consumption of the reference case," which used a higher-GWP refrigerant. But that description obscures that only two of the five cities (Houston and Los Angeles) are

---

[5] EPA does not cite to the record, *see* Br. 60, but Petitioners deduce from EPA's description that this is a reference to the graph at JA445 (cited at Pet'rs' Br. 55).

in the "warmer climates" that are relevant to Petitioners' argument.[6]  Indeed, the graph highlights the drop-off in $CO_2$ efficiency in warmer climates.  Of the graph's eight total deployments across these two cities, five involved higher energy consumption than the reference case and all eight involved higher energy consumption than the similar deployments in cities further North.  JA445.  EPA thus dodges, rather than addresses, the import of the data.

More telling is that EPA never grapples with the problem of increased water consumption or the environmental impact of food loss and waste.  *See* Pet'rs' Br. 53-54.  So too in the Final Rule.  EPA deflected comments about water contamination and consumption.  *See* RTC, JA809-JA810 (referring a concern on this topic to Section VI.F.1.c of the preamble); Final Rule, JA052-JA064 (Section VI.F.1.c not mentioning water).  And EPA dismissed the "environmental impacts of food waste" as "beyond the scope of [the Agency's] analysis."  RTC, JA794.  EPA's failure to "consider [these] important aspect[s] of the problem" is arbitrary and capricious.  *State Farm*, 463 U.S. at 43.

## IV.    EPA failed to adequately consider "the remaining phase-down period."

The AIM Act requires EPA to factor in "the remaining phase-down period for regulated substances under [EPA's Framework Rule]."  42 U.S.C. §7675(i)(4)(D).

---

[6] The remaining cities are New York City, Washington, D.C., and Montreal.

Yet the Final Rule will effectively phase out the use of HFCs in new and remodeled supermarkets no later than *nine years* before the Framework Rule requires an 85% reduction in HFC usage.  Pet'rs' Br. 58-59.  To the extent there is any doubt EPA needed to explain its predictions in the Final Rule, this statutory factor reaffirms that obligation.  *Id.*

EPA claims this issue, too, was not raised with "reasonable specificity." §7607(d)(7)(B).  But the discrepancy between the remaining phase-down period and the Final Rule was conspicuous and brought to EPA's attention.  *See* JA493 (requesting a compliance-date extension tied to the number of years remaining before "the 85% reduction goal in HFC use in the AIM Act"); JA469 (explaining that companies were preparing "as quickly as they are able" in order to fall in line with "the AIM Act phase-down schedule"); JA426 (arguing the phase-down period "already provide[s] the regulatory certainty necessary to result in a dramatic [HFC] reduction" and "EPA need not impose additional use restrictions to accelerate the process").  EPA had the opportunity to explain why such a discrepancy was appropriate. *Appalachian Power*, 135 F.3d at 818.

Furthermore, the Agency misses the point of Petitioners' argument. Petitioners argued that this statutory requirement confirms that Congress expected EPA to heed the remaining phase-down period when evaluating the availability of substitutes.  *Cf.* Final Rule, JA032 (concluding that the "best available evidence"

27

factor is "an instruction with respect to the other factors"). In other words, this factor reinforces that in assessing the availability of substitutes, EPA was required to explain why that assessment supported the deadlines it chose. It has not done so.

The Agency defends the gap between the phase-down schedule and the Final Rule by pointing to the earlier ODS phaseout, "where most products were restricted well in advance of ultimate phaseout deadlines." Br. 63; *see* Final Rule, JA043. Petitioners explained multiple times in their opening brief (at 42, 55-56) why "it was arbitrary for EPA to presume that the transition under the Final Rule would parallel the ODS transition in all respects[.]" *See also* Final Rule, JA042 (acknowledging the "unique regulatory features and technological transitions at play" in the ODS phaseout). The Agency never acknowledges, much less refutes, any of these arguments.

## V. This Court should vacate the portions of the Final Rule setting the challenged compliance deadlines.

EPA does not respond to Petitioners' argument that "the normal remedy" of vacatur is appropriate if Petitioners' merits arguments are successful. *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020) (citation omitted); *see* Pet'rs' Br. 59-60. The Agency merely insists (Br. 35) that this Court "should not remand or vacate *all* challenged compliance deadlines merely because of issues with one or more identified substitutes." This argument conflates two issues.

The first is whether problems "with one or more identified substitutes" render a corresponding deadline invalid. This two-step analysis asks whether EPA intended a given restriction in the Final Rule to stand despite a lack of the anticipated available substitutes and whether such a restriction "could function sensibly" without those substitutes. *MD/DC/DE I*, 236 F.3d at 22. For the reasons given (pp.8-9), EPA cannot satisfy either step of this analysis.

The second issue is whether a decision from this Court that one restriction in the Final Rule is invalid necessarily requires invalidating all other restrictions. The parties agree that this Court need only vacate those deadlines created in violation of the AIM Act. In theory, then, it is possible to vacate some, but less than all, challenged deadlines. But for the reasons explained, all the challenged compliance deadlines were promulgated in violation of the AIM Act and must be vacated.

## CONCLUSION

This Court should grant the petition for review and vacate the Final Rule's challenged compliance deadlines.

Dated: July 12, 2024                    Respectfully submitted,

                                        /s/ Elbert Lin

Matthew W. Morrison                     Elbert Lin
Sidney L. Fowler                        Kevin S. Elliker
Shelby L. Dyl                           David N. Goldman
PILLSBURY WINTHROP SHAW                 HUNTON ANDREWS KURTH
PITTMAN LLP                             LLP
1200 Seventeenth Street, NW             Riverfront Plaza, East Tower
Washington, DC 20036                    951 East Byrd Street
(202) 663-8036                          Richmond, VA 23219
                                        (804) 788-8200

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,485 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Times New Roman font, using Microsoft Word.

Dated: July 12, 2024                    /s/ Elbert Lin
                                        Elbert Lin
                                        HUNTON ANDREWS KURTH LLP
                                        Riverfront Plaza, East Tower
                                        951 East Byrd Street
                                        Richmond, VA 23219
                                        (804) 788-8200

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of July, 2024, a true copy of Petitioner's Reply Brief (page proof) was served on opposing counsel via electronic filing using the appellate CM/ECF system.

                                        /s/ Elbert Lin
                                        Elbert Lin
                                        HUNTON ANDREWS KURTH LLP
                                        Riverfront Plaza, East Tower
                                        951 East Byrd Street
                                        Richmond, VA 23219
                                        (804) 788-8200